RECEIVED
SDNY PRO SE OFFICE
2023 JUL 21 PM 4:55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

Yusuf A. Harris,
Ishmael C. Harris,
Gregory S. Harris,
Oral R. Sinclair,

Plaintiffs,

23 CV 6344

COMPLAINT
JURY TRIAL
DEMANDED.

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT,
ADREW DIETZ, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
VINCENT PRICE, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
EUGENE GOTTWIN, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
CHRISTINE FORTUNE, NEW YORK CITY POLICE DEPARTMENT DECTECTIVE,
JOSEPH NEENAN, NEW YORK POLICE DETECTIVE,
BRONX COUNTY DISTRICT ATTORNEY, DARCEL CLARK, BRONX COUNTY
ASSISTANT DISTRICT ATTORNEY, FELICITY LUNG,
BRONX COUNTY ASSISTANT DISTRICT ATTORNEY, ALLEN KAREN,

Defendants.

---------------------------------------------------------------------X

Yusuf A. Harris, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

Gregory S. Harris, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

Ishmael C. Harris, pro-se
465 East 188th Street
Box 987

Oral R. Sinclair, pro-se
465 East 188th Street
Box 987

TABLE OF CONTENTS

INTRODUCTION....1

NATURE OF ACTION....9

JURISDICTION & VENUE....11

JURY DEMAND....12

PARTIES....12

FACTS....1

DAMAGES....2

ESTABLISHED LIABILITY OF DEFENDANTS....29

CAUSE OF ACTION....31

FIRST CAUSE OF ACTION
42 U.S.C. § 1983: DENIAL OF DOUBLE HOMICIDE VICTIMS' DUE PROCESS & EQUAL PROTECTION RIGHTS IN VIOLATION OF THE 5TH & 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION....31

SECOND CAUSE OF ACTION
42 U.S.C. § 1983: DENIAL OF VICTIM'S CONSTITUTIONAL DUE PROCESS & EQUAL PROTECTION RIGHTS. MONELL UNCONSTITUTIONAL POLICY, CUSTOM, OR PATTERN AND PRACTICE OF PROMOTING, FACILITATING, OR CONDONING IMPROPER, ILLEGAL AND UNCONSTITUTIONAL INVESTIGATVE TECHNIQUES AND FALURE TO SUPERVISE, DISCIPLINE AND TRAIN....33

THIRD CAUSE OF ACTION
42 U.S.C. § 1983: THE ACTS & OMISSIONS OF THE BCDAO IN THE PEOPLE V. BUARI, DEPRIVED THE VICTIMS IN THAT MATTER THEIR COLLECTIVE AND RESPECTIVE CONSTITUTIONAL RIGHTS UNDER THE 5TH & 14TH AMENDMENTS; AND IS ATTRIBUTABLE TO THE CITY OF NEW YORK AS A MONELL CLAIM....39

FOURTH CAUSE OF ACTION
42 U.S.C. § 1983: MONELL V. DEPARTMENT OF SOCIAL SERVICE, 436 US 658 (1978) AGAINST DEFENDANT THE CITY OF NEW YORK....47

FIFTH CAUSE OF ACTION
NEW YORK STATE CONSTITUTION: DENIAL OF DUE PROCESS RIGHT TO A FAIR TRIAL,

FABRICATION OF EVIDENCE, SUPPRESSION OF INCULPATORY EVIDENCE, AND FAILURE TO PROSECUTE (NEW YORK STATE CONSTITUTION, ARTICLE I §§ 1,11)....................50

SIXTH CAUSE OF ACTION
NEGLIGENCE: NEW YORK STATE LAW. AGAINST DEFENDANT THE CITY OF NEW YORK....................51

REQUEST FOR RELIEF....................53

EXHIBITS....................54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

X

Yusuf A. Harris,
Ishmael C. Harris,
Gregory S. Harris,
Oral R. Sinclair,

Plaintiffs,

COMPLAINT
JURY TRIAL
DEMANDED.

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT,
ADREW DIETZ, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
VINCENT PRICE, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
EUGENE GOTTWIN, NEW YORK CITY POLICE DEPARTMENT DETECTIVE,
CHRISTINE FORTUNE, NEW YORK CITY POLICE DEPARTMENT DECTECTIVE,
JOSEPH NEENAN, NEW YORK POLICE DETECTIVE,
BRONX COUNTY DISTRICT ATTORNEY, DARCEL CLARK, BRONX COUNTY
ASSISTANT DISTRICT ATTORNEY, FELICITY LUNG,
BRONX COUNTY ASSISTANT DISTRICT ATTORNEY, ALLEN KAREN,

Defendants.

X

Plaintiffs, hereby file this complaint pursuant to 42 U.S.C.A. §§ 1983 and 1988 for the myriad of Constitutional Rights that were denied, deprived, transgressed, and are continuously being violated and denied the Double Homicide Victims Salaha-din Elazar Harris (1966-1992) and Elijah Joabe Harris (1968-1992) and by direct proxy the *Harris Family*, (two of whom were Four (4) years and Two (2) years old at the point in time of their Father Salaha-din's 9/10/1992 brutal Homicide).

The Defendants did utterly fail to discharge their duties and obligations as *"Representatives of The People"* in People v. Calvin Buari, *93X012370,* by the Thirty (30+) year debacle, illegal/ unconstitutional conundrum of its own, collective and respective creation. The Plaintiffs' Brothers'/Nephews suffered the *deprivation of rights under color of law by 47th Precinct Detectives in violation of 18 U.S.C.A.§§ 241 and 242,* when Detectives' of New York City Police Department; under the command of the 47th Precinct in the North Bronx, did, unlawfully, without lawful authority, while acting with the authority granted pursuant to their individual pledge to *lawfully uphold the duties & assignments of a New York City Police Officer; did conspire, agree, and did, aid and assist, then teenage Dwight Robinson in avoiding his culpability for the Double Homicide deaths of The Harris Brothers' for over Thirty (30+) years to-date. This Complaint is based on the following:*

1. On September 10th, 1992, Plaintiff's Two (2) younger Brothers'/Uncles' Salaha-din (26) and Elijah (24) Harris were shot to death in a volley of gunshots fired into their car by Dwight Robinson (17) on "Orders" of Calvin Buari (21), for whom Robinson distributed crack cocaine, (EXHIBIT "A" 9/14/1992 Death Certificates/ EXHIBIT "B"*People v. Buari, §440.10 Written Decision Vacating Conviction&Sentence: @pp.12-15).*

2. Plaintiffs' Two (2) younger Brothers'/Uncles, Salaha-din and Elijah Harris had stopped on 213th Street and Bronxwood Avenue at about 9:00pm to patronize the *Soup Bowl Restaurant and a Bodega Store located thereat.*

3. The *extant thirty-plus (30+) year record* (both intrinsic and extrinsic), substantiates that at the point and time of Salaha-din and Elijah Harris' September 10th, 1992, *cold blooded*

*Double Homicides*; the 213th Street and Bronxwood Avenue, Northeast Bronx Neighborhood, within the 47th Precinct Jurisdiction, was entrenched in *"open-air" crack-cocaine trafficking.*

*4.* The Plaintiff's deceased Two (2) Brothers'/Uncles' Salaha-din and Elijah Harris were absolutely, un-involved, un-affiliated and un-associated with the narcotic related activities and/or those known to be narcotics traffickers. That the Plaintiffs' Two (2) Brothers'/ Father/Uncle, Salaha-din and Elijah Harris' presence on 213th Street and Bronxwood Avenue on September 10th, 1992, at approximately 9:00pm was as customers who did purchase *take-out meals from Soup Bowl Caribbean Restaurant.*

5. The individuals physically present immediately before, during and after the September 10th, 1994, shooting on 213th and Bronxwood Ave were later identified, interviewed and/or *debriefed by NYPD Homicide Detectives from the 47th Precinct Detective Homicide Squad.*

*6.* Those identified as being either directly or indirectly responsible for the *Seventeen (17) 9mm shots fired which instantly ended the lives of Plaintiffs' Brothers'/ Uncles, Salaha-din and Elijah Harris are: Calvin Buari, Dwight Robinson, Stephen "Peter" Robinson, Kinto Effort, Jonathan Parris, Lamont Seabrook, Jerry Connor, Keya Holder.*

7. The NYPD Detectives operating from the 47th Precinct Homicide Squad within the time frame of the *9/10/1992 Double Homicides of Plaintiffs' two (2) Brothers'/ Uncles;* the March 1993 arrest of Calvin Buari; the October 1995 trial and conviction of Buari in Bronx Supreme Court and the June 1997 arrest of Dwight Robinson for the homicide of Leroy McClennon. NYPD Detectives' knew and had ample evidence that Calvin Buari was a major crack-cocaine distributor in the 213th Street and Bronxwood Avenue Neighborhood; *before, during and after the 9/10/1992 double Homicide of the Harris Brothers'/Uncles.* That *Buari, himself, testified under oath to "being*

*in the illegal drug trade since the mid-80s." That he, "Buari was the main person bringing crack-cocaine to that area of the Bronx." That he, Buari: "was the chief supplier of 'weight'", (i.e., large quantities of crack-cocaine,) and had admitted 'crack-supplier' relationships with Dwight Robinson, Peter Robinson, Jonathan Parris, Kintu Effort and others.*

8. The NYPD 47th Precinct Detectives Squad investigating the 9/10/1992 Double Homicide deaths of Plaintiffs' Two (2) Brothers'/Uncles, were clearly and fully cognizant that Dwight Robinson (who became the chief recruited witness in the peoples' case), had been arrested for the sale and possession of crack-cocaine nine (9) times, with one pending case (in the 47th Precinct jurisdiction), before he/Robinson attempted the homicide of Buari (when he & his brother, "Peter Robinson" in a power struggle to control the $4,000 a week crack trade of 213th & Bxwd Ave, attempted to shoot Buari and Parris); and committed the Homicide of L. McClennon (the homicide he stands convicted). That Lamont Seabook had at least six (6) *"drug related cases and an equal number of bench warrants." That Kenya Holder had pending drug and gun charges. That Kintu Effort was convicted and sentenced for narcotic related offense in State Court.*

*9. Based on the flagrant, open air trafficking of crack-cocaine and ancillary gun violence which permeated the 213th Street and Bronxwood Avenue Neighborhood, before, on and after 9/10/1992; The Supremacy Clause of The United States Constitution mandated that Federal Jurisdiction trumped the NYS Laws and Jurisdiction based on the unavoidable Fact that the conduct of Calvin Buari and those individuals involved in crack-cocaine trafficking and gun violence fell squarely within the parameters of 18 U.S.C.A. § 922(g) (felons in possession of firearms); 18 U.S.C.A. § 924(C)(1)(a)(iii) (discharge of firearms in furtherance of narcotic*

*trafficking); 18 U.S.C.A. § 924(j)(1) (murder while in possession of a firearm during the commission of a crime of violence or drug trafficking); 18 U.S.C.A. § 1959 (murder in aid of racketeering activity); 18 U.S.C.A. § 1961 (RICO related murder & drug trafficking); 21 U.S.C.A. § 841(a)(1) (possession w/ intent to distribute crack-cocaine); 21 U.S.C.A. § 846(a) (conspiracy to distribute crack cocaine) and 21 U.S.C.A. § 848 (Continuing Criminal Enterprises).*

10. These Federal Statutes which were specifically enacted, and activated by The U.S. Congress to address the very conduct of Buari and his co-defendants/co-conspirators, who were directly supplied by Buari in the traditional *"Hub & Spoke Conspiracy" as a "Racketeering Influenced & Corrupt Organization" or as leader of a "Continuing Criminal Enterprise" supplying large quantities of the Community destroying 'Crack-Cocaine' into the 213th Street Bronxwood Avenue Community and committing/causing homicides of non-involved Citizens. EXHIBIT "B" @ pp. 12-13.*

11. The *"20/20 Vision of hindsight", here, at present, is substantiated and aided by thirty plus (30+) years of extant records, dispositions, direct testimonies under oath, findings of fact by State Supreme Court Justice Honorable Eugene Oliver, Jr., in his November 9th, 2017, written decision in* *People v. Buari*, *Ind. No. 2111-1993 (EXHIBIT "B"). The findings made by* Federal District Court Judge Mary Kay Vyskocil in Buari v. City of New York, et al., 18-cv-12299 (MKV) in Her "Opinion and Order" Denying the Defendant: NYPDs' & BCDAOs' Motion to Dismiss pursuant to FRCvP Rule 12(b) on the glaring, undeniable links between the corruption outlined and exposed by the then contemporaneous "Mollen Commission Report" dated July 7th, 1994, and the actions of NYPDs' 47th Precinct Detectives' relative to investigating the Double Homicide murders of Plaintiffs' Two Brothers'/ Uncles, while shielding Dwight Robinson, and aligning

themselves with Dwight Robinson and the perjurious "witnesses" he introduced to the NYPD 47th Precinct Detectives, who they validated, (while using their NYPD positions to thwart the Federally relevant Statutes and arrest patterns and strategies of Federal Law Enforcement, necessary to solve murders relative to Continuing Criminal Enterprises; i.e., the conduct of Buari and his co-conspirators.) *EXHIBIT "C" 3/30/2021 Decision & Order USDJ M.J. Vyskocil in Buari v. City of New York, et al., @pp. 53-55,61-64.*

*12.* The September 1992, NYPD 47th Precinct Detective Squad Command, NYPD Detectives Price, Gottwin, Neenan, Fortune, and BCDAO ADA Karen all, not only ignored the Supremacy Clause and Federal Preemption regarding the numerous, glaring violations of the United States Controlled Substance Act transpiring within the 47th Precinct jurisdiction along with the connected homicides of United States Citizens by "Non-Citizen individuals"; the aforementioned NYPD 47th Precinct Detectives did knowingly and intentionally commit Acts and Omissions under color of law and authority and jurisdiction of New York City Police Department that deprived the Harris Brothers' of their Respective and Collective, Rights Protected by the Constitution and Laws of the United States, in violation of 18 U.S.C.A. §§ 241 and 242 (conspiracy against rights and deprivation of rights under color of law). 47th Precinct Detectives' (Price, Gottwin, Neenan and Fortune) "aiding and abetting" and "assisting after the fact" (in violation of 18 U.S.C.A. §§ 2,3) by their status as NYPD Detectives were instrumental in causing Dwight Robinson and the "witnesses" he procured and introduced to NYPD Detectives, to avoid punitive consequences for their direct and vicarious liability in the Double Homicide deaths of Salaha-din and Elijah Harris and/or their direct and vicarious culpability in violations of the United States Controlled Substance Act for the conspiracy to distribute, and actual distribution of large

quantities of crack cocaine. The NYPD 47th Precinct Detectives' by and thru their collective and respective authority under color of law caused the wrongful conviction of Calvin Buari as the "actual shooter" in the Double Homicide Deaths of Plaintiffs' Two Brothers/Uncles. The collateral effects of the Defendant NYPD Detectives Unlawful and Unconstitutional Acts and Omissions, in regards to Dwight Robinson, have resulted in the Thirty Plus (30+) Years, that the Harris Brothers' Double Homicide *perpetrator*, Dwight Robinson, has been allowed to avoid culpability for that brutal offense because of the acts and omissions caused and committed by those under the color of law as NYPD Detectives.

13. The extant record substantiates that at the point in time, September 10th, 1992, while violating Federal Narcotic Laws, and violating the parameters clearly defined within the Organized Crime Control Act, N.Y. Penal Law § 460.00.; NYPD and BCDAO failed to prosecute those directly and/or *vicariously involved* by their relevant conduct in the Harris Brothers' Double Homicides and/or crack-cocaine distribution in the 213th Street and Bronxwood Ave jurisdiction of both NYPD and BCDAO based on deals and compromises that denied the Homicide Victims their Constitutional Right to have those involved in their brutal Homicide held accountable and brought to Justice, in accord with their 14th Amendment Constitutional Rights.

14. Federal District Court Judge, M.K. Vyskocil's March 30th, 2021, "OPINION & ORDER" in *Buari v. City of New York, et al.*, supra, (EXHIBIT "C") ("Granting in part and DENYING in part Defendants: City of New York/NYPD/BCDAO motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)); made *Findings of Fact and Conclusions of Law* on the Violation of *Constitutional Rights alleged by the petitioner Buari and objected to by Defendants; thereafter, petitioner Buari's "Second Amended Complaint"* (filed 4/26/'21 & Doc.#76), and Defendants' *boilerplate "answer"*

*(filed on 6/30/'21 & Doc.#86 after 4x requests for extensions to file), resulted in the August 31st, 2021, Settlement Conference conducted before Magistrate Judge B. Moses in spite of the Defendants' vehement, non-factual, A-Legal earlier arguments, the City of New York, NYPD & BCDAO Settled for Four Million USD ($4,000,000).* [1]

*15.* The NYPD and BCDAOs' Acts and Omissions by unlawfully entering the "*Quid Quo Pro*", aiding and abetting, being accessories after the fact, failing to prosecute and failing to cede Federal Jurisdiction; did cause irreparable harm and the current, unresolved status of the Brutal 1992 1st degree, Double Homicides of Two (2) Bronx Native Citizens who were absolutely, uninvolved and affiliated with the Narcotic Traffickers who violently caused and committed their cold blooded, senseless murders.

---

[1] /"Buari [has] sufficiently pled a claim for denial of a trial based on an alleged fabrication of evidence." Count I. Id. EXHIBIT "C" @ P.32. "Buari [had] plausibly alleged a Section 1983 claim predicated on "NYPD" Defendants coerced the identifying witnesses into testifying falsely and which NYPD Defendants failed to intercede... While the NYPD Defendants cannot be liable for both the underlying constitutional violations and failure to intercede, these claims may be pleaded in the alternative". Count III. Id. EXHIBIT "C" @ P.32-38. "Defendants' arguments in support of their qualified immunity defense are unavailing on a motion to dismiss. First, Buari has pleaded sufficiently a lack of probable ca[use]. [ ] Second, ***the NYPD Defendants did not act on the basis of information from witnesses; rather, it is alleged that they coerced individuals to serve as witnesses and testify falsely against Buari. Finally, while the NYPD Defendants had no authority over the prosecution, their misconduct initiated and caused a continuation of Buari's prosecution. [citations omitted]. Acceptin these allegations as true, as the Court must in a 12(b)(6) motion, the NYPD Defendants are not entitled to qualified immunity from claims at this time. Count V. Id. EXHIBIT "C" @ P.44-45*** *[emphasis added]* "BUari, however, has sufficiently pleaded a failure by the Bronx DA to train, discipline, and supervise, relying on a plausibly alleged deliberate indifference theory. First, Bronx DA officials plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire Brady material "because these are basic facets of an ADA's job. [citations omitted] Second, as discussed below, Buari plausibly alleges a history of ADAs mishandling these matters. Third, it is reasonable to infer that the failure to train, supervise, and discipline prosecutors in connection with these matters likely would cause recurrent constitutional violations... In addition, Buari identifies specific areas where in the Bronx DA's Office allegedly was deficient: initiating prosecutions without probable cause, using false or unreliable testimony or statements in criminal proceedings, ***failing to correct such testimony or statements***, and fulfilling *Brady* obligations. [ ] ... Finally, it is plausible that the alleged training deficiencies led to Buari's injury given the factual similarities in the judicial decisions Buari cites and the temporal proximity of Buari's prosecution to the alleged training deficiencies. Accordingly, the Court denies Defendants' Motion with respect to Buari's Bronx DA *Monell* claim based on a failure to train theory. Buari has also sufficiently pleaded a *Monell* claim based on a failure to supervise and discipline theory.... In short, Buari plausibly alleges a conscious disregard for prosecutorial misconduct and an absence of disciplinary action. Accepting these allegations as true, Buari has plausibly stated a claim for failure to supervise and discipline "tantamount to deliberate indifference."[citations omitted] Finally, the Court may reasonably infer that the constitutional deprivations of which Buari complains were directly linked to the alleged failure by the Bronx DA to supervise and discipl[ine] prosecutors committing violations. In sum, Buari's *Monell* claim relating to the Bronx DA fails under a widespread practice theory but survives under a theory of failure to train, supervise, and discipline. Counts VI & VII. Id. EXHIBIT "C" @ PP.61-64. "Buari's state constitutional due process claim survives, however, insofar as he seeks to hold the City liable under the doctrine of *respondeat superior.*" [citations omitted] Id. EXHIBIT "C" @ p.66.

16. The liability for the myriad of Constitutional Violations done to the victims Salaha-din and Elijah Harris' *Constitutional Rights* is clearly, convincingly and necessarily established by the Defendants, NYPDs' and BCDAOs' August 31st, 2021, Settlement in Buari v. City of New York, et. al., (EXHIBIT "D"); which by *a fortiori* established the same *Defendants* culpabilities in the very case the issues complained of originated, as prejudicing the *Victims Salaha-din and Elijah Harris. I.e., People v. Buari,*.

**NATURE OF ACTION**

17. This Action is to recover compensatory and punitive damages and award of costs for the violations of Plaintiffs' Two (2) younger Brothers'/Uncles Salaha-din and Elijah Harris' rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including the Fifth and Fourteenth Amendments, as well as New York State Law.

18. This Lawsuit also seeks to hold Defendant, the City of New York liable for the individual Defendants' misconduct under Monell v. Department of Social Services, 436 US 658 (1978). The City maintained unlawful policies, customs, and practices before, during and after the 9/10/1992 Double Homicides of Salaha-din and Elijah Harris by aiding and abetting, and intentionally ignoring Federal Narcotic Trafficking within the 213th Street and Bronxwood Ave Neighborhood which festered into the deadly environment the Harris Brothers'; Two Native Residents, unwittingly entered simply seeking to patronize legal establishments, i.e., The Soup Bowl Restaurant and Local *Bodega*. NYPD's 47th Precinct Detectives suborned the perjury of those actively violating United States Controlled Substance Laws and Statutes with actualized favors, leniency and granting exemption from Federal and State Law culpability for narcotic trafficking and gun violence by use of their Authority under Color of Law as New York City Police

Department Detectives. Perjury that was used to build and sustain a wrongful conviction for Twenty-Two (22) years while Defendants' *"chief witness", Dwight Robinson/ the actual perpetrator of the 9/10/1992 Double Homicide of Plaintiffs' Brothers'/Uncles, remains un-charged for his crimes. And consequently, the 9/10/1992 Double Homicides of Salaha-din and Elijah Harris remains "Unsolved." Thus, for Thirty Plus years (30+) The Victims have unquestionably been denied the very basic "Justice Due" Victims of such a horrific, unwarranted Double Homicide (that brutally ended the lives of two Innocent young Black men in the Prime of life, One of Whom was an active father in the lives of his Two (2) daughters then ages Two (2yrs old) and Four (4yrs old)). Primarily due to the unlawful, illicit companionship NYPDs', 47th Precinct Detectives fostered with Dwight Robinson and his crack-peddling cohorts. All of whom provided suborned perjury, i.e., "what the 47th Precinct Detectives' wanted to hear, because it implicated Calvin Buari." And, with conduct straight out of* The Mollen Commission Report*, 47th Precinct Detectives', illegally, bargained, persuaded and suborned then Non-Citizen, teenaged/young adult, homicidal, crack peddling, gun-toting, persistent felon, neighborhood terrorists into helping NYPD & BCDAO falsely build the case that ultimately crumbled with Bronx Supreme Court Justice Eugene Oliver's November 9th, 2017, Order vacating the conviction of Buari for a* New Trial*, (explicitly denying Buari's claim of "Actual Innocence."). Ironically, it wasn't until Buari's § 1983, Civil Rights Suit and Federal District Court Judge, Mary K. Vyskocil's fact finding that the depth, stench and degree of NYPD official misconduct and BCDAO prosecutorial misconduct are exposed and identified. And, thereafter, Defendants' August 31st, 2021, "Settlement" (which has the legal significance of an "admission to well pleaded facts", which were certified by a United*

*States District Court Judges' findings on those facts, i.e, "A Guilty Plea with a $4,000,000 Restitution Agreement.")*

19. NYPD's 47th Precinct Detectives were deliberately indifferent to policy, terms and the lawful requirements of their respective and collective *oaths* pursuant to *art. XIII, §1; Public Law §10: "Support the United States Constitution and the Constitution of the State of New York, and faithfully discharge the duties of a Police Officer."* *[emphasis added]* None of which include and/or condone the *respective and/or collective*, actions of 47th Precinct Detectives' which obfuscated the *confessed/ eyewitness identified/double homicide murderer/ known narcotic trafficker Dwight Robinson from culpability for: 1) the Double Homicides of Plaintiffs' immediate family members, Salaha-din & Elijah Harris, to-date. 2) Robinson's Federal Narcotic Violations; 3) Robinson's continued Narcotic Trafficking which included additional gun violence, and 4) and the subsequent Homicide he stands convicted.* As a result, the City of New York is liable.

**JURISDICTION AND VENUE**

20. This action is brought under 42 U.S.C. §§ 1983, 1985 and 1988 in that Plaintiffs' Brothers'/ Uncles', Salaha-din and Elijah Harris were deprived under color of law of their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution directly consequent of New York City's, NYPD's Detectives' illicit, unlawful alliance with Dwight Robinson, and the subsequent suborned perjury the NYPD Detectives relationships with Dwight Robinson, Jerry Conner, Kenya Holder, Brian Johnson and Lamont Seabrook; did produce and cause to their Double Homicides being solved/resolved for over Thirty Plus (30+) years.

21. The Southern District of New York has original subject matter jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking

redress for the violation of Salaha-din and Elijah Harris' Constitutional and Civil Rights, and Supplemental Jurisdiction over Plaintiffs' State Law claims under 28 U.S.C. § 1367.

22. Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391 because All events giving rise to Plaintiffs' claims occurred in this District.

23. The proceedings in *Buari v. City of New York, et al.,* 18-CV-12299(MKV)(BCM), in this Court are germane and intrinsic to this matter and Judicial Notice is hereby requested pursuant to Fed.R.Ev. Rule 201(c)(2) of those proceedings.

**JURY DEMAND**

24. Plaintiffs' hereby demand trial by jury of all issues raised in this Complaint.

**PARTIES**

25. Plaintiff, Yusuf A. Harris is the Oldest Surviving Natural Born son of Daniel N.X. Harris (1933-2015), born to the previous, lawful marriage of the late Mr. Daniel N.X. Harris and the late Ms. Lucy Tucker (19??-2017). He is the biological older brother of the Homicide Victims Salaha-din & Elijah Harris. Ishmael C. Harris is the Second Surviving Natural Born son of Daniel N.X. Harris, born to the previous, lawful marriage to the late Helen R. Harris (1937-1995). Homicide Victim, Salaha-din E. Harris is the 5th Natural Born son of Daniel N.X. Harris, born to the previous, lawful marriage to the late Helen R. Harris on February 9th, 1966, (1966-1992). Homicide Victim, Elijah J. Harris is the 6th Natural Born son born of Daniel N.X. Harris, born to the previous. Lawful marriage to the late Helen Harris on January 5th, 1968, (1968-1992). Gregory S. Harris Jr., is the biological nephew of the Homicide Victims' Salaha-din and Elijah Harris by lineage of their late Father Gregory Harris, Daniel N.X. Harris' 2nd Natural Born son, Daniel N.X. Harris is

their Grand Father. Oral R. Sinclair is the Oldest Surviving son of the late Helen R. Harris, (formerly Helen R. Sinclair), born in 1953 Brooklyn NY. Homicide Victims Salaha-din and Elijah Harris are his younger Biological Brothers Maternally.

26. The Defendant City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the Laws of the City and State of New York, and having the powers and duties imposed by Law thereon.

27. The New York City Police Department (NYPD) and Bronx County District Attorney's Office (BCDAO) are and were at all relevant times agencies of Defendant the City of New York. At all times relevant to this action, Defendant the City of New York, by its agents, servants, and employees, was responsible for the operation, maintenance and control of the NYPD; the selection, training, supervision, and discipline of police officers; and the training, supervision, and discipline of BCDAO employees.

28. Defendant the City of New York was at all times relevant the public employer of the individual Defendants Vincent Price, Eugene Gottwin, Christine Fortune, Joseph Neenan, FNU Tracy, Allen Karen, Felicity Lung, Darcell Clark and was/is legally responsible for torts they committed within the scope of their employment or under color of law. Defendant the City of New York is also obligated under law and by contract to indemnify and defend the individual Defendants named herein.

29. Defendant Detective Andrew Dietz was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to

indemnification under New York General Municipal Law § 50-k and by contract. This lawsuit seeks to hold Defendant Dietz liable in his individual capacity.

30. Defendant Detective Vincent Price was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York. He is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This lawsuit seeks to hold Defendant Price liable in his individual capacity.

31. Defendant Detective Eugene Gottwin was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This lawsuit seeks to hold Detective Gottwin liable in his individual capacity.

32. Defendant Detective Joseph Neenan was at all times relevant to this Complaint a duly appointed and acting Detective of NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This Lawsuit seeks to hold Defendant Neenan liable in his individual capacity.

33. Defendant Detective Christine Fortune was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in her individual

capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and the State of New York. She is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This Lawsuit seeks to hold Defendant Fortune liable in her individual capacity.

34. The Bronx County District Attorney's Office (BCDAO) was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Bronx County of the City of New York. It is an agency of Bronx County, a constituent county of the City. The District Attorney and Assistant District Attorneys are deemed employees of both the County of the Bronx and the City.

35. Defendant BCDAO District Attorney Darcel D. Clark is Elected District Attorney for the County of the Bronx. She was at all times relevant to this Complaint District Attorney of the BCDAO, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and State of New York. She is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This Lawsuit seeks to hold Defendant Clark liable in her individual capacity.

36. Defendant BCDAO Assistant District Attorney Allen Karen was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. He is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This Lawsuit seeks to hold Defendant Karen liable in his individual capacity.

37. Defendant BCDAO Assistant District Attorney Felicity Lung was at all times relevant to this Complaint a duly appointed and acting Assistant District Attorney of the BCDAO, acting under color of law and her individual capacity within the scope of employment pursuant to the statutes, ordinances regulations, policies, customs, and usage of the City and the State of New York. She is entitled to indemnification under New York General Municipal Law § 50-k and by contract. This Lawsuit seeks to hold Defendant Lung liable in her individual capacity.

## FACTS

### *September 10th, 1992: 9:00pm*

38. The extant, 30 plus year record, both intrinsic and extrinsic, show *clearly and convincingly* that the *Factors* involved on 213th Street and Bronxwood Ave on September 10th, 1992, at approximately 9:00pm were absolutely opposite to those, *knowingly and intentionally* misrepresented in the Second Amended Complaint of *Buari v. City of New York,* 18-cv-12299 (MKV), docketed as *Document 76 and filed 04/26/21, which states: in pertinent part:*

***STATEMENT OF FACTS***

***Calvin Buari and the Night of the Murders***

> *37. In September of 1992, Calvin Buari was twenty-one-years old and lived in the Wakefield Section of the Bronx, New York on 211th Street between Bronxwood Avenue and Paulding Avenue.*
>
> *38. On the night of September 10th, 1992, at approximately 9:00pm., Mr. Buari returned to the Wakefield neighborhood after having spent the day in Manhattan.*
>
> *39. Mr. Buari was going to visit his friend, John Parris, who lived on 213th Street between Bronxwood Avenue and Paulding Avenue.*
>
> *40. Mr. Buari walked through the intersection of 213th Street and Bronxwood Avenue , where a lot of people were out. Although the sun had gone down, the intersection was well lit by streetlights.*

*41. Mr. Buari noticed two brothers, Mr. Robinson and his brother, Peter Robinson ("Peter"), on the southwest corner of 213th Street and Bronxwood Avenue sitting on milk crates just outside Frank's Soup Bowl restaurant. Mr. Robinson and Peter appeared to be smoking marijuana and drinking beer.*

*42. As Mr. Buari proceeded down 213th Street towards Paulding Avenue, he noticed a person named Kintu Effort playing basketball on the street.*

*43. Mr. Buari met John Parris on 213th Street approximately halfway between Bronxwood Avenue and Paulding Avenue, where they engaged in conversation.*

*44. As Mr. Buari was talking with John Parris, an older woman stopped and asked Mr. Buari if she could use Mr. Buari's cigarette lighter. Mr. Buari recognized the woman as someone from the neighborhood but did not know her personally. Mr. Buari lent the woman his lighter.*

*45. Seconds after Mr. Buari gave the woman his lighter, he heard gunshots ring out from the intersection of 213th Street and Bronxwood Ave.*

*46. Mr. Buari and Mr. Parris immediately ran down 213th Street towards Paulding Ave.*

*47. The woman who had just borrowed Mr. Buari's lighter immediately ran into a building that she, Mr. Buari, and Mr. Parris had been standing in front of.*

*48. Later on, Mr. Buari and Mr. Parris walked to the corner of 213th Street and Bronxwood Avenue to see what had happened.*

*49. A large crowd had gathered at the intersection. Among the crowd was Mr. Robinson.*

*50. Numerous police cars and police officers were present at the intersection.*

*51. Mr. Buari learned that two males, the Harris brothers, had been shot and killed as they sat inside a white BMW parked near the corner of 213th Street and Bronxwood Avenue in front of Frank's Soup Bowl.*

*52. Mr. Buari had never seen the Harris brothers before and did not know who the were or why they had been killed.*

*53. Unbeknownst to Mr. Buari, Mr. Robinson was the person who had shot and killed the Harris brothers.*

*********

**Id. Buari Second Amended Complaint: "Statement Of Facts @ ¶37-53"**

40. This *"Sworn Statement of Facts"* is a *knowing and intentional* factual misrepresentation which directly contradicts Calvin Buari's own *Sworn Testimony/Statements* during the hearing before his Honor Eugene Oliver, Jr., Associate Supreme Court Justice Supreme Court of the State of New York County of Bronx: Criminal Term Part 31, on March 27th, 2017, and concluded on April 7, 2017. When that Court rejected Buari's ***"Actual Innocence"*** claim and *"Vacated"* his conviction for the Double Homicides of Salah-din and Elijah Harris, stating:

> *"Finally, this Court rejects the [Buari's] claim of third part culpability. The decision for a New trial, is based completely on the overwhelming credible testimony of three disinterested Witnesses, who testified before this Court. However, the new evidence on this issue is Highly probative, and [Buari] should be allowed to argue that Dwight Robinson is actually responsible for the homicides of September 10, 199[2]. [citations omitted]"*
>
> *Id. November 9th, 2017, Written Decision of Hon. Eugene Oliver.*

41. During the abovementioned § 440 proceedings which resulted in the *vacation* of Buari's State conviction for being the *actual shooter* in the 9/10/1992 Double Homicide of Plaintiffs' Two Brothers/ Father/ Uncles; Calvin Buari's *"Second C.P.L. § 440.10 Hearing" testimony under oath is summarized in his Honor's written decision as follows:*

> *The defendant Calvin Buari, was the first witness called to the stand. He testified that he Stated selling drugs in the mid 1980's. ... He started selling drugs in Manhattan, specifically Harlem because he didn't want his family members to know he was selling drugs. He Started out as a lookout, moving up to hand to hand. Selling crack cocaine, and dust. He started working with a friend of his John "Jay" Parris. Buari testified that he primarily worked for someone in Harlem, but he would also deliver drugs to his friend Parris in the Bronx. They made more money in the Bronx, and split the profits fifty-fifty.* ***Later on, he also distributed drugs to Peter Robinson, Dwight Robinson, and Kintu Effort. The sales were concentrated in the vicinity of 213th Street and Bronxwood Avenue. Peter Robinson, worked mostly with John Parris. Dwight Robinson worked for [] Alji Griffin, of the Shower Posse, (Jamaicans), that sold drugs on the opposite side of the street. Buari testified that he distributed to both sides of the street, and to Kintu Effort. Operations were five to six days a week. Depending on the circumstances, he would deliver the product to the street or to John Parris' house. John Parris, was the primary person he dealt with on the block. ....***
> *On September 10, 1992, he got to 213th Street in the Bronx around 9:00P.M. He had to deliver some drugs to John Parris. He saw Dwight and Peter Robinson, sitting outside the Soup Bowl Restaurant....*
> *[emphasis added]*

On Cross Examination, Buari testified:

> ... He only distributed in the Bronx. He just sold weight, didn't like being in the Bronx, it was a very hot area. He was making $1200 to $1500 a week. **He eventually started selling to Jay, Kintu, Peter Robinson, and Dwight Robinson. Then his income went up to about $4000 a week. He was a distributor. He was the main person bringing crack cocaine to that area of the Bronx. He would deal with "Lips," "Fritz," or the Dominicans to buy in Harlem from around 112th Street. He lived with his mother, but eventually got an apartment in Parkchester. He didn't carry a gun. He would usually make exchanges to Jay, Peter, and Dwight at their apartment building they all lived in the same building. .....**
> **[emphasis added]**
>
> **Id. 11/9/2017 Written Decision of A.S.C.J. Hon. Eugene Oliver, Jr., @ pp. 12-13. (Emphasis Added) EXHIBIT "B".**

42. That although fully cognizant of Buari's *self-confessed "Kingpin/Distributor"* Status and/or Position in the 9/10/1992, 213th Street & Bronxwood Avenue *"Crack-Scene"* (and the ancillary gun violence attached to Buari's *"self-made" $4,000 a week crack distribution-conspiracy operating within the 47th Precinct jurisdiction).* The City of New York by and thru Defendant BCDAO, failed in its duty as representatives of the People, (Salaha-din and Elijah Harris); to bringing *"Justice"* to the *"uninvolved, innocent, bystander" victims of the 1st Degree, cold blooded, brutal double homicide committed in the middle of the narcotic trafficking and racketeering; organized and supplied by Buari.*

43. The testimony of Buari and his co-conspirators; coupled with the extant records, files, transcript of proceedings and affidavit established, clearly & convincingly; that the double homicides of Salaha-din and Elijah Harris were committed during and in relation to Federal narcotic trafficking by those committing Federal felony narcotic offenses.

44. The Defendant, BCDAO, failed to exhibit the minimal "prosecuting attorney acumen" both in 1995 and 2017; in recognizing that the *"Offenders/ Perpetrators"* involved in the 1992 Double Homicides of the Harris Brothers were *vicariously* involved in violating the United States Controlled Substance Act; and, accordingly, pursuant to Article VI of the United

States Constitution which makes Federal Law "the Supreme Law of the Land, ('notwithstanding the contrary law any State might have.')" BCDAO was obligated to cede these 'murders by those while in possession of a firearm during the commission of drug trafficking' to the Federal Authorities, Federal Jurisdiction (i.e., Drug Enforcement Agency (DEA) and/or Federal Bureau of Investigation (FBI)). The BCDAO's failing to cede jurisdiction of the Double Homicides of Salaha-din and Elijah Harris, when their Homicides are directly intertwined with Federal Drug Trafficking; caused irreparable harm and is a principal cause and reason the Double Homicide "investigation" was/is corrupted by NYPD Detectives acts and omissions and remains unresolved thirty plus (30+) years later.

45. The explicit factual findings of the Bronx Supreme Court Justice when vacating Buari's conviction as the "*actual shooter* on 9/10/1992"; that "Buari *failed to establish his innocence by clear and convincing evidence*". *That the evidence was "highly probative" on the issue of Buari being the actual shooter on 9/10/92. And that the vacation and order for a "new trial" placed duty and obligation on BCDAO to seek prosecution for the Double Homicide of the Victims Salaha-din and Elijah Harris by ceding prosecution to Federal Law Enforcement based on the elements which established the Victims Double Homicides on 9/10/1992 were directly related violations of 18 U.S.C. § 924(j)(1)(murder while in possession of a firearm during the commission of drug* trafficking*), 18 U.S.C. § 1961 (RICO related murder & drug trafficking), 21 U.S.C. § 848 (Continuing Criminal Enterprise).*

46. The BCDAO's failure to cede federal Jurisdiction over *Federal Law Violations* did cause irreparable harm to solving and upholding these Victims Constitutional Rights to Equal Protection under the Law; and bringing to Justice the perpetrators of the 9/10/1992 1st Degree

Double Homicides of Salaha-din and Elijah Harris, (the *"Victims"* whose *"Rights"* Defendants' were/are charged with upholding and seeking Justice on behalf of), especially where, as here, BCDAO's acts and/or omissions, and attempts to prosecute the Double Homicides of the Harris Brother's was Stalled/ dormant for over two (2) years, and the New York State Statutes did not include the *"vicarious liability elements" of the Federal Narcotic Statutes which were directly tied to the conduct and environment which resulted in the Double Homicide deaths of the Two (2) Harris Brothers on 213th Street and Bronxwood Ave.*

47. The conduct reasonably inferred from the 47th Precinct Detective Price's suborning the perjury of Dwight Robinson and Lamont Seabrook in 1995 by encouraging Robinson and Seabrook to *"get Buari out of the way so "they" could control the block", (i.e., the 213th Street & Bronxwood Avenue crack trade and the $1500 to $4,000 a week proceeds),* caused irreparable harm to the Victims 14th Amendment Equal Protection Rights. And has allowed the actual perpetrator(s) of the 9/10/1992 Double Homicide to avoid lawful prosecution, to present day. ***EXHIBIT "A" @ 3, 4, 8-9.***

48. It has been over five plus (5+) calendar years since the Bronx Supreme Court proceedings which resulted in the vacating of Buari's conviction and sentence as the *"actual shooter"* in the 9/10/1992 Double Homicides of the Victims' Salaha-din & Elijah Harris based in pertinent part, on the *"Newly Discovered, Newly Presented Evidence" that NYPD Personnel, employed as Detectives in the 47th Precinct were corruptly involved in the investigative process and that NYPD corruption irreparably, illegally and unconstitutionally deprived Buari's Constitutionally Protected Rights.*

49. The *uncontroverted factual allegations* of the specific acts and omissions committed by NYPD Detectives from the 47th Precinct which did cause the perjury that undermined the Constitutionality of Buari's New York State conviction and sentence; subsequently resulted in the August 31st, 2021, Settlement in Buari v. City of New York, *supra,* the direct consequence of the *"extrinsic fraud"* by Detectives of the NYPD; whose acts and omissions suborned the knowing and intentional perjury of Jerry Conner, Kenya Holder, Brian Johnson and Lamont Seabrook. And prevented the investigation of the perpetrators of the Double Homicides of the Plaintiff's Two (2) Brothers'/Uncles' Salaha-din and Elijah Harris. And translates into the denial of the Victims' 5th and 14th Amendment, Due Process and Equal Protection Rights.

50. The current "unresolved/ Cold Case status" (i.e., No Perpetrator Charged or Convicted) of the brazen, brutal Double Homicides of Two (2) Young Native, Born & Raised, Bronx Citizen-Residents, on a busy Bronx New York Street after Thirty plus (30+) years is the direct & collateral consequence of the *Extrinsic Fraud, caused and committed by NYPD Detectives which did result in the actualized, manifest corruption of the lawful investigation, arrest, prosecution and conviction of the perpetrator(s) of the 9/10/1992 Murders.*

51. The March 30th, 2021, *"Opinion and Order Granting in Part Denying in Part Defendants' Motion To Dismiss"* in Buari v. City of New York, et. al. supra; determined the allegations against these Defendants' to be *"True and Plausibly alleged, in regards to a connection between the misconduct here, and, the findings in the* Mollen Commission Report*", stating, in pertinent part:*

> *"Here, accepting his allegations as true, as the Court must, Buari has plausibly alleged a connection between the alleged misconduct by the NYPD Defendants in his case and the*

*findings in the Mollen Commission Report. Buari's allegations of misconduct by the NYPD—inter alia, testifying falsely, coercing witnesses to do the same, and permitting Robinson to sell narcotics without "heat" from the police if he and his associates provided evidence implicating Buari [citations omitted]* ***are factually similar to findings in the relatively contemporaneous Mollen Commission Report. The Mollen Commission Report describes perjury and falsification of evidence, as well as police officers protecting and assisting narcotic traffickers. See generally Mollen Commission Report 31-34, 36-43. In addition, Buari alleges misconduct by the NYPD during the precise time of the Mollen Commission's investigation (1992-1994). Therefore, considering Buari's allegations together with the findings in the Mollen Commission Report, the allegations are sufficient at the pleading stage to support a reasonable inference of the existence of a de facto policy or custom and link between the policy or custom and Buari's alleged constitutional deprivation.***

*Buari has also plausibly alleged a failure by the NYPD to train, supervise, and discipline. As a threshold matter, Buari plausibly has alleged deliberate indifference. [] First, NYPD officials clearly knew that police officers would initiate arrests and prosecutions, speak with witnesses, and possess Brady material because these are basic aspect of a police officer's job. [citations omitted] Second, Buari alleges that there is a history of NYPD officers mishandling arrests, witness interviews, and production of Brady materials [] similar misconduct is documented in the Mollen Commission Report. See, e.g., Mollen Commission Report 36-43;[citations omitted] Third, it is reasonable to infer that the alleged failure to train, supervise, and discipline subordinate officers with respect to these matters could cause frequent constitutional deprivations.[citations & quotations omitted].*

**Id. 3/30/2021 Opinion & Order, USDJ M.K.Vyskocil @ 53-55 (Emphasis Added/ Citations Omitted)**

The impropriety, corruption and witness tampering, which were exposed in the *Buari v. City of New York, et. al*, proceedings; were elevated to *"tangible reality"* by the Defendant's August 31st, 2021, Settlement. The *"tangible reality"* underlying *"why"* the Double Homicide of Salaha-din and Elijah Harris remains unsolved *thirty plus (30+) years later.*

52. The Defendants' 8/31/2021, *"Settlement"* in Buari v. City of New York, et al., supra, in legal parlance is tantamount to *"a compromise achieved by adverse parties in a civil suit before final judgment..."*

53. The Defendant's 8/31/2021 *"$4,000,000.00 Compromise/Settlement"* with Buari resulted after several consecutive Defendant's requests for extensions of time to respond after the 3/30/2021 factual findings made by USDJ M.K. Vyskocil; which juxtaposed the NYPD's 47th Precinct Detective's *"acts & omissions" in* People v. Buari, with the conduct exposed and detailed

in the _Mollen Commission Report_. In addition to her Honor's findings that BCDAO's *professional misconduct* being the direct consequence of the alleged failure to *train, supervise and discipline the NYPD 47th Precinct Detectives, who's corruption was the catalyst for, and introduction of the parade of perjurious federal narcotic traffickers* who BCDAO welcomed with *"open arms" as "State Witnesses"* in the "Peoples Case," i.e., the Double Homicides prosecution for Salaha-din and Elijah Harris' cold blooded 9/10/1992 killings. The *"victims" in the Thirty plus year old unsolved Homicides.*

## _DAMAGES_

54. This action seeks punitive and compensatory damages and awards for the unlawful, intentional, purposeful, deliberate, indifferent, reckless, bad-faith, and/or malicious acts, misdeeds and omissions which have resulted in the present day unsolved, unresolved disposition in the unjustified-brutal 1st Degree, Double Homicides of Salaha-din and Elijah Harris committed on September 10th, 1992, caused by and attributable to the City of New York, by and thru the *Acts and Omissions* of NYPD and BCDAO.

55. Salaha-din Elazar Harris was a Twenty-Six (26.7) year old, *active father* in the lives of his two (2) daughters, then, two (2) and four (4) years old in 1992. On the evening of 9/10/1992, he did make a purchase at the Bodega Mini Mart which included "baby formula" for his then two (2) year old daughter's morning bottle he intended making the following morning for his daughter. He unwittingly stepped into the *uncontrolled, federal level narcotic trafficking and gun violence* which premeditated the 213th Street and Bronxwood Avenue area of NYPD's 47th Precinct's jurisdiction, (which the then contemporaneous _Mollen Commission Report_ establishes as being intrinsically connected to illegal, illicit NYPD oversight).

56. Salaha-din E. Harris was a childhood survivor of *acute myeloid leukemia*. He was a college drop-out from a four year liberal arts bachelor degree program at Antioch University in Yellow Springs Ohio.

57. In or about 1988 Salaha-din along with his younger, "baby brother" Elijah J. Harris did enroll at Antioch University in Ohio, in their collective effort to further their formal education. Unfortunately, their educational goals were more than their financial means could sustain, and the two Brothers' "dropped-out of college" and returned to their childhood home at 1183 Grenada Place, i.e., "Their Mother's House."

58. Salaha-din E. Harris, "Sal" as he was known and called by family and friends. Was born on February 9th, 1966, at the Bronx's Old Morrisania Hospital. He was the 2nd healthy baby boy born to the 1963 marriage of Mr. & Mrs. Daniel and Helen Harris. Salaha-din was raised from 1967 in the same North Bronx, Single Family House/Home he lived on the day of the brutal homicides that claimed him and Elijah Harris. Their Father, the late Daniel N.X. Harris, a New York Native born in 1933 Brooklyn. Was among 1963's "*Manhattan Bronx Surface Transit Authorities (MaBSTOA) select/first ADOS/Blackmen*" hired by the newly established "1962 MaBSTOA" to operate a "City Bus." Mr. Daniel N.X. Harris was a founding member of the still functioning and relevant "*Society Of African American Transit Employees.*"

59. It was by means of his 1963 employment with MaBSTOA (which lasted Thirty-five years), that Daniel N.X. Harris and his wife did close on the 1183 Grenada Place, Northeast Bronx, Single Family House his Sons were residing at the time of their 9/10/1992 *Unsolved 1st Degree, Double Homicides.*

60. For a brief while after dropping out of college in Ohio and returning to the Bronx NY with his younger Brother, Elijah Harris; Salaha-din Harris did reside briefly with his paramour and youngest daughter's mother on Burke Avenue and Olinville Avenue, and had only recently moved back home at the point in time of his 9/10/1992 homicide death.

61. Elijah Joab Harris, born January 5th, 1968, was Twenty-four (24.9) years old on 9/10/1992. Although standing a towering 6' 5"; Elijah Harris was actually the "baby Brother" to his brother Salaha-din's 6' 3" stature.

62. Although a drop-out from Manhattan's Technical High School in the late 1980's; Elijah J. Harris scored impressively on the City's G.E.D. test which occasioned him being able to attend Antioch University in Ohio with his older Brother Salaha-din.

63. Elijah Joab Harris was the 3rd, healthy baby boy born to the marriage of Mr. Daniel and Helen Harris on January 5th, 1968, at Bronx Lebanon. He lived at 1183 Grenada Place from 1968 till his unfortunate, untimely, brutal Homicide. He left behind no offspring.

64. Mrs. Helen R. Harris was 56 years old at the point in time she experienced the traumatizing brutal Double Homicides of her sons Salaha-din (26) and Elijah (24) on September 10th, 1992.

65. On September 10th, 1992, Mrs. Harris was poised to parlay her portion of a payout (as a Party in the *Delkon Shield Class-Action Settlement*) into an entrepreneurial endeavor with her Three (3) Sons, and open a local Butcher Shop in accord with her Islamic Faith.

66. That as a direct consequence of the September 10th, 1992, brutal Double Homicides of her Two (2) Sons, Mrs. Harris, in dealing with the trauma of Her Sons' deaths wanted to, and did move from New York, the Bronx where she'd resided since her family migrated from

Charlotte, North Carolina in the Great Migrations of the Formerly Enslaved, Descendants of American Slavery to "Northern Cities" of the 1940s. That Mrs. Harris grew up *"Helen Ruth Sinclair"* in New York's Brooklyn of the 1940s & 1950s; she moved to and settled in the early 1960s Bronx. Where in 1963 she became *Mrs. Helen R. Harris.*

67. Instead of her entrepreneurial aspirations with her Sons; the funds she'd received from her Settlement were used to relocate from the Bronx New York to the U.S. Virgin Island of St. Croix in April 1993 seeking solace from the tragedy the Bronx New York represented for her life.

68. That after relocating to St. Croix in the U.S.V.I. and renting the 1183 Grenada Place property where she'd lived since 1967 (Mr. & Mrs. Harris had originally paid-off and re-mortgaged). The Bronx Property was foreclosed on after, Mr. Harris; in his *trauma and PTSD, became delinquent on his second mortgage payments, and without proper, lawful notice or procedure the Harris' 1183 Grenada Place property was foreclosed upon.* The absence of any documentation in the foreclosure that was instituted against the Harris' 1183 Grenada Place, Bronx property evidences the Victim's Family were not accorded any *due process* or compassion pursuant to New York's then very vague *victim's Rights policies, the least, they were owed under the then, extenuating circumstances of their Sons Double Homicides.*

*69. That based on the unforeseen foreclosure on her Bronx Property; Mrs. Harris did seek Chapter 7 Bankruptcy Protection in the United States District Court for the District of the Virgin Islands, St. Croix Division on 9/1/1994; Bankruptcy Petition # 94-bk-00018-JLC.*

70. That in *recorded proceedings in The U.S. District Court for the United States Virgin Islands, St. Croix Division, the USDJ in compassion for her loss, i.e., the Double Homicides of her*

*two (2) Sons; his honor, assured Mrs. Harris that in accord with legal precedent and his judicial authority; the improper foreclosure on Mrs. Harris' property would be rectified pursuant to Bankruptcy proceedings She'd instituted before his court.*

71. That unfortunately, in January 1995, Ms. Harris was found deceased in her St. Croix home in the United States Virgin Islands from *"Undetermined Cause". A little more the Two (2) years after the 9/10/1992 Brutal Double Homicides of her two (2) Sons, Mrs. Helen Harris' body was found 4-5 days decomposed. And* ***"Depression, acute, clinical"*** *being noted as a contributing factor. See EXHIBIT "E": January 22nd, 1995, CERTIFICATE OF DEATH: Helen [] Harris.*

72. The Two (2) Daughters of Salaha-din Harris who were Four (4) years old and Two (2) years old at the point in time of their Father's 9/10/1992 Murder. Can respectively account their life's reality of their missing Father. Relationships never realized and experienced due to the brutal killing of their Biological Father because of the violence ancillary to the Federal Racketeering and Continuing Criminal Enterprise of Crack-Cocaine Distribution which dominated the 213th Street and Bronxwood Ave Area of the 47th Precinct Jurisdiction on 9/10/1992. A *Continuing Criminal Enterprise* over which Calvin Buari was the original *curator and leader.* And the illicit agreement between Dwight Robinson and Detectives from the 47th Precinct, establish became in the purview of partnership with *The 47th Precinct Detectives'* who provided "Robinson and company freedom to operate without heat from the police."

73. The devastating reverberations of the 9/10/1992 Double Murders of the Harris' "Sons", "Brothers", "Father", "Uncles"; Salaha-din & Elijah Harris on *the Harris Family,* some of which are mentioned above, (e.g. the untimely death of the grieving Mother Mrs. Harris 2yrs after the 9/10/'92 (still unresolved killing) of her two (2) Sons; Fatherless Children; disrupted

business aspirations; loss of real property), are too numerous and detailed to recount here, but are best contextualized as "immense mental anguish, extreme emotional suffering, and life-long sorrow over loss loved ones."

74. All the alleged acts, misdeeds, and omissions committed by the individual & collective Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowing, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said conduct meeting all the standards for imposition of *Punitive and Compensatory* Damages were subsequently the Subject of the August 31st, 2021, Settlement made by named Defendants in what in the *Federal Civil Proceedings context is equivalent to a "plea of guilty".*

*ESTABLISHED LIABILITY OF DEFENDANTS, ET. AL:*

75. The August 31st, 2021, Settlement by the *City of New York, Et. AL.*, in Buari v. City of New York Et. Al, (EXHIBIT "D") is *a Fortiori* to the liability for the continuing constitutional rights violations caused to the Double Homicide Victims 5th Amendment Due Process of Law Rights and 14th Amendment Equal Protection Rights. (Accordingly, Rule 408 of The Federal Rules of Evidence does not apply where the *"Fact", not the Content of the August 31st,2021, Settlement is called in to Notice as the "logical consequence" after USDJ Vyskocil's 3/30/2021, Findings of Fact and Conclusions of Law, established the plausibility of the allegations.)*

76. The August 31st, 2021, Four Million USD ($4,000,000) Settlement by the Defendants', (The City of New York, et. al.), is the direct consequence of USDJ M.K. Vyskocil's 3/30/2021 *"OPINION & ORDER" (EXHIBIT "C"), in which the Court found a factual basis for Plaintiff Buari's § 1983 Constitutional Rights violations claims, (in the underlying matter of* People v. Buari, *i.e., the 1st Degree, Double Murders of Salaha-din & Elijah Harris).*

77. The Conclusions of Law made by USDJ M.K. Vyskocil's in her 3/30/2021 "OPINION & ORDER", that:

> ***"....[M]isconduct by the NYPD Defendants in [this] case and the findings in the <u>Mollen Commission Report</u>....—inter alia, testifying falsely, coercing witnesses to do the same, and permitting[Dwight] Robinson to sell narcotics without "heat" from the police if he and his associates provided evidence implicating Buari [citations omitted] are factually similar to findings in the relatively contemporaneous <u>Mollen Commission Report</u>. The <u>Mollen Commission Report</u> describes perjury and falsification of evidence, as well as police officers protecting and assisting narcotic traffickers. See generally <u>Mollen Commission Report</u> 31-34, 36-43. In addition, Buari alleges misconduct by the NYPD during the precise time of the <u>Mollen Commission's</u> investigation (1992-1994). Therefore, considering Buari's allegations together with the findings in the <u>Mollen Commission Report</u>, the allegations are <u>sufficient at the pleading stage to support a reasonable inference of the existence of a de</u> facto policy or custom and link between the policy or custom and Buari's alleged constitutional deprivation.***
>
> *Buari has also plausibly alleged a failure by the NYPD to train, supervise, and discipline. As a threshold matter, Buari plausibly has alleged deliberate indifference. [] First, NYPD officials clearly knew that police officers would initiate arrests and prosecutions, speak with witnesses, and possess <u>Brady</u> material because these are basic aspect of a police officer's job. [citations omitted] Second, Buari alleges that there is a history of NYPD officers mishandling arrests, witness interviews, and production of <u>Brady</u> materials [] similar misconduct is documented in the <u>Mollen Commission Report</u>. See, e.g., <u>Mollen Commission Report</u> 36-43; [citations omitted] Third, it is reasonable to infer that the alleged failure to train, supervise, and discipline subordinate officers with respect to these matters could cause frequent constitutional deprivations. [citations & quotations omitted].*
>
> *Id. EXHIBIT "C" 3/30/2021 Tr.@Pp.53-55.*

Here, the very *NYPD corruption* found to have resulted in *Constitutional Rights Violations of the Defendant/Plaintiff in the underlying case <u>People v. Buari</u>, (i.e., the 1st Degree Double Homicides of Salaha-din & Elijah Harris); translates into the "cause & effect" of the current, unresolved, unsolved, still pending, thirty plus (30+) year old 1st Degree Double Homicide death investigation relative to the Harris Brothers.*

78. The Acts & Omissions of the NYPD's 47th Precinct Detectives by entering into the *'quid quo pro' agreement* with Dwight Robinson *(the self-confessed, eye-witness identified, actual shooter of Salaha-din & Elijah Harris on 9/10/1992); "allowing him to sell narcotics without "heat"*

*from the police if he [Robinson] and his [Federal Drug Trafficking] cohorts provided [Perjured] evidence..."* Amount to Federal Criminal Offenses pursuant to 18 U.S.C. §§ 2 and 3. Aiding and Abetting and/or Accessory after the fact to Federal Narcotic Trafficking which included foreseeable "murder while in possession of a firearm during the commission of drug trafficking" and/or "RICO related murder and drug trafficking" in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 1959. Offenses for which the penalties range from Death to life imprisonment. Here, the Double Homicides of the Harris Brothers *are* 1st degree in nature, as they were planned and foreseeable. The 47th Precinct Detectives who aided & abetted, were accessories-after-the fact to Dwight Robinson's hiding his culpability in the Harris Brothers' Homicides; his continued *Narcotic* Trafficking *with NYPD protection,* are vicariously culpable for the third (3X known) shooting of the Deceased L. McClennon, for which Robinson is solely convicted and sentenced.

FEDERAL CLAIMS

FIRST CAUSE OF ACTION

42 U.S.C. § 1983

Denial of Double Homicide Victims' Due Process & Equal Protection
Rights In Violation Of The 5th & 14th Amendments To United States Constitution.

79. Plaintiffs' repeats and realleges each and every allegation contained in the proceeding paragraphs above as if fully set forth herein.

80. The Gravamen of this Complaint is that the August 31st, 2021, Settlement by The City of New York, The NYPD and BCDAO in _Buari v. City of New York, et. al.,_ 18-cv-12299-MKV, (EXHIBIT "D"), does establish, *A Fortiori*, New York City's *vicarious liability* for the acts & omissions of its employees' policies, customs, corruption and practices of deliberate indifference to violations of the Constitutional rights of the individuals who were the victims in the 9/10/1992, 1st Degree, Double Homicides. That the conduct underlying the 8/31/2021 Settlement establishes acts & omissions of NYPD 47th Precinct Detectives and BCDAO personnel that has unconstitutionally deprived Double Homicide victims Salaha-din & Elijah Harris due process of laws and equal protection of the laws, which would have legally and lawfully led to the apprehensions, prosecutions and appropriate penalties for those responsible for committing their murders incident to, and in furtherance of Federal Narcotics Trafficking.

81. The violations of the 1st Degree Homicide victims' constitutional rights and the resulting injuries are continuing to date, and were proximately and foreseeably caused by conduct, chargeable to the City, amounting to deliberate indifference to the Constitutional rights of persons, including the Harris Brothers whose Homicides were subjected to investigation and resolution by NYPD 47th Precinct Detectives. Who instead of investigating Dwight Robinson as the actual shooter of the Harris Brothers' on 9/10/1992; entered an illicit *quid quo pro* agreement/conspiracy with Robinson, which did:

a. Falsely implicate another as the *"actual shooter"* in the Harris Brothers' double murder on 9/10/1992,

b. Allowed Robinson & Others to continue in their *"collective, continuing, organized federal felony narcotic distribution and racketeering activities without heat from the police." (e.g., attempted murder of Buari & Parris in June 1995/ EXHIBIT "B" @p.12); and*

c. *Has allowed Robinson to avoid culpability for the Harris' 1992 Double Murders (for in excess of Thirty Years) and commit the "Third Known" (3X) Murder in a similar fashion to the Harris Brothers' '92 Murders, (the sole Murder he is convicted and sentenced).*

82. The NYPD's 47th Precinct Detectives' acts and omissions, via their actualized *"Quid Quo Pro", Obstructed Justice and* Denied the 1st Degree, Double Homicide Victims' Their Respective and Collective, 5th Amendment Due Process Rights to have the Serious Criminal Perpetrator(s) of Their Double Murders prosecuted pursuant to The Law.

83. The NYPD's 47th Precinct Detectives' acts and omissions via their actualized *"Quid Quo Pro" with D. Robinson,* did Obstruct Justice. And denied the 1st Degree, Double Homicide Victims' Their respective and collective, 14th Amendment Equal Protection Rights under the Law to have the serious criminal perpetrator(s) who unlawfully, with malice aforethought, unconstitutionally and brutally, caused their 1st Degree murders; brought to Justice Under the Law. 84. The individual Defendants' NYPD's acts and omissions were willful, malicious, oppressive, and reckless and have caused the current, unresolved, still pending status of the 9/10/1992, 1st Degree, Double Homicides Case of Salaha-din and Elijah Harris; and are of such nature as to warrant Punitive Damages being imposed in the amount of Twenty-five Million USD ($25,000,000) for each Salaha-din and Elijah Harris' for a total Fifty Million USD ($50,000,000) in Punitive Damages.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

Denial Of Victim's Constitutional Due Process & Equal Protection Rights.
*Monell* Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, Or Condoning Improper, Illegal and Unconstitutional Investigative Techniques and Failure To Supervise, Discipline and Train.

85. Plaintiffs' repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

86. Here the NYPD's 47th Precinct Detectives' whose acts and omissions were vicariously encompassed within the August 31st, 2021, Settlement in _Buari v. City of New York, et al., 18-cv-12299-MKV,_ which is directly consequent of the March 30th, 2021, *"ORDER & OPINION"* which explicitly found:

> With respect to his failure to train theory, [] relying on the Mollen Commission Report and the Mayor's Committee Report, alleges that "police perjury and falsification of official records [wa]s probably the most common form of police corruption" and that "the NYPD ha[d] been on notice [of] inadequate . . . police officers joining the force." [ ] These allegations, together with the findings in the Mollen Commission Report, accepted as true, plausibly allege a "pattern of similar constitutional violations" and that training was "deficient in a similar respect."
>
> Here, like in *Collins*, the findings in the Mollen Commission Report "make it plausible that the type of misconduct that led to [Buari's] arrest and prosecution was endemic within the NYPD" during the relevant time period. Id. Therefore, Buari has plausibly alleged that NYPD officials "were aware of a serious risk of constitutional violations, and that the failure to take any action in response to the problem—whether through training or otherwise—was the result of deliberate indifference." Id.
>
> *Id. EXHIBIT "C": 3/30/2021 "ORDER & OPINION" USDJ-MKV @pp.55,56 [Citations Omitted]*

87. In addition to the above Conclusions of Law regarding NYPD, USDJ Vyskocil found:

> While the misconduct underlying the uninvestigated complaints and undisciplined cases is unknown, it is at least plausible that it is similar to Buari's allegations and that the alleged failure to supervise and discipline is causally related to Buari's alleged injuries. This inference is not unreasonable in light of the factual similarity and temporal proximity between Buari's alleged injuries and the alleged inadequate misconduct control measures of the NYPD outlined in the Mollen Commission Report's thirty-nine-page chapter titled "The Collapse of the Department's Corruption Controls." Mollen Commission Report 70–109. See Pipitone v. City of New York, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.' ***The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the***

***supervisory and disciplinary failures described therein constituted a municipal policy for Monell purposes…***

Id. 3/30/2021 "ORDER & OPINION" @pp.57-58 [Citations Omitted/Emphasis Supplied]

88. As shown above; after consecutive motions to extend their time to respond to USDJ Vyskocil's 3/30/2021 "ORDER & OPINION", the Defendants' did Settle on August 31st, 2021.

89. The August 31st, 2021, *"Settlement" necessarily establishes that NYPD's 47th Precinct Detectives unlawfully and in violation of 18 U.S.C. §§ 241 and 242, deprived the Murder Victims, Salaha-din and Elijah Harris, Due Process under the Law when those culpable Detectives' knowingly and intentionally ignored the "Federal Nexus / Statutory Jurisdiction" relative to "Organized Continuing Crack-Cocaine Distribution and Firearm Use" which permeated 213th Street and Bronxwood Ave on September 10th, 1992, when the Harris Brothers' were executed without rights, by:*

1. *Felon(s) in Possession of Firearm(s) in violation of 18 U.S.C. § 922(g),*
2. *Firearms Discharged in Furtherance of Narcotic Trafficking in Violation of 18 U.S.C. § 924(c)(1)(a)(iii),*
3. *Murder While In Possession Of A Firearm During The Commission Of Drug Trafficking In Violation of 18 U.S.C. § 924(j)(1),*
4. *Murder In Aid Of Racketeering Activity In Violation Of 18 U.S.C. § 1959,*
5. *RICO Related Murder & Drug Trafficking In Violation Of 18 U.S.C. § 1961,*
6. *Possession W/ Intent To Distribute Crack-Cocaine In Violation Of 21 U.S.C. § 841(a)(1),*
7. *Conspiracy To Distribute Crack Cocaine In Violation of 21 U.S.C. § 846(a), and,*
8. *Continuing Criminal Enterprise In Violation Of 21 U.S.C. § 848.*

90. It is completely conceivable that the NYPD's 47th Precinct Detectives in their *"quid quo pro"* with Dwight Robinson for *perjured testimony* in exchange for *'No Heat' From the Police"*; 47th Precinct Detectives corruptly utilized their position as New York City Police Personnel to hinder and/or thwart *Federal Law Enforcement* from becoming aware of the myriad of Federal Narcotic Offenses transpiring within the 47th Precinct Jurisdiction of 213th Street and Bronxwood Avenue. It is *Not Far Fetched* that the 47th Precinct Detectives already corrupt, outrageous *"Quid Quo Pro" agreement to allow Dwight Robinson to continue distributing crack-cocaine without 'heat from police' also encompassed "no heat from Federal Law Enforcement" becoming aware of the myriad of Federal Narcotic & Firearm Violations rampant on 213th Street & Bronxwood Avenue, which set the environment the Harris Brothers' unwittingly entered on the evening of 9/10/1992.*

91. The acts and omissions of NYPD by and through the 47th Precinct Detectives' *Quid Quo Pro* agreement with those actively engaged in Federal Narcotic Trafficking and Federal Firearms Violations; deprived the Double Homicide Victims their respective and collective 5th Amendment Right To Due Process of Law where it is logically presumable that 47th Precinct Detectives' used their positions as New York City Police Officers to prevent Federal Narcotic & Firearm Offenses 'from heat from the Feds'. Thereby Federal Jurisdiction was prevented from being properly noticed and/or investigated by Federal Law Enforcement. Drug Enforcement Agents (DEA), Federal Bureau of Investigation (FBI), and/or Bureau of Alcohol, Tobacco, and Firearms (ATF). Thus, investigation & prosecution under Federal Narcotic Statutes. Statutes and Proceedings which would not have resulted in the outrageous current outcomes of wrongful conviction, suborned perjury, tainted, corrupted and unsolved status 30+ years later.

*"Outcomes"* caused because 47th Precinct Detectives aligned their Badges with the *actual shooter* in the Harris Brothers' Double Homicide in a twisted, warped Noble Cause, Self-Serving Corruption. And thereby set the stage for the current unresolved status of the Harris Murder Case, i.e., No Perpetrator(s) charged (or convicted) after 30+ years, self-confessions, and eye-witness identifications.

92. The Federal Laws, Statutes and Jurisdiction are structured and enacted to prosecute the situation and circumstances of the Harris Brothers' Homicides, however, the acts and omissions of NYPD's 47th Precinct Detective's investigating the Harris Brothers' Homicides did interfere with the lawful investigation of their brutal Double Murders and did deny them their 14th Amendment Rights to Equal Protection of The Laws.

93. The Acts & Omissions of the 47th Precinct Detectives who as employees of NYPD are imputed to the City of New York through Plaintiffs' *Monell claim* based on the previous Conclusions of Law in USDJ Vyskocil's 3/30/2021 finding that:

> ***The Mollen Commission Report "make it plausible that the type of misconduct that led to [Buari's] arrest and prosecution was endemic within the NYPD" during the relevant time period. Id. Therefore, Buari has plausibly alleged that NYPD officials "were aware of a serious risk of constitutional violations, and that the failure to take any action in response to the problem—whether through training or otherwise—was the result of deliberate indifference." Id.***
> ***Emphasis Supplied.***

94. Here, The NYPD, by and through the 47th Precinct Detectives Acts & Omissions which include the illegal, actualized Quid Quo Pro for suborned perjury in exchange for *"A Green Light from those 47th Precinct Detectives to 'Continuing Federal Criminal Narcotic Distribution'"*, substantiates the denial of the Homicide Victims *"Equal Protection Rights Under The Law"* when *the 47th Precinct Detectives used their position as New York City Law Enforcement* to Obstruct the

exercise of Federal Narcotics & Firearms Violations Laws, Statutes and Penalties relative to the situation and circumstances at issue in the 1st Degree, Double Homicides of Two (2) Native U.S. ADOS Citizens, uninvolved with the Federal Narcotics Trafficking, but brutally gunned downed by those who 47th Precinct Detectives', knowing and intentional acts & omissions denied The Homicide Victims' Equal Protection Rights; by use and thru their Offcial positions with NYPD, violating 18 U.S.C. §§ 241 and 242.

95. In accord with USDJ MK Vyskocil's Conclusions of Law issued against these Defendants' on 3/30/2021; these violations by NYPD Personnel are attributable to New York City pursuant to *Monell*.

> *The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for Monell purposes...*

**Id. EXHIBIT "C", 3/30/2021 OPINION @ p.58.**

96. The Individual and collective Defendants' action were willful, malicious, oppressive and reckless, and were of such a nature that Punitive Damages of Twenty-Five Million U.S. Dollars ($25,000,000) be paid for the deprivation of Salaha-din Harris' Constitutional Rights by Defendants' collectively and respectively, in addition to Compensatory Damages.

97. The Individual and collective Defendants' action were willful, malicious, oppressive and reckless, and were of such nature that Punitive Damages of Twenty-Five Million U.S. Dollars ($25,000,000) be paid for the deprivation of Elijah Harris' Constitutional Rights by Defendants' collectively and respectively, in addition to Compensatory Damages.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

THE ACTS & OMISSIONS OF THE BRONX COUNTY DISTRICT ATTORNEY'S OFFICE IN THE *PEOPLE v. BUARI*, DEPRIVED THE VICTIMS IN THAT MATTER THEIR COLLECTIVE AND RESPECTIVE CONSTITUTIONAL RIGHTS UNDER THE 5TH & 14TH AMENDMENTS; AND IS ATTRIBUTABLE TO THE CITY OF NEW YORK AS A *MONELL CLAIM*.

98. Plaintiffs' repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

99. Here, the *Conclusions of Law* in the germane proceedings *Buari v. City of New York*, on the underlying issue of the Bronx County District Attorney's Office's "Acts & Omissions" in the *"Wrongful Conviction & Sentence of Buari as the Actual Shooter in the 9/10/1992 Double Homicides of the Harris Brothers."* USDJ Vyskocil wrote in her detailed Conclusion of Law Denying the Defendant, NYC/NYPD and BCDAOs' FRCvP Rule 12(b) Motion To Dismiss the § 1983 (Claims NYC/ NYPD/ & BCDAO subsequently *"Settled"* on August 31st, 2021); her Honor ruled; in pertinent part:

> Buari, however, has sufficiently pleaded a failure by the Bronx DA to train, discipline, and supervise, relying on a plausibly alleged deliberate indifference theory. First, Bronx DA officials plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire Brady material "because these are basic facets of an ADA's job." Second, as discussed below, Buari plausibly alleges a history of ADAs mishandling these matters. Third, it is reasonable to infer that the failure to train, supervise, and discipline prosecutors in connection with these matters likely would cause recurrent constitutional violations....
>
> With respect to his failure to train theory, drawing reasonable inferences in Buari's favor, as the Court must, Iqbal, 556 U.S. at 678; Buari's list of judicial decisions finding similar prosecutorial misconduct plausibly permits a reasonable inference that Bronx DA policymakers should have been aware or were on notice of training deficiencies with respect evidence presentation and Brady obligations. (Am. Compl. Ex. A.) The list of decisions Buari cites include five vacated convictions in 1993 and 1994, the two years before Buari's prosecution, and several others before then....
>
> ....

In addition, Buari identifies specific areas where training in the Bronx DA's Office allegedly was deficient: initiating prosecutions without probable cause, using false or unreliable testimony or statements in criminal proceedings, failing to correct such testimony or statements, and failing to fulfill Brady obligations. (Id. ¶ 326.a.) Buari further alleges that the Bronx DA "trained prosecutors in blatantly unlawful practices to prevent disclosure of evidence favorable to criminal defendants under Brady." (Am. Compl. ¶ 334.) Since Buari cannot be expected to know particulars of Bronx DA training policies prior to discovery, see Amnesty America, 361 F.3d at 130 n.10, the Court finds that these allegations, accepted as true at the 12(b)(6) stage, plausibly state a claim, see supra Analysis, Section VII.B.1. Finally, it is plausible that the alleged training deficiencies led to Buari's injury given the factual similarities in the judicial decisions Buari cites and the temporal proximity of Buari's prosecution to the alleged training deficiencies. Accordingly, the Court denies Defendants' Motion with respect to Buari's Bronx DA Monell claim based on a failure to train theory.

Buari has also sufficiently pleaded a Monell claim based on a failure to supervise and discipline theory. As discussed above, Buari has plausibly alleged that the Bronx DA was on notice of prosecutorial misconduct similar to what Buari has alleged. He has also alleged a failure to investigate and discipline the misconduct. Specifically, Buari alleges that the Bronx DA's Office failed to "conduct internal disciplinary investigations; discipline the prosecutors who were known to engage in such misconduct . . . ; or refer such individuals for possible discipline." (Am. Compl. ¶ 329.) More specifically, he alleges that "in approximately 72 cases where courts had found prosecutorial misconduct occurred (including the use of and failure to correct false or misleading testimony and Brady violations), officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect." Furthermore, Buari alleges that "personnel files for [Bronx DA] cases where prosecutor misconduct had been found from between 1989 through 2006 . . . [revealed no] documentary evidence of disciplinary action ever being taken against the prosecutors." (Id. ¶ 335.) In short, Buari plausibly alleges a conscious disregard for prosecutorial misconduct and an absence of disciplinary action. Accepting these allegations as true, Buari has plausibly stated a claim for failure to supervise and discipline "tantamount to deliberate indifference."

Id. 3/30/2021 OPINION @ pp.61-64

100. USDJ Vyskocil's Conclusions Of Law regarding the Acts & Omissions of BCDAO in the underlying matter of ***Buari v. City of New York***, *supra,* is *a fortiori* to the fact the BCDAO's *'training deficiencies'* manifested against the Double Homicide Victim's Rights under the 5th and 14th Amendments when the BCDAO maladroitly sought to, did, and continually fails to prosecute the Harris Brother's Double Homicide as *"Homicides Separate, devoid, and apart from the Federal Narcotic Trafficking related Elements of: "Murder During & Relation To Narcotic Trafficking", "RICO Related Murder", and or as "Part of a Continuing Criminal Enterprise".*

101. The BCDAO Did and Continues to Act in complete and utter disregard for the *Supremacy Clause and Federal Preemption:*

THE SUPREMACY CLAUSE

Article. VI.

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

---

102. Here, in a manifestation of *'training deficiency'* for some murky, unfathomable reason, unsupported by precedent, jurisdictional authority and contrary to the judicial mandate for a new trial issued by ASCJ Oliver on 11/9/2017; BCDAO chose to ignore blatant, glaring, flagrant *Overt Acts* which establish *Probable Cause of the requisite elements* 18 U.S.C. § 924(j)(1)(murder while in possession of a firearm during the commission of drug trafficking), 18 U.S.C. § 1959(murder in aid of racketeering activity), 18 U.S.C. § 1961 (RICO related murder & drug trafficking). The Federal Law *Violations* which dominated the *"elements" and "environment" of the Harris' Brothers' Double Murders, i.e., being shot multiple times by a known, active narcotic trafficker, with an illegal firearm based on the orders from his 'boss', supplier, leader of the conspiracy to distribute crack-cocaine in the 213th Street & Bronxwood Avenue neighborhood.*

103. The BCDAO's failure to cede the Double Homicides prosecution of the Harris Brothers' is the manifestation of *prosecutorial training deficiencies* which did contribute to the current, unresolved, no perpetrator brought to "Justice" status of the 9/10/1992 1st Degree, Double Homicide Murders of Salaha-din and Elijah Harris.

104. The BCDAO's failure to recognize and allow the Federal Prosecution on the relevant, concurrent, contemporaneous, flagrant "federal racketeering related offenses" relevant to

the 9/10/1992 Murders; evidence tangible fact of the ineptness of the BCDAO's defective trial strategy, and overall "*theory of the case*" as clearly shown when, (as noted in *footnote #3 of ASCJ, Oliver's 440.10 Written* Opinion dated 11/9/2017 (EXHIBIT "B" @pp.2)), during the perjurious testimony of Dwight Robinson, (testimony eventually *recanted as perjurious)* the individual actually responsible for firing the Seventeen (17) 9mm rounds on 9/10/1992, which did kill the Harris Brothers in Cold Blood. Dwight Robinson, (vouched for by *BCDAO* and testifying as the star/chief/*eyewitness*), testified about "*working for Buari", i.e., distributing crack-cocaine.* The Trial Judge "*admonished*" the BCDAO: *"Not to infer or make any reference to the theory that everyone worked for Calvin [Buari], in any manner." Id. EXHIBIT "B" @ pp.2.*

105. The BCDAO's inept procedural decisions exhibit "*prosecutorial training deficiencies*" which caused irreparable harm to the *Victims Rights* to Due Process of Law when the BCDAO incorrectly and maladroitly prosecuted the Double Homicides of Salaha-din and Elijah Harris as isolated offenses, unrelated to the *climate of federal narcotic violations dominating 213th & Bronxwood Avenue and the conduct in which the perpetrator of the Harris Brothers' shooting was directly and specifically involved at the time of the 9/10/1992 shooting.*

106. The BCDAO's inept and maladroit procedural posture which was ruled the product of "*prosecutorial training deficiencies*" in People v. Buari, *Ind.No.:2111-1993*, and the *CPL §440.10 proceedings* vacating the resulting 22-year-old *wrongful* conviction & sentence for Defendant Buari; a fortiori is actualized, continuing prejudice to the Murder Victims' Constitutional Rights pursuant the 14th Amendment and "*equal protection under the laws.*"

107. Here, the BCDAO's maladroit decision to *retain State/Local Prosecution* of the 9/10/1992, pre-planned, knowing & Intentional, cold blooded, Double Murders' of Salaha-din & Elijah Harris; committed by those entrenched in *Federal Narcotic Trafficking and Firearm*

*Violations*, denied the murder Victims' their Rights pursuant to the 5th & 14th Amendments, to Due Process and Equal Protection under the Laws relevant, active and enacted to sternly deal with the very conduct which caused/resulted in these Victims 9/10/1992, 1st Degree, Double Homicides.

108. The BCDAO's decision, to dismiss prosecution and forego any further prosecution in the Double Homicide Shooting deaths of Salaha-din and Elijah Harris after Thirty Plus (30+) years of extrinsic and intrinsic Facts have given absolute clarity as to the *circumstances/ events/ conditions/ persons/ and situation relevant to the 9/10/1992 shooting;* is a flagrant denial of these *Victims' 14th Amendment Rights under the Law.*

109. Because the 9/10/1992 Double Homicides of Salaha-din & Elijah Harris were committed with *mens rea "planned with malice aforethought";* the Harris Brothers' murders constitute *"First Degree Murder"* and as such liability for Their Double Homicides remains *Unresolved and Pending.*

110. Here, BCDAO's defective prosecution & conviction was predicated on the grounds stated in, and underlying in Buari v. City of New York, et. al., *supra, which are necessarily relevant to the failure of the Double Homicide Victims' case being currently unsolved and/or No Perpetrator charged & convicted for the offense although clearly known and identified based on the Conclusions of Law made by U.S. District Court Judge MK Vyskocil in her 3/30/2021 Opinion and Order.*

111. The BCDAO's still standing *decision Not to pursue the Federal Narcotic Trafficking, RICO* Conspiracy Violations in which the Harris Brother's Double Homicide were, in fact, *"Overt Acts"* of the Buari Federal Narcotic Trafficking Conspiracy, Buari was leader organizer and supplier to; is the manifestation of "inadequate training" which did become

actualized, manifest Constitutional Violations, Irreparable Harm and the continuing unresolved double homicides of the Victims' Salaha-din and Elijah Harris.

112. Because Federal crimes have distinctive jurisdictional components and a characteristic complexity that set them apart from *simpler and broader pronouncements of New York State Law.* The National Policy Makers in-step with the *"1994 Crime Bill: Violent Crime Control and Law Enforcement Act"* and then U.S. Attorney Janet Reno's directive to the Drug Enforcement Agency (DEA), Federal Bureau Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Federal Prosecutions of narcotic trafficking related gun/firearm violence became a heighten priority of *Federal Law Enforcement during the specific time frame of the Harris Brother's 9/10/1992, 1st Degree, Double Homicides.*

113. Despite the fact that All the Individuals involved in the 9/10/1992 1st Degree, Double Homicides of the Harris' Brothers being known and confirmed *firearm possessing, crack-cocaine traffickers;* BCDAO failed miserably in alerting the Southern District United States Attorney's Office (and/or other Federal Agency) as to the Federal level narcotic trafficking and ancillary firearm violence and homicides which constituted *"Overt Acts"* to Federal RICO and/or Continuing Criminal Enterprise violations which *"occasioned & encompassed the Double Homicides of Plaintiffs' Brothers, Uncles, Salaha-din and Elijah Harris.*

114. The maladroit, prejudicial, ineffective, illegal prosecution and thereby, the subpar ability to carry-out the *Statutory Duties of the Bronx District Attorney's Office, is established by a "preponderance of the evidence"* during the trial of Defendant Buari in October 1995, in *People v. Buari, supra,* extant trial transcript @ page 489, lines 5-9. The Trial Court admonished ***ADA Karen, that he was not to infer or make any reference to the theory that everyone worked for***

***Calvin [Buari], in any manner.*** *See Trial Transcript pp. 548:8 thru 551:16. (Id. EXIBIT "B" @ p.2 ftn3).*

115. When BCDAO, ADA Karen attempted to argue the elements which established *"Distributor-Worker"* relationships between Buari and the witnesses (whose testimonies were the product of the "*Quid Quo Pro*" with the 47th Precinct Detectives) in the *People's* October 1995 Summation of the trial. ***The Bronx Supreme Court Justice presiding admonished ADA Karen that if he continued, he would be held in contempt, and a mistrial would be declared. (See EXHIBIT "B" referring Trial Transcript, People's Summation page 1282:11 thru page 1285:6.)***

116. The fact key elements/ acts of the offense were barred in the State Court Prosecution when those very elements/ acts, were/are key aspects of the Double Homicides of the Harris Brothers. Evidences the prejudicial, maladroit comprehension BCDAO retains of their Duties and Responsibilities to Victims, Defendants and the District Attorney's Office's Constituencies. Whereas here, ***the Homicides which were committed by a felon in possession of a firearm during the commission of drug trafficking, as part of the greater conspiracies to possess with intent to distribute narcotics in the 213th Street & Bronxwood Ave Neighborhood in partnership with Calvin Buari.*** Clearly constitutes Federal Offenses that per *The Supremacy Clause* juxtaposed with the then current '*94 Crime Bill* put the BCDAO on Notice to execute a *Basic Function* of that District Attorney's Office and, at the very least, alert the Southern District Federal Law Enforcement Agencies as to the Federal Offense Elements at issue in the Harris Brothers' Double Homicides. These failings, demonstrate, clearly and convincingly, that the Victims 5th and 14th Amendment Rights to Due Process of Law as well as Equal Protection Under Law were and are continually being violated, trampled and blatantly "*disregarded*" by the BCDAO.

117. At a point in time which marked the enactment of the *"1994 Crime Bill: Violent Crime Control and Law Enforcement Act"* and thereby a dramatic increase in Federal Prosecutions in conjunction with *"Joint Federal & Local Law Enforcement Drug Task Forces."* The BCDAO, in obvious disregard for prevailing protocols. Amateurishly, maladroitly, and continuously fails to cede the Federal Offenses in which the Harris Brothers' murders are "*Overt Acts*": ***RICO Related Murders, pursuant to 18 U.S.C. §§ 1959, 1961. Murder while in possession of a firearm during the commission of drug trafficking, pursuant to 18 U.S.C. § 924(j)(1). And as part of a Continuing Criminal Enterprise, pursuant to 21 U.S.C. § 848(e)(1)(A).*** BCDAO instead ignored relevant controlling Federal Statutory Authority and prevailing protocol of relinquishing serious/complex Offenses to be investigated and prosecuted *Federally.* And did retain a prosecution under simpler broader pronouncements of NYS Law, the extant record substantiates was beyond BCDAO's jurisdiction to prosecute, either lawfully or effectively.

118. The failure of BCDAO to perform to the level reasonably expected of that Office of The City of New York; did and is continually prejudicing the Victims of the 9/10/1992 Homicide whose *Case is currently unresolved and unsolved because of the acts and omissions of BCDAO in tandem with NYPD's 47th Precinct Detectives.*

119. The acts and omissions of the Bronx County District Attorney's Office were maladroit, amateurish and beneath the level of professionalism set and required for a New York City Agency charged with the responsibility and duty of upholding the United States Constitution, the NYS Constitution and the Rights of Bronx Citizens.

120. Accordingly, Punitive Damages are sought in the amount of One Hundred Million USD, ($100,000,000), as vindication for both Salaha-din and Elijah Harris' Constitutional Rights to Due Process and Equal Protection Under The Law, (and the two (2) consecutive 25 years to

Life *Statutory Penalties obfuscated being lawfully imposed)*; which were unconstitutionally & illegally compromised, deprived and denied these *Victims*, (and by proxy the Plaintiffs'), by the Defendant's unlawful acts and unconstitutional omissions which have caused the current, unresolved and unsolved status of the 9/10/1992, "*30+ year old*" 1st Degree, Double Homicide for which no perpetrator is charged or convicted due to NYPD & BCDAO's admitted *misconduct via the August 31st, 2021, Settlement in Buari v. City of New York, et al., EXHIBIT "D".*

## FOURTH CAUSE OF ACTION

42 U.S.C § 1983

*MONELL V. DEPARTMENT OF SOCIAL SERVICE, 436 US 658 (1978)*

*[Against Defendant the City of New York]*

121. Plaintiffs repeat and realleges each and every allegation contained in the preceding paragraphs above as if set forth herein.

122. At the time of Salaha-din and Elijah Harris' 9/10/1992, unsolved, 1st Degree, Double homicides; Defendant the City of New York created and maintained policies, customs and practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were the victims of a brutal, pre-planned 1st Degree, double homicide by individuals actively violating Federal Narcotic Statutory laws, to cede the investigation and prosecution of clearly defined *Federal Criminal Conduct to Federal Law Enforcement Agencies/ Jurisdiction, as per the Supremacy Clause, Article IV of the U.S. Constitution and the Specific intent of the U.S. Congress when it legislated, enacted and had active at the point in time of September 10th, 1992, shooting deaths of two (2) unarmed young men by individuals deeply entrenched at that point and time in the unlawful trafficking of crack cocaine on and in the vicinity of 213th Street and Bronxwood Ave.*

123. The violations of the Harris Brothers' Constitutional Rights and the resulting failure of the perpetrator(s) to be lawfully investigated, and prosecuted are the direct result of:

a. the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

i. the duty not to create or use false or misleading evidence, testimony, and witness statements during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

ii. the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, and statements whenever such misconduct is discovered to overturn convictions discovered to have been obtained through such unconstitutional means; and

iii. the continuing duty to obtain, preserve, and timely disclose criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

b. the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

124. The foregoing express de facto polices, practices and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases and conduct.

125. The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions and the July 7, *1994 'Mollen Commission Report'*, that its employees maintained wrongfully alliances with

*culpable witnesses (i.e., D. Robinson and the State's 'witnesses' he suborned perjury from on behalf of NYPD's 47 Precinct Detectives as overt acts in their corrupt 'Quid Quo Pro' agreement.)*

126. The City of New York knew of the unconstitutional actions of its employees in the Harris Brothers' 1st Degree, Double Homicides in failing to execute their respective and collective duties pursuant to the Supremacy Clause of the U.S. Constitution in regards to the clear *federal nexus* involved in the *"pre-planned, shooting deaths, by known felons, actively distributing narcotics, while using firearms during Continuing Criminal /RICO conspiracies to distribute crack-cocaine, brutally and in cold blood, with malice aforethought, fired Seventeen (17) 9mm rounds at two (2) unarmed, uninvolved, innocent young men who stopped to buy food in a NY neighborhood saturated in illegal narcotic trafficking and gun violence."*

127. And that the acts and omissions of the New York Employees/ Personnel (i.e., BCDAO & NYPD) did so impede, hinder, violate and has rendered virtually impossible judicial resolution. That the current unresolved, unsolved status of the thirty plus (30+) year old, first degree double homicides of Salaha-din and Elijah Harris are attributable to the City of New York under the doctrine of *respondeat superior* for the myriad of constitutional level bad acts and maladroit omissions clearly exhibiting a lack of prosecutorial acumen academic to a County District Attorney's Office the magnitude of BCDAO. (As evidence by the current, unresolved, *still pending*, first degree, 30+ year old, double homicides of Salaha-din and Elijah Harris, for which no disciplinary action has been taken against any of the previously established culpable New York City Departments, Office, and/or Officers.)

129. Accordingly, in light of The City of New York's, BCDAO's declining to pursue *Justice* in and on behalf of Salaha-din and Elijah Harris, the *Victims of the 30+ year old, 1st Degree, Unsolved, Unresolved, Brutal Double Homicide, whose investigation & prosecution was marred*

*by Serious Constitutional Violations juxtaposed with Horrendous Professional Misconduct, (of which is directly attributable to BCDAO); the Plaintiff's demand the City Of New York pay just Compensation in the amount of Fifty Million USD ($25,000,000 x 2=$50,000,000) for Salaha-din & Elijah Harris' Unjust 1st Degree Murder and the subsequent Unconstitutional, Prejudicial Acts & Omissions of the BCDAO who are major contributors in the current unresolved, unsolved status of the Harris Brothers' 1st degree, 1992, Homicides. And the attendant fact of "Justice Denied" these two (2) Homicide Victims and by direct proxy, Plaintiffs.*

130. The Defendants named above, at all times relevant to this Complaint acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City, and within the Scope of their employment, agency, department and tenets of their job functions and/or description.

FIFTH CAUSE OF ACTION

*New York State Constitution*

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence, Suppression of Inculpatory Evidence, and Failure to Prosecute (New York State Constitution, Article I §§ 1,11)*

*Against All Defendants*

131. Plaintiffs repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein in regards both Salaha-din and Elijah Harris' respective & collective Rights under the New York State Constitution.

132. Contrary to the unethical, unprofessional, unconstitutional, illegal treatment the 1st Degree, Double Homicide Victims, Salaha-din and Elijah Harris' case received. The Rights, Whims, Provocations, Unlawful Acts, Omissions and/or Abnormal, Criminal use of their

collective and/or respective Authority Under Color of Law by Defendants' Do Not and Did Not negate the Rights these Lifelong Residents of New York Retained even in their untimely Deaths or by proxy, through their Family, the Plaintiffs.

133. The Rights, Whims, Actualized Unlawful Acts, Omissions and/or Abnormal, Criminal use of Their collective and/or respective Authority Under Color of Law did not and does not *trump or negate* the Rights of the Victims.

134. The Acts and Omissions described above caused violations of Victims Salaha-din and Elijah Harris' rights under the New York State Constitution, including the rights to life and the rights to due process and protections under law for the violation of those guaranteed rights under the New York State Constitution.

SIXTH CAUSE OF ACTION

Negligence

New York State Law

Against Defendant the City Of New York

135. Plaintiffs repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

136. Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to the 1st Degree, Homicide Victims, Salaha-din and Elijah Harris and by proxy the Plaintiffs.

137. Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its Officers and Employees with regard to the matters described above. The City of New York's inadequate

training, supervision, and discipline proximately caused the misconduct described above and the current unresolved and unsolved status of the Thirty plus (30+) year old 1st Degree Double Homicides.

138. The City's negligence and gross negligence directly and proximately caused ***No Perpetrator*** of the 1st Degree, Double Homicide Victims, Salaha-din and Elijah Harris to be arrested, charged and convicted in the *Thirty Plus (30+) year old, unresolved, still pending matter.*

139. *Plaintiffs' cause of action for Negligence that violated the Constitutional Rights of Salaha-din and Elijah Harris was unavailable until August 31st, 2021, when the Defendants did Settle and agree to payout Four Million USD/$4,000,000 on Allegations/Claims that by a fortiori apply with greater force to the Rights of the 1st Degree Homicide Victims here.*

140. Defendant, City of New York is liable under *respondeat superior* for the *acts & omissions of its employees within the scope of their employment.*

***********

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs Demand Judgment Against the Above-captioned Defendants as follows:

a. For Compensatory Damages To Be Determined At Trial, But In All Events No Less Than $50 Million;

b. For Punitive Damages To Be Determined At Trial, But In All Events No Less Than $100 Million;

c. For Reasonable Attorneys' Fees, Cost and Disbursements, Under 42 U.S.C. § 1988 and Other Applicable Laws;

d. For Pre & Post-Judgment Interest As Allowed By Law; and

e. For Such Other Relief As This Court Deems Just And Proper.

Dated: July 21, 2023
New York, New York

Yusuf A. Harris, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

Gregory S. Harris, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

Ishmael C. Harris, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

Oral R. Sinclair, pro-se
465 East 188th Street
Box 987
Bronx, NY 10458

# EXHIBITS

A = **9/1992 DEATH CERTIFICATES**
**SALAHA-DIN E. HARRIS & ELIJAH J. HARRIS**

B = **11/9/2017 CPL § 440.10 WRITTEN DECISION:**
*PEOPLE OF THE STATE OF NEW YORK v. CALVIN BUARI, #2111-1993*
*ASSOCIATE SUPREME COURT JUSTICE HON. EUGENE OLIVER, JR.*

C= 3/30/2021 OPINION & ORDER:
*BUARI v. CITY OF NEW YORK, ET AL., 18-CV-12299*
*UNITED STATES DISTRICT COURT JUDGE HON. MARY KAY VYSKOCIL*

D= 8/31/2021 SETTLEMENT CONFERENCE:
*BUARI v. CITY OF NEW YORK, ET AL.*, 18-CV-12299

E= 1/1995 DEATH CERTIFICATE
MS. HELEN R. HARRIS (MOTHER OF VICTIMS)



THE CITY OF NEW YORK
VITAL RECORDS CERTIFICATE

5

VITAL RECORDS DEPARTMENT OF HEALTH BOROUGH OF MANHATTAN
92 SEP 14 PM 7:36
DATE FILED

## CERTIFICATE OF DEATH

Certificate No. 156-92-018959

1. NAME OF DECEASED (Type or Print): Salahadin (First Name) (Middle Name) Harris (Last Name)

OFFICE OF CHIEF MEDICAL EXAMINER, 520 FIRST AVENUE NY 10016

### MEDICAL CERTIFICATE OF DEATH (To be filled in by the Physician)

2. PLACE OF DEATH — NEW YORK CITY — 2a. BOROUGH: Bronx
2b. Name of hospital or other facility / If not facility, street address: East 213th St. & Bronxwood
2c. If in Hospital or Other Facility (Check): 1 ☐ DOA 3 ☐ Outpatient 2 ☐ Emerg. 4 ☐ Inpatient
2d. If inpatient, date of current admission: Month / Day / Year

3. DATE AND HOUR OF DEATH OR FOUND DEAD — 3a. (Month) (Day) (Year): September 10 1992 — 3b. HOUR: 9:39 ☐ AM ☒ PM
4. SEX: Male
5. APPROXIMATE AGE: 26 Years

6. DEATH WAS CAUSED BY: Enter only one cause per line — INTERVAL BETWEEN ONSET AND DEATH

PART 1
a. Immediate cause: Multiple (6) gunshot wounds to torso and head
b. with perforation of brain
c. Due to or as a consequence of

PART 2
d. Other significant conditions contributing to death but not resulting in the underlying cause given in part 1

7a. INJURY DATE OF INJURY (Month) (Day) (Year): 9 10 92
7b. TIME: 9:25 ☐ AM ☒ PM
7c. AT WORK: 1 ☐ YES 2 ☒ NO
7d. PLACE OF INJURY — At home, farm, street, factory, office building, etc. (Specify): Street
7e. LOCATION: East 213th St. & Bronxwood Ave.
7f. HOW INJURY OCCURRED: Shot By Another Person(s)

8. Manner of Death (Check all that apply): Pending ☐ Investigation (P/FM) ☐ Toxicology ☐ Further Study ☐ Natural ☐ Accident ☐ Suicide ☒ Homicide ☐ Undetermined
9. Autopsy: ☒ Yes ☐ No Autopsy Pursuant to Law ☐ No Autopsy
10. On the basis of examination and/or investigation, in my opinion, death occurred due to the causes and manner as stated:
CERTIFIER SIGNATURE: [signature] M.D.
DATE: September 11, 1992

11. M.E. Case No.: BK92-3841
12a. Date Pronounced Dead (Month, Day, Year) (if different from 3a)
12b. TIME ☐ AM ☐ PM
CERTIFIER NAME (Print): Zoya Shmuter (Medical Examiner)

### PERSONAL PARTICULARS (To be filled in by Funeral Director)

13. Usual Residence a. State: New York
13b. County: Bronx
13c. City, Town, or Location: New York
13d. Street & House No.: 1183 Grenada Pl — Zip: 10466 — Apt. No.
13e. Inside City Limits of 7c: ☒ Yes ☐ No

14. Served in U.S. Armed Forces: No 0 ☒ Yes 1 ☐ Specify years From To
15. Marital Status (Check One): 1 ☒ Never Married 2 ☐ Widowed 3 ☐ Married or separated 4 ☐ Divorced
16. Name of Surviving Spouse (If wife, give maiden name)

17. Date of birth of Decedent (Month) (Day) (Year): February 9, 1966
18. Age at last birthday: 26
If under 1 Year: mos. days — If less than 1 Day: hours min.
19. Social Security No.: 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

20a. Usual Occupation (Kind of work done during most of working lifetime; do not enter retired): Mechanic
20b. Kind of Business

21. Birthplace (City & State or Foreign Country): Brooklyn, NY
22. Education (Check only one): 0-11 ☐1 12 ☐2 13-15 ☒3 16 ☐4 17+ ☐5
23. Other name(s) by which decedent was known: SALAHADDIN HARRIS

24. NAME OF FATHER OF DECEDENT: Daniel Harris
25. MAIDEN NAME OF MOTHER OF DECEDENT: Helen Sinclair

26a. NAME OF INFORMANT: Daniel Harris
26b. RELATIONSHIP TO DECEASED: Father
26c. ADDRESS (City) (State) (Zip): 15 Lynn St. Spring Valley, N.Y. 10977

27a. NAME OF CEMETERY OR CREMATORY: Restland Cemetery
27b. LOCATION (City, Town, State and Country): East Hanover, N.J.
27c. DATE OF BURIAL OR CREMATION: September 15, 1992

28a. FUNERAL DIRECTOR: John H. Joyce Inc.
28b. ADDRESS: 2332 7th Ave NY, NY. 10030

VR16 (1/88) BUREAU OF VITAL RECORDS — DEPARTMENT OF HEALTH — THE CITY OF NEW YORK

This is to certify that the foregoing is a true copy of a record on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made thereon, as no inquiry as to the facts has been provided by law.

Gretchen Van Wye, PhD, City Registrar

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited by §3.19(b) of the New York City Health Code if the purpose is the evasion or violation of any provision of the Health Code or any other law.

The City of New York

134000038 3315

December 9, 2022

THE CITY OF NEW YORK

VITAL RECORDS CERTIFICATE

VITAL RECORDS
DEPARTMENT OF HEALTH
BOROUGH OF MANHATTAN

92 SEP 14 PM 7 35

DATE FILED

11

## CERTIFICATE OF DEATH

Certificate No. 156 92-048958

1. NAME OF DECEASED (Type or Print): Elijah (First Name) (Middle Name) Harris (Last Name)

OFFICE OF CHIEF MEDICAL EXAMINER

### MEDICAL CERTIFICATE OF DEATH (To be filled in by the Physician)

2. PLACE OF DEATH — NEW YORK CITY — 2a. BOROUGH: Bronx
2b. Name of hospital or other facility. If not facility, street address: East 213th St. & Bronxwood Avenue
2c. If in Hospital or Other Facility (Check): 1 ☐ DOA 3 ☐ Outpatient 2 ☐ Emerg. 4 ☐ Inpatient
2d. If Inpatient, date of current admission: Month / Day / Year

3. DATE AND HOUR OF DEATH OR FOUND DEAD — 3a. (Month) (Day) (Year): September 10, 1992 — 3b. HOUR: 9:39 ☐ AM ☒ PM
4. SEX: Male
5. APPROXIMATE AGE: 24 Years

6. DEATH WAS CAUSED BY: Enter only one cause per line — INTERVAL BETWEEN ONSET AND DEATH

PART 1
a. Immediate cause: Multiple (5) gunshot wounds to neck, upper
b. extremities and torso with lungs, aorta, liver,
c. spinal cord perforations and bleeding

PART 2
d. Other significant conditions contributing to death but not resulting in the underlying cause given in part 1

7a. INJURY DATE OF INJURY (Month) (Day) (Year): 9 10 92
7b. TIME: 9:25 ☐ AM ☒ PM
7c. AT WORK: 1 ☐ YES 2 ☒ NO
7d. PLACE OF INJURY — At home, farm, street, factory, office building, etc. (Specify): Street
7e. LOCATION: East 213th St. & Bronxwood Ave.
7f. HOW INJURY OCCURRED: Shot By Another Person(s)

8. Manner of Death (Check all that apply): Pending ☐ Investigation (P/FM) ☐ Toxicology ☐ Further Study; ☐ Natural ☐ Accident ☐ Suicide ☒ Homicide ☐ Undetermined
9. Autopsy: ☒ Yes ☐ No Autopsy Pursuant to Law ☐ No Autopsy
10. On the basis of examination and/or investigation, in my opinion, death occurred due to the causes and manner as stated:
CERTIFIER SIGNATURE: Zoya [signature] M.D.
DATE: September 11, 1992
CERTIFIER NAME (Print): Zoya Shmuter (Medical Examiner)

11. M.E. Case No.: Bx92-3840
12a. Date Pronounced Dead (Month, Day, Year) (If different from 3a)
12b. TIME ☐ AM ☐ PM

### PERSONAL PARTICULARS (To be filled in by Funeral Director)

13. Usual Residence a. State: New York
13b. County: Bronx
13c. City, Town, or Location: New York
13d. Street & House No. / Zip / Apt. No.: 1183 Grenada Pl, 10466
13e. Inside City Limits of 7c: ☒ Yes ☐ No

14. Served in U.S. Armed Forces: 0 ☒ No 1 ☐ Yes — Specify years From To
15. Marital Status (Check One): 1 ☒ Never Married 2 ☐ Widowed 3 ☐ Married or separated 4 ☐ Divorced
16. Name of Surviving Spouse (If wife, give maiden name)

17. Date of birth of Decedent (Month) (Day) (Year): January 5, 1968
18. Age at last birthday: 24
If under 1 Year: mos. days — If less than 1 Day: hours min.
19. Social Security No.: 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

20a. Usual Occupation (Kind of work done during most of working lifetime, do not enter retired): Mechanic
20b. Kind of Business

21. Birthplace (City & State or Foreign Country): Bronx, N.Y.
22. Education (Check only one): 0-11 ☐ 1 12 ☐ 2 13-15 ☒ 3 16 ☐ 4 17+ ☐ 5
23. Other name(s) by which decedent was known

24. NAME OF FATHER OF DECEDENT: Daniel Harris
25. MAIDEN NAME OF MOTHER OF DECEDENT: Helen Sinclair

26a. NAME OF INFORMANT: Daniel Harris
26b. RELATIONSHIP TO DECEASED: Father
26c. ADDRESS (City) (State) (Zip): 15 4th St., Spring Valley, N.Y. 10977

27a. NAME OF CEMETERY OR CREMATORY: Restland Cemetery
27b. LOCATION (City, Town, State and Country): East Hanover, N.J.
27c. DATE OF BURIAL OR CREMATION: September 15, 1992

28a. FUNERAL DIRECTOR: John H. Joyce Inc.
28b. ADDRESS: 2332 7th Ave. N.Y., N.Y. 10030

VR15 (1/88) BUREAU OF VITAL RECORDS — DEPARTMENT OF HEALTH — THE CITY OF NEW YORK

This is to certify that the foregoing is a true copy of a record on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made thereon, as no inquiry as to the facts has been provided by law.

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited by §3.19(b) of the New York City Health Code if the purpose is the evasion or violation of any provision of the Health Code or any other law.

Gretchen Van Wye
Gretchen Van Wye, PhD, City Registrar


134000038331b

December 9, 2022

EXHIBIT "B"



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: CRIMINAL TERM PART 31

---------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

CALVIN BUARI,

Defendant.

---------------------------------------------------------X

DECISION
IND. NO.: 2111-1993

OLIVER, JR.:

The defendant Calvin Buari, submitted the underlying motion pursuant to C.P.L.§ 440.10[1], [b], [c], [g] and [h] on October 15, 2015. The motion was assigned to this Court in December of 2015. The case was adjourned on consent throughout 2016, to provide the Bronx District Attorney's Office, with the opportunity to interview witnesses proffered by the defense. In the interim, the People consented to a hearing. A hearing was initiated before this Court on March 27, 2017, and concluded on April 7, 2017. On May 5, 2017, this Court granted the defendant's motion on the ground of C.P.L. § 440.10[1][g], newly discovered evidence. The following is the Court's written decision in support of that ruling.

<u>Procedural History</u>

On September 10, 1992, at approximately 9:25 P.M., brothers, Salhaddin and Elijah Harris, were seated in the front seat of a light colored BMW, when they were killed by multiple gunshots fired through the vehicle's rear passenger window. The car was parked at 213th Street and Bronxwood Avenue in Bronx County. Calvin Buari, a known drug dealer in the neighborhood, was arrested for the double homicide on March 22, 1993. The case was tried before the Hon. Joseph Cerbone. The defendant was convicted of two counts of murder in the second degree on December 5, 1995. He was thereby sentenced to two consecutive indeterminate terms of twenty-five years to life.

The defendant subsequently filed a motion to vacate his conviction pursuant to C.P.L.§ 440.10 on June 26, 2003. That motion was assigned to the Hon. Dominic Massaro. The defendant was represented by the Office of the Appellate Defender. After a hearing, the Court denied the defendant's motion. A lengthy decision was filed on April 10, 2006. Appeal of the decision was denied. On October 15, 2015 the instant motion was filed, based upon newly discovered evidence, and actual innocence. [illegible] hearing on March 27, 2017. [illegible] additional witnesses [illegible]. The People did not present any witnesses. The parties submitted briefs. On May 5, 2017, this Court denied the actual innocence claim, and granted the motion, finding newly discovered evidence. A new trial was ordered.

Major Trial Testimony People's Case.

Jerry Connor, testified that he was a barber. He was 18 in September 1992. He was on the block at the time of the shooting, standing with his friends drinking beer. He observed Kinto Effort jump over a wall, and then pass an automatic weapon to the defendant, Calvin Buari. He then saw the defendant approach a white BMW and fire shots into it. Then Calvin put the gun in his waistband and ran away. Dwight Robinson, told the police that he was a witness to the shooting, and told him to speak with the police (see Trial Transcript pg. 156), and accompanied him to see the ADA. He denied knowing if Dwight sold drugs, but assumed so. He's known the defendant since childhood, and owed him money in March 1995. He personally knew where the gun was kept, and inferred that everyone knew.[1] He was repeatedly admonished by the Court to speak up throughout his testimony.

Dwight Robinson, was 20 when he testified. He had been arrested for the sale and possession of crack nine times, and had one pending case. He testified that on September 10, 1992, he saw "Calvin shoot the 2 kids." [2] Calvin, Jonathan Parris, Stephen Robinson, Kinto Effort, Lamont Seabrook, and Jerry Connor were present. He was 17 at the time. He sold drugs on the corner of 213th Street and Bronxwood. At the time of the incident, he went across the street to roll a blunt, the two kids in the white BMW said to Calvin "Get that money kid." The driver also said " I heard you brought the sweeper," to Calvin. Calvin turned to Kinto, and said "give me that." "Is this thing on safe?" Calvin proceeded to fire 14 shots into the rear passenger window of the BMW. He was three to four feet away from Calvin at the time. Calvin called him in March 1993 to tell him he had been arrested for the September 10, 1992 shooting. At Calvin's urging, he went to see his lawyer with Kinto Effort, Stephan Robinson, Lamont Seabrook, and Jerry Conner. They provided an alternate version of what happened. In exchange for testifying, he was promised no jail time on his pending charges. He did not have an attorney present when he made the arrangements. He didn't see the gun retrieved, but obviously the gun came from the alley, Kinto had the gun on him when the BMW pulled up. He admitted to selling crack in 1992. His brother Stephen Robinson was killed in the summer of 1995. Pursuant to that investigation, in August 1995, he informed the detectives that he knew who had killed the Harris brothers. He also testified that he and his brother always sold drugs for Calvin.[3]

Kenya Holder testified that he was 13 in September 1992. He knew Calvin, had been coming

[1] Trial transcript page 133, lines 8-12.
Q: What did you see Kinto do?
Court: If anything?
A: After I seen him come back from getting wherever we keep the gun at, I seen him approach Calvin after these guys came out of the restaurant.

[2] Dr. Zoya Schnuter, medical examiner, testified that the deceased were 26 and a 31 year old men, each died as a result of multiple gun shot wounds.

[3] [illegible] ... ADA Karen ... any reference to the theory that everyone worked for Calvin ... through page 558 line 10. ADA Karen attempted to argue the point during his summation and was informed that if he continued he would be held in contempt, and a mistrial would be declared. See Trial Transcript, People's summation page 1282, line 11 through page 1285 line 6.





from a girlfriend's house, he saw Calvin fire shots into a white BMW, and then walk away. He had pending drug and gun charges. He was promised no jail time, and no criminal record in exchange for testifying. Holder stated that any prior charges against him weren't true, and denied selling drugs. He didn't tell anyone what had happened until August 3, 1995 when he spoke with the police. Holder was repeatedly admonished by the Court to speak up.

Brian Johnson, age 20, was on probation for sale of narcotics. He sold drugs on 213th Street and Bronxwood Avenue. He testified that had known Calvin for six years. On September 10, 1992 he was approximately 25 to 30 feet away, when he came out of the store, and saw Calvin shooting into a white BMW. He saw Calvin ask for the gun from Kinto Effort. He saw Kinto, go and get the gun from the alley and give it to Calvin. Dwight Robinson told him to speak with ADA Karen, a week or so prior to testifying. He was repeatedly admonished to speak up by the Court.

Lamont Seabrook, age 20, testified with his attorney present. In exchange for testifying, he was promised help on all his cases, and that he wouldn't charged with bail jumping. On September 10, 1992, he saw a white BMW pull up, and two guys got out. He was with Brian Johnson, Jerry Connor, and Dwight Robinson. He saw Kinto Effort, Calvin Buari and Jay Parris. He saw one of the men say to Calvin, "Get that money kid." One of the men also said "I heard you brought a street sweeper?" Then he saw Kinto Effort jump over the wall and come back with a gun. The men went into the restaurant. He saw Kinto pass the gun to Calvin. After they got back into their car, Calvin shot them. He didn't mention what he had seen, until October 16, 1995, when he spoke with ADA Karen. On January 11, 1995, he was arrested for possession and sale of crack, on 213th Street and Bronxwood. He was also in possession of a 380 cartridge, and a 9 millimeter round on him at the time. He has a total of six cases, and at least six bench warrants. The witness was repeatedly admonished to speak up.

The final witness called on the People's case was Kintu Effort, age 22. He was produced from prison, while serving a sentence for narcotics of four to eight years. He was promised a letter to the parole board verifying that he helped them on a case. That would also provide him early release from parole. He was also assured that he wouldn't be prosecuted as an accomplice for the September 1992 homicides. He spoke both with the People and detectives, a month to two weeks before testifying. He had known Calvin for seven to eight years. On September 10, 1992, two guys drove up in a BMW, he was with Calvin, John Parris, Dwight Robinson, and Peter Robinson. Calvin had given him the gun in the alleyway. One guy from the car went into the store, the other went into the restaurant. When they came out, one said something to Calvin, before they got back into the car. He didn't hear what was said. Calvin asked him for the gun. He gave Calvin the gun, and he started shooting into the back window. They each ran in opposite directions. In a police report prepared by Det. Dietz, who interviewed Kintu in September 1992, he said that he heard the shooting, but didn't see who shot.

DEFENSE CASE

Det. Christine Fortune, had been assigned to Bronx Homicide for just over a year. She testified that she spoke with Dwight Robinson in July 1995 about various homicides within the confines of the 47th Precinct. The defense introduced Detective Fortune's testimony from what

appeared to be a previously held pre-trial hearing, conducted before Judge Cerbone on October 6, 1995. Apparently at that hearing on page 117, line 8, Det. Fortune testified that she questioned Dwight Robinson in July 1995, about the homicide of his brother, and the September 10, 1992 homicides. ADA Karen refused to stipulate to the accuracy of transcript. The Court clarified that Det. Fortune said that the first time she spoke with Dwight Robinson, about the September 1992 homicide was on August 18, 1995. In July 1995, she questioned him about the homicide of his brother. At some point, Dwight Robinson called Det. Price, and said he wanted to talk about the September 10, 1992 homicides.[4]

**John Parris aka "Jay," age 24,** was sentenced to jail in November 1992 for 2 1/3 to seven, years. He was on parole when he testified. On September 10, 1992, he was with Calvin Buari, and Kintu Effort, the three of them heard shots fired and ran down the block. He came back after the shooting with Calvin, and Kintu, when the cops were there. When he returned, he saw Dwight, Lamont, Jerry, and Peter. He did not see Brian Johnson, and doesn't know Kenya Holder. On June 25, 1995 he and Calvin were shot, by Peter and Dwight Robinson. He was shot five times. He spoke with the police, but he did not tell them that Dwight, and Peter shot them, because he was on parole, and he didn't want to become involved with the police. He sold crack to support himself. He's been convicted for sale of crack at least four times. The Court repeatedly admonished the witness to keep his voice up.

**Wayne Sutton, age 25,** testified that on September 10, 1992, he was coming from the barber shop, and saw Dwight Robinson, Peter Robinson, and Kintu Effort. They were on the corner of 213th Street and Bronxwood Avenue. They told him what had happened.

**Sylvester Heggie, age 26,** testified that on September 10, 1992 he was walking to 919 East 213th Street. He saw Peter, and Dwight Robinson, and continued to walk. As he got closer to his destination he heard gun shots. He ducked, and turned around, and saw Calvin, Jay, and Kintu running. He continued to hear shots firing as he saw them running. He is testifying because he was served with a subpoena.

The defendant was found guilty of two counts of murder in the second degree. He was subsequently sentenced to 25 years to life consecutive on December 5, 1993.

First C.P.L. § 440.10 Motion

Mr. Buari's first C.P.L. §440.10 motion was filed on June 26, 2003. He was represented by the Office of the Appellate Defender, specifically attorneys Brian Stull, and Risa Gerson. The motion cited multiple grounds for vacatur of conviction. The most significant being that Mr. Buari's estranged uncle by marriage was a member of the trial jury, and the failure of the People to provide the criminal background of one prosecution witness, Jerry Connor. The People filed a response in opposition to the defendant's motion in November 2003. The defense filed a supplemental motion on January 23, 2004, arguing newly discovered evidence in the form of recantation testimony by Dwight Robinson. During the course of their representation of Mr. Buari,

[4] The official Court file does not contain copies of pre-trial motions, or decisions. The hearing transcript in not in the official file. Neither party has provided pre-trial documents to the Court.





Mr. Stull, and Ms. Gerson, visited him in state prison. They also met with Dwight Robinson, in state prison for homicide. In an affidavit dated December 30, 2003, Dwight Robinson, confessed that he was the actual killer of the Harris brothers not Calvin. In addition, an affidavit from Kintu Effort had been prepared, stating that at the time of the shooting he, and Calvin actually ran away when they heard the shots, and that he had lied at trial when he said he handed Calvin the gun. The motion also asserted that Dwight Robinson, incarcerated for a double homicide committed in the same location, with a weapon of the same caliber, was the actual killer of the Harris brothers.

The People investigated the affidavits, and questioned Dwight Robinson. Pursuant to that investigation, Robinson withdrew his recantation, and stated he was being threatened and that was why he had recanted his trial testimony. Kintu Effort also withdrew his recantation and said that he and his family were being threatened and that was why he had recanted. The People filed an opposition to the defendant's motion on August 12, 2004. The motion was assigned to the Hon. Dominick Massaro, now retired, he granted the motion to the extent of ordering a hearing.

First C.P.L. § 440.10 Hearing

The hearing started on November 17, 2004. Mr. Buari was represented by the Office of the Appellate Defender, specifically attorneys Brian Stull, and Risa Gerson. Dwight Robinson had legal counsel present during his testimony, Ms. Susan K. Starr, Esq.

The issue pertaining to the related juror, and the failure of the People to provide the complete criminal background of Jerry Connor, was denied.

The first witness called by the defense was Dwight Robinson. He testified that although he had been convicted of killing Leroy Muggsy McLennon, with a 9mm weapon, he was innocent of that crime. Muggsy used to sell drugs, he was convicted of killing him in June 1997, it happened at the corner of 213th and Bronxwood Avenue. He testified on his own behalf at trial. In September 2002, he received a letter from defense counsel Stull, introducing himself and inquiring if he would be open to a meeting to discuss the Buari case. Dwight Robinson confirmed that he subsequently wrote a letter to defense, dated December 14, 2003, stating that he in fact was the person that committed the murders in September 1992. He repeatedly testified that he wrote the letter because he was being pressured by Calvin, and his associates to confess. Robinson also confirmed, that in December, 2003, attorneys Stull, and Gerson, came to see him in prison. He admitted to killing the Harris brothers during that conversation. They returned the next day to prepare an affidavit. They spent time discussing the events that lead up to the shooting. Robinson contradicted all of his assertions in two subsequent affidavits prepared by the Bronx District Attorney's Office. At the hearing, he stated that he only said what he knew Calvin wanted him to say in the affidavits prepared by the defense attorneys. He was actually, in fear for his life. He stated that the defense attorneys did not pressure him in any way to sign an affidavit confessing to the crime. Robinson also testified that he was being pressured by the district attorneys office to take back his confession.

Once notice of his first recantation affidavit was provided to the Bronx District Attorney's Office, he was visited by detectives four times. He then signed an affidavit recanting his recantation, and indicated that he was being pressured by Calvin and his friends. He wanted to be transferred to another facility or put in protective custody. He wrote out the first affidavit

exonerating Calvin because he believed that his life was in danger, and subsequently signed a five page type written affidavit in June 2004 confirming his trial testimony. Robinson testified that he repeatedly lied to the defense attorneys representing Calvin. When asked if they pressured him into confessing, he stated that he couldn't recall. Robinson denied knowing fellow inmate Kenneth Smith, the next witness called by the defense.

**Kenneth Smith, was an incarcerated persistent felony offender.** Mr. Smith completed courses to become a paralegal, while in jail. He testified that Dwight Robinson came to see him in late August, early September 2003, asked him if he could help him with his legal matters. Ultimately he saw him in the library, where Robinson stated that he had committed a crime someone else was in jail for, a double homicide from 213th Street and Bronxwood. Smith explained double jeopardy and said it wouldn't apply. He met Calvin Buari shortly thereafter, and realized that the person Dwight was talking about was Calvin. Kenneth Smith contacted the defense, and told the lawyer what he knew. **Subsequently, Det. Viggiano, came to visit him in prison, and said that he was aware that he knew something about the Buari case. The detective told him that Calvin was a really bad guy, and said he could help with him being moved closer to home, or put money in his account. They told him not to be involved.** Mr. Smith admitted to having used numerous aliases, and of being convicted of multiple crimes. He was unable to pick Dwight Robinson out in a photo array.[5]

Finally, the defense called Risa Gerson, Supervising Attorney at the Office of the Appellate Defender. She testified that she met with Dwight Robinson in jail. On the first visit, he indicated that it was difficult to talk, but heard from him again about a year later. She went to see him, he did not admit to killing the Harris brothers. **Subsequently he sent a letter, admitting to the homicides, they went to see him and, discussed all options, eventually he signed an affidavit. At one point Dwight Robinson asked if Calvin could join their meeting.**

The People called Detective Frank Viggiano, currently Deputy Chief, employed by the Bronx District Attorney's Office Detective Squad. He testified that he spoke with Kenneth Smith, who stated that he knew Calvin for approximately three years, and they had been bunk mates in the same room in Upstate Shoe. Smith had claimed that Dwight Robinson had come to him for legal advise. Based upon his investigation, he concluded that they had never met.

**The Hearing resumed on June 13, 2005. The defense called Kintu Effort. He appeared represented by counsel, Mr. Edward Dudley, Esq. He testified that he was present on September 10, 1992 with John Parish, Calvin Buari, Lamont Seabrook, Jerry Connor, Peter Robinson and Dwight Robinson. He saw two men arrive in a white BMW. He was playing basketball, and when he looked to the right, he saw Dwight Robinson standing outside, pointing a black gun towards a car. After he heard the first shot, he turned around, and saw Dwight with Stephan "Peter" Robinson. He was about 20 to 30 feet away. He was between Dwight and Calvin. He and Calvin ran. He never told the police, because he was scared of Dwight, and Peter. He knew that Dwight, and Stephan Robinson had shot Calvin, and John Parrish in a car. He testified that his testimony at the trial was false. He had been pressured by detectives, and his family to testify the way he did. At the time, he believed that he could have also been charged with the homicide of the Harris brothers. He had been informed of how the other prosecution witnesses were going to testify. He ultimately contacted**

[5] The photo array with Dwight Robinson's picture was an issue during the hearing. The defense wanted attorney Risa Gerson to view the photo array and answer questions regarding it's accuracy, however the People objected and Judge Massaro sustained all objections. It is unknown to this Court if that array has been preserved.





**the Office of the Appellate Defender because he wanted to clear his conscience. He signed an affidavit in 2002, denying his trial testimony, then, signed another affidavit recanting the first recantation.**

Judge Massaro denied the motion, see People v. Buari, 11 Misc.3d 1077(A)(Sup. Ct., Bronx Co. April 10, 2006). He concluded that recantation testimony was inherently unreliable, he ruled that Dwight Robinson was inherently credible. Finding that the defendant had threatened Robinson, and that those threats were the reason for his repeated sworn statements that contradicted his trial testimony. Judge Massaro, completely discounted the remaining witnesses presented by the defense and determined them to be incredible. He ruled that Calvin Buari, and his associates both in and out of prison had pressured the witnesses to change the testimony they gave at trial. The Court relied upon People v. Shilitano, 218 N.Y. 161, 169 (1916); *Bearing in mind that the witnesses to crime of violence are often of a low and degraded character and that after they have given their testimony they are sometimes influenced by bribery and other improper considerations, it is evident that the establishment of a rule which left the power to grant a new trial to a defendant to depend upon recantation by such witnesses would be subsersive of the proper administration of justice...*

The decision was affirmed by People v. Buari, 50 A.D.3d 483 (App. Div. 1st Dept. 2008), leave to appeal denied at 11 N.Y. 3d 735 (2008).

C.P.L. §440.10 Motion Filed October 15, 2015

Mr. Buari, filed the underlying motion seeking to vacate his conviction on October 15, 2015. Represented by new counsel, the firm of Beldock, Levine & Hoffman LLP. The motion was filed pursuant to C.P.L. § 440.10[1], [b], [c], [g] and [h]; contending actual innocence; ineffectiveness of trial counsel; Brady violations; newly discovered evidence, and finally requesting that Judge Massaro recuse himself from deciding the motion.

The motion was initially assigned to Judge Massaro, who presided over the previous 440. The motion was reassigned to this Court in December 2015, because Judge Massaro was scheduled to retire from the bench on December 31, 2015.

Defense Motion

The motion details extensive efforts by the family of Mr. Buari to attract media attention to his case, and hopefully find new witnesses. They posted flyers in the vicinity of the crime, 213th Street and Bronxwood Avenue, displaying a photo of Mr. Buari's face, and a telephone number viewers could call if they had any information pertaining to the September 1992 double homicide. The defendant created a Facebook page proclaiming his innocence, and discussing his case. Tee Shirts were sold saying "Free Calvin." Mr. Buari hired private investigators to look into his case. A reporter from "Buzzfeed," an online magazine, published an article on Calvin Buari, in January 2015. The article, featured an interview with Dwight Robinson from prison. In the article, Robinson recanted both his trial, and hearing testimony. He stated that he had in fact lied at the 440 hearing before Judge Massaro. He did not confess to committing the double homicide, or knowing

address, indicates his willingness to help.

**Exhibit T, is an affidavit from Mrs. Pamela Buari, Calvin's wife. She contends that in 1995, her cousin Lamont Seabrook, was staying with her for a week. One day she came home one day to find him talking to Dwight Robinson, he was explaining that Detective Pryce had assured them that if they testified against Calvin, everything would be wiped clean, and he needed Lamont to step up, otherwise they would never control the block. The affidavit was sworn on August 13, 2015. Pamela married the defendant in 2000.**

Exhibit U, is an affidavit from Mr. Shannon Holmes, dated September 21, 2015. It states that Jerry Connor is his second cousin, and that in or about 2002, Jerry told him that he testified falsely at Calvin's criminal trial. Dwight pressured him, and threatened to kill him if he did not go along with saying Calvin did the shooting.

**Exhibit V, is a handwritten letter by Dwight Robinson to Calvin Buari, dated February 21, 2001. This letter was not presented at the first 440 hearing before Judge Massaro.** The four page letter, expresses Dwight Robinson's regret for setting Calvin up for the murders; details how he manipulated the police; admits to killing the brothers to obtain control; details how he arranged for the witnesses to testify against Calvin at his trial; and said that he would make it right.[7]

Exhibit W, is an affidavit from Ms. Kara Shannon, a three page document notarized on October 4, 2015. In sum and substance, she states that on the morning of September 24, 2015, she was passing by City Hall, in NYC, stopped to watch a rally being held by people stating wrongful conviction. She learned that a man named Calvin Buari, claimed he was innocent of shooting two men in a white car at the intersection of 213th Street and Bronxwood Avenue, in Bronx New York. She was given a t-shirt bearing the picture of Calvin Buari. She personally witnessed a shooting at that location in 1992. Unsure of the exact date, she was 21 years old, at the time and didn't live in the neighborhood. A man she knew as "Bo," had driven her to that location. That night Bo, drove alongside a Jamaican restaurant at the intersection, she was in the passenger seat. It was about 9:00 pm. She observed three men on the street that appeared to be having an argument. Bo got out of the car, and walked towards the men, while she remained in the passenger seat. Bo approached the group, two of the men walked into the Jamaican restaurant while one remained. He was dark skinned with a low cut hair cut. Bo talked to that person for two to three minutes and then went inside the restaurant. The dark skinned man walked away. The two men exited the restaurant and got into a white car parked on the south side of East 213th Street, just east of Bronxwood Avenue. Several minutes later, the dark skinned male pulled out a gun, and started shooting into the car. She heard many shots. Then the dark skinned male started running down Bronxwood Avenue in the direction of the car she was in. She ducked down in fear. When Bo returned, she told him what had happened, he told her to mind her own business, and that she didn't see nothing. Then they drove away from the restaurant. Bo stopped the car a couple of blocks from the Jamaican restaurant to go into a store. She was so upset over what she had just seen, that she got out of the car and ran away. She has not seen or communicated with Bo since. The person on the t-shirt, is not the person that she saw shoot into the white car. She called the phone number she got at the rally. She has never discussed this with anyone before. She doesn't know Calvin Buari.

[7] Defense Exhibit I, presented at the second 440 hearing, is an NYPD handwriting analysis report of the letter that concludes the letter was written by Dwight Robinson.





The defendant also argued ineffective assistance of trial counsel. Contending that the trial attorney's failure to fully investigate witnesses that may have been actually present during the homicides, was ineffective assistance of counsel.

It was additionally argued that Actual Innocence had been established, based upon the prior testimony, and numerous contradictory statements of Dwight Robinson. Dwight Robinson's trial testimony was recanted by his hand written letter to the defendant dated February 21, 2001, where he confessed to committing the murders, (Exhibit V). At the first 440 hearing, Dwight Robinson testified that he was afraid of the defendant, and that he had cooperated with defense attorneys out of fear from Calvin. In January 2015, **Dwight Robinson was interviewed by Buzzfeed, an online magazine. During that interview, he stated that he had manipulated the police, prosecutors, and the** court system to put the defendant in jail for the crime. He did not however confess to committing **the murders himself. He also stated that he had been wrongly convicted of the homicide that he was currently incarcerated for.** Robinson did acknowledge that the homicide he was convicted of was carried out in the same manner and same Bronx neighborhood as the September 1992 homicides. **He stated that the police had made promises to him in order to get him not to change his trial testimony. They also put pressure on his family. That treatment caused him to lie after he wrote the initial letter, at the 440 hearing. These representations combined with new eyewitness affidavits, identifying Dwight Robinson as the shooter, substantiated the defendant's Actual Innocence argument.**

The defendant claimed that the People violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose benefits provided to Dwight Robinson in exchange for testifying for the People. The defendant also contended that discovery was not complete and noted the missing exhibits and court files, connected with the case.

Part 31

This Court calendared the motion in Part 31, for March 15, 2016, for control purposes. On March 15, 2016, the defense and the prosecution appeared, Mr. Buari was not present. The People indicated that they needed an opportunity to interview the numerous witnesses proffered by the defense. The case was adjourned to provide the People with said opportunity. In addition, although the defendant had not previously testified in any legal procedure, arrangements were made for him to testify within the confines of the Bronx District Attorney's Office. The motion was repeatedly adjourned until a hearing date was scheduled for March 27, 2017.

The People filed an Affirmation in Opposition to the defendant's 440.10 motion on March 7, 2017. The People's response focused on the case history, and previous legal rulings made on the defendant's case. The People conceded that the defendant was entitled to a hearing on his current motion. The People did not address any of the contentions raised in the defendant's current motion, and primarily relied upon J. Massaro's decision of April 2006. In addition, the People indicated that Ms. Risa Gerson, formerly of the Office of the Appellate Defender, had been hired by the Bronx District Attorney's Office as an Assistant District Attorney on September 12, 2016. The People represented that Ms. Gerson, now assigned to their Conviction Integrity Unit, would be isolated from the case, but that Mr. Buari would be required to waive any possible conflict presented by her

employment pursuant to the Rules of Professional Conduct sections 1.07;1.09 and 1.10. The waiver would allow the Bronx District Attorney's Office to continue to represent the State of New York, otherwise, a special prosecutor would need to be appointed. This Court and the defense, was well aware that not only had Ms. Gerson, represented Mr. Buari in various appellate, and legal proceedings, she had also visited him while incarcerated, and had testified as a witness at the prior 440.10 hearing.

On March 27, 2017, Mr. Buari appeared in Court, and executed the written waiver prepared by the Bronx District Attorney's Office.

Second C.P.L. § 440.10 Hearing

**The defendant Calvin Buari, was the first witness called to the stand. He testified that he started selling drugs in the mid 1980's. His mother was struggling financially, and she couldn't afford some of the things he wanted.** He started selling drugs in Manhattan, specifically Harlem because he didn't want his family members to know that he was selling drugs. He started out as a lookout, moving up to hand to hand. Selling crack cocaine, and dust. He started working with a friend of his John "Jay" Parris. Buari testified that he primarily worked for someone in Harlem, but he would also deliver drugs to his friend Parris in the Bronx. They made more money in the Bronx, and split the profits fifty-fifty. Later on, he also distributed drugs to Peter Robinson, Dwight Robinson, and Kintu Effort. The sales were concentrated in the vicinity of 213th Street and Bronxwood, Avenue. Peter Robinson, worked mostly with John Parris. Dwight Robinson, worked for the Alji Griffin, of the Shower Posse, (Jamaicans), that sold drugs on the opposite side of the street. Buari testified that he distributed to both sides of the street, and to Kintu Effort. Operations were five to six days a week. Depending on the circumstances, he would deliver the product to the street or to John Parris' house. John Parris, was the primary person he dealt with on the block.

**On September** 10, 1992, he got **to** 213th **Street** in the Bronx around 9:00 P.M. He had to deliver some drugs to John Parris. He saw Dwight, and Peter Robinson, sitting outside the Soup Bowl Restaurant. There was always a lot of activity on the street. There were four bodegas; another Jamaican pattie place; people playing basketball; drug dealers; people getting high, and people who lived on the block. He was in the middle of the block with John Parris, when an older lady asked him for a light for her cigarette, then seconds later shots started to go off at the corner of 213th Street and Bronxwood. He immediately ran towards Paulding Avenue, in the opposite direction. He and John Parris stayed there until they saw police lights up on Bronxwood Avenue. They went to Parris' house to drop off the drugs his was delivering, then they went out to see what had happened. Upon arrival at the corner, he saw two males dead inside a parked white BMW. There were numerous police cars and lots of people. He stayed there for about an hour. He learned the names of the two men to be Elijah Harris, and Salhaddin Harris. Six to eight months later, he was arrested for the double homicide. He found out that Algi Griffin, the guy Dwight Robinson worked for had been arrested, and told the police that he had committed the murders. He was then arrested. The People subsequently made an offer of three years incarceration on the case. The presiding judge then set bail, which he made. Nothing happened with the case. He and John Parris, were shot at by Dwight, and Peter Robinson, in June 1995. He was walking on Bartholdi Avenue, about four blocks from





213th Street and Bronxwood. He was shot twice in the legs, John Parris was shot five times. They didn't file a police report, thinking that cooperating would make them and their families targets. He was taken to trial later that year for the Harris brothers homicides. Peter Robinson had previously told him that his brother Dwight had committed the murders of the Harris brothers. After he was convicted, he heard that Dwight had also been found guilty of a double homicide. There came a time when his attorney informed him that they had gotten a letter from Dwight Robinson confessing to the killing of the Harris brothers, and that he was going to recant his testimony. After his conviction he hired different private investigators to try to find new evidence in the case. The last one was Mr. Joseph Barry. Mr. Barry, located two sisters that lived alongside the Soup Bowl and other witnesses. He never called them, wrote them and never had any contact with any of the new witnesses.

During his testimony, multiple exhibits depicting 213th Street and Bronxwood Avenue from different angles were introduced as evidence. Mr. Buari, marked the exhibits with initials to indicate the positions of the numerous individuals mentioned were located during the incident. At one point, the defense asked the Court to sign a subpoena for copies of all the DD5's, and crime scene photographs. A record was made that they had been requesting copies of the photographs from the People who refused, contending that there was no discovery required for a 440 motion, and that they should just contact prior counsel. The Court encouraged the parties to try and work together, and directed the People to turn over what they had. The People then stated that they didn't have any DD5's or crime scene photos because everything had been destroyed in Hurricane Sandy. It is unknown to this Court why the People were not forthcoming with that information.

Cross

**Joseph Barry was referred to him by a friend named, Emel McDowell, who he met in Albourne Correctional Facility.** He had his wife Pamela Williams contact him. They got married in 1990, she is first cousin to Lamont Seabrook. He may have had another investigator at the time named Michael Race. Race, uncovered the information about Patricia Damm. His wife works at Kings County Hospital. He believes she works in telecommunications. He doesn't know if that gives her access to the records of people who go to the hospital. He knows Joseph Barry is paid by either his family or his lawyers, he's not exactly sure. He recalled seeing the sisters around the neighborhood. **He only distributed in the Bronx. He just sold weight, didn't like being in the Bronx, it was a very hot area. He was making $1200 to $1500 a week. He eventually started selling to Jay, Kintu, Peter Robinson, and Dwight Robinson. Then his income went up to about $4000 a week. He was a distributor. He was the main person bringing crack cocaine to that area of the Bronx.** He would deal with "Lips," "Fritz," or the Dominicans to buy in Harlem from around 112th Street. He lived with his mother, but eventually got an apartment in Parkchester. He didn't carry a gun. He would usually make the exchanges to Jay, Peter, and Dwight at their apartment building they all lived in the same building.

**On the night of Sept. 10, 1992, he was driving a gray BMW.** He went to see his mother first. He parked his car on 211th Street, and then walked over, so as not to draw attention to himself. He saw Peter, and Dwight sitting on a crate outside of the Soup Bowl. They were smoking weed and drinking beer. His family paid his first lawyer. He dressed in linen suits, mink coats, rolex watches

and stuff like that. He never braided his hair, he wore different types of hats. That night he arrived to give product to Jay. But they did it in the alleyway, not upstairs. He had just passed the bottles off when someone asked him for a light. Seconds after that shots went off at the end of the corner on 213th and Bronxwood. He and Jay both ran to Paulding Avenue. Jay went to his house to drop off the drugs as the police began to arrive. He walked back to Bronxwood, and learned that the two guys in the Parked white BMW had been killed. It took the police about fifteen minutes to arrive. They stayed with the crowd and watched the police for about an hour. It started to rain, and he left, and he took a cab to see a girl. He and the girl, Denise Jones, went to Friendly's Hotel on Boston Road. He was still staying with this mother at that time. They spent the night at the hotel. He took a cab back to Harlem the next day. He stayed away from distributing to that area for about a week. He started again when John Parris needed product. He saw Denise again the same week.

While incarcerated, he received a letter from his lawyer Risa Gerson, in 2003, it stated that Dwight had confessed to the crime. After that he was transferred to Clinton Correctional Facility where Dwight was at, and they came in contact with each other there. He saw him in the mess hall. Dwight told him that he had already contacted his lawyers, and told them he was innocent, and come to the yard. He saw him in the yard, and Dwight started crying and telling him that he is on the inside looking out and he is going to do the right thing and clear up his name, for the crime that he committed. He would see him in the yard after that. Once in the visiting area, when his wife was seeing him, he saw Dwight walking to talk to his lawyers. Risa Gerson, and Brian Stull came to see him three to four times while he was incarcerated.

All the people that testified against him at trial worked for Peter and Dwight Robinson. He met Peter through John Parris. He and John Parris, had been close friends since High School. At the time of the shooting there were a lot of people on the block. Kintu, was playing basketball in front of 900, and there were people in front of the building. When he and John Parris were running away, he saw Sylvester Heggie, across the street from them on the opposite side running as well. Kintu may have been running behind him and John. The lady I was giving a light to, I think she probably ran into her building, she lived close by. The Soup Bowl was crowded that night. The lighting conditions were good, the street lamps were on. I ran after hearing one shot, kept hearing shots as I was running away.

Ms. Kimberlia Clarke, has been a resident of Greensboro, North Carolina for approximately seventeen years. In September 1992, she lived at 900 Bronxwood Avenue in Bronx New York. She testified that she wasn't nervous to be in Court. Her apartment had two windows that faced 213th Street. On September 10, 1992, at approximately 9:00 P.M., she had just gotten her kids out of the tub and was getting them ready for bed when she started hearing some gunshots. After the first two, she peaked out the window. The window that would be closer to Bronxwood Avenue. She saw Dwight standing on the passenger side of a car, more towards the back. She saw Dwight firing a gun into the car. She looked long enough to see two to three more shots fired. He was holding the gun in his right hand. She knew him as someone who sold drugs on her block. After seeing the shooting, she went to her front door and yelled for her sister to come upstairs. Her sister is Nakia Clarke, she was living with her at the time. She never told anyone what she saw until 2014. She was visiting New York, and decided to go to her old block, and take some pictures. She saw a picture on a telephone pole that she found disturbing. It was a flyer, Defense F in evidence. She took it down and looked it over. The flyer had a picture of Calvin Buari, whom she recognized, but not from that night. She called the number on the flyer. She told her sister about the flyer about a





month later.

Cross

ADA Lung, confirmed that they had met previously in her office, and that she brought a lawyer with her, who was present in the courtroom during her testimony. How did you meet the lawyer, how did you get her number? Defense counsel stipulated that their firm provided counsel for all witnesses that appeared in the District Attorney's Office for questioning prior to the hearing. Kimberlia Clarke, recalled leaving a message on the telephone number on the flyer, but could not recall who she spoke with, when they called her back. In September 1992, detectives knocked on her door after the homicide and asked her if she had seen anything, and she told them no. She is only coming forward now because she saw the flyer on the pole. She knows there was more than one telephone number on the flyer. Doesn't recall how long the conversation was when her call was returned. Doesn't recall if she spoke with the exact same person more than once, but she may have. She met with one or two people in High Point North Carolina to prepare her affidavit. We met at a hotel with my sister. She recalled he was an older, thin man, named Joe. On September 10, 1992, she peaked through the Venetian blinds, standing to the side of the window to look out. Once she called out to her sister, her sister came upstairs. She did not speak to the police. They came to the door about a half hour later. She moved out of that apartment within a year. Her sister returned to live with their mother. She saw Calvin in the neighborhood but didn't know him. Her husband is a retired police officer, she never told him about what she saw at the time. He knows why she is there today, he wasn't thrilled about it. She didn't peak out the window to look at the police cars. She didn't go to the scene. She doesn't know Caroline Brown. She has heard of Patricia Damm. She wasn't friendly with anyone on the block. Her sister would come and stay with her almost every weekend back then. She didn't type the affidavits herself. The People introduced Exhibit 1, and Exhibit 2, her typed affidavits. Ms. Clarke explained the affidavits as People's 2, was a two page document that came in the mail. People's 1, is word for word of what she said. She was saying what happened and they were typing it. People's 1, she originally wrote by hand, and then they typed it up and she signed it the same day at the hotel, on April 7th, 2015. People's 2, she had it notarized after she received it and mailed it back to Mr. Barry. She did not see Calvin Buari, in the neighborhood after the shooting. At this point during the testimony, the witness began to cry. She stated that this appearance in Court is the first time she has seen the boy, referring to the defendant. She's bothered, she's hurt, she's pissed. Clearly referencing that she believes he has been wrongly incarcerated. She stated that she could see clearly out of the window on the night of the shooting. When referring to defense photo Exhibit A1, a recent photograph of the front of her former apartment building 900 Bronxwood Avenue, she stated that the trees depicted weren't there. It was well lit, because there were light poles, light from the Soup Bowl. The light in her apartment was off at the time. She has spoken with four or five people about this incident. She was able to see Dwight's full body, his face and a gun. The barrel of the gun was outside of the car. She didn't see Dwight in the neighborhood after the shooting. Dwight and his brother were known drug dealers. She didn't know Calvin Buari. Calvin, and Dwight do not look alike to her. She told the police that she didn't see anything because she was a single mother with three kids that had to live in that neighborhood. She wasn't taking any chances. Before the shooting she saw Dwight everyday. After the shooting she didn't she him.

Ms. Nakia Clarke, currently lives in Kingston, New York. She testified that in September

1992, she was 17 years old and pregnant. She was living with her sister, and her nieces and nephews, and but her permanent address was 660 Southern Boulevard, in the Bronx. **On September 10, 1992, around 9:00 P.M., she was sitting on the stoop of her sister's apartment building talking to a friend. She couldn't recall the friend's name right now.** On the same side of the street as the Soup Bowl. **She noticed somebody walking towards her.** He either came from her left side, from either the alleyway or from across the street. Then he just started shooting. It was Dwight, she knew him from the neighborhood. She didn't know him personally, but she knew that he sold drugs on the block. There were two guys in a white car. He just came up and started shooting them. She remembered seeing their bodies jerking. She got scared and ran. The car was parked by the fire hydrant. The car was pointed towards Paulding Avenue. She noticed the car before the shooting, the guys were just sitting there listening to music. She didn't pay attention to who was in the car, she was talking to her friend. Dwight was on the sidewalk, he came up to the passenger side of the car. She heard five or six shots, then she ran upstairs to her sister's apartment. Kimberlia was freaking out because she thought she had gotten hurt. She told her, that she was all right. Then they looked out the window and they were still in the car. The police came, she never spoke with them. Her sister told her not to talk to them. She didn't personally know Calvin Buari. She never talked to anybody about the incident.

She got involved because she saw something on Facebook, and her sister had visited New York and saw the flyers. She showed her a picture of the flyer. After seeing the flyer, her sister kept telling her that they needed to do something about it. She didn't agree at first. She was scared and confused, but it was the right thing to do. She wished she could have gotten contacted sooner. She was living in High Point, North Carolina, and was contacted by an investigator. Two people came, Mr. Barry and Steve. They came to see her, they asked what happened, and she told them the story. She really doesn't like talking about it. **She saw Dwight watch the police, as they went to the car** where the Harris brothers were. Her sister wouldn't let her go back outside. She watched from the window. She couldn't recall which hand Dwight had the gun in. The two people were in the front seat, one on the drivers side, the other on the passenger side.

Cross

Nakia Clarke testified that she only saw Calvin Buari in the neighborhood, occasionally. She would see him on the block. She didn't know what he was doing on the block. She would see him talking to people, she never paid attention. She knew that Dwight, and Peter, sold drugs because they used the alleyway where her sister lived. On the night of the incident she was 17, and just sitting talking to her friend. She wasn't paying attention to anything or anyone on the street. She just suddenly noticed Dwight approach the, car and start shooting. Then she ran into her sister's house. As soon as she got to the apartment, she dropped to her knees, crying and screaming. Her sister was trying to calm her down. At this point in the proceeding, Ms. N. Clarke, became anxious, when asked by ADA Lung about meeting her in the District Attorney's Office. ADA Lung attempted to introduce a transcript of that sworn interview. The defense, then indicated that ADA Lung, never provided them with a copy. The People introduced People's Exhibit 5A, Nakia's sworn deposition, where she said that she saw Dwight come from the alleyway holding a gun and go over to the car, ADA asks which is it? Nakia states the one in the affidavit because it was fresher in her mind. She then stated that she's been through a lot since then, "You (referring to ADA Lung), sent police officers after me, you got me kicked out of my apartment, and fired from my job. They came





to Kingston, New York where I was living, I was in a battered relationship, went to a women's domestic violence shelter, they helped me get an apartment, and was paying part of the rent. The officers showed up at the shelter, told them I was part of a double homicide. The shelter said they couldn't help me anymore because it could jeopardize the other women." The witness was very upset, emotional, and clearly angry at the prosecution.

She testified that she only knew the defendant by the name "Cal," she didn't know his full name. She went on Facebook, and saw the stuff about him, but didn't say anything. Then her sister contacted her. Kimberlia was emotional because of what she had witnessed, she had carried it, all that time. "He's been in there, and we could have did something." Nakia left the neighborhood about a week after she had her son, on October 2, 1992. She didn't stay with sister after that. She doesn't recall the specific Facebook page she saw the Buari story on. She testified that she must have been sitting on the stoop for over an hour. Due to her pregnancy, her sister didn't want her to go too far. She saw Dwight all the time, but after the shooting not so much. Saw Calvin maybe once a week, never saw him standing around.

Caroline Brown, testified that she was born in May 1951, and has been a resident of Redding, Pennsylvania for almost 21 years. She currently works in a halfway house. Prior to moving to Redding she lived at 908 East 213th Street in the Bronx. It was an apartment inside of a private house. She lived there with her daughter Lenise Ingram. On September 10, 1992, she was coming from a friend's house, from the direction of Bronxwood Avenue. When she got to her building, she saw Cal, and he was with either Jay or Kentu, she couldn't recall which one. They were standing there talking, and she asked Calvin if he had a light. He gave her a light, and he continued talking to his friend. She thanked him, and then one of them said "Run," they heard gunshots. She ran into her house. She saw them run towards Paulding Avenue. She remained inside for about 30 to 45 minutes. When she went back outside, she saw Calvin, and Jay. Calvin asked her for his lighter back. She asked him what happened, and he said that there had been a shooting and two gentlemen in a car were shot. The police weren't there yet. She could see into the car, and saw two people slumped over.

She and her girlfriend, who's also her supervisor, were surfing the internet, at her house. She was looking up her old neighborhood. Then Calvin's picture and an article about him came up. It said "Free Calvin." She recognized him from the neighborhood, so she read through the article and it said if you have any information call "Buzz Feed." She called them to say she knew Cal, and then she spoke with an investigator. He said that she needed to send him a notarized letter in regards to what happened that day. She believed the investigator's name was Joseph. About a day passed from when she saw the article to when she contacted the investigator, and produced the notarized letter. She would see Cal a few times in a two week period. He would be talking to Jay, Kintu, and other people from the area. She used crack, weed and alcohol back then. She didn't buy from the block because she didn't want her daughter to see her. She knew Dwight, Peter, Kintu, and Jay from the neighborhood. She believed some of them sold drugs but, she didn't buy from them so she really didn't know who sold there.

The next witness called by the defense was Mr. Joseph Barry, a private investigator. Mr. Barry testified that he has been a licensed investigator since 1990. Currently self employed, he has worked for the Legal Aid Society, and multiple private agencies. He became involved with the case of Calvin Buari in 2012, when the defendant sent him a letter. After several letters, Calvin convinced him that he wasn't going to lie to him about anything. He asked for a retainer, and

obtained all the transcripts and any documents from the original case. He has been paid by Calvin's family, friends, and the law firm. His investigation started with studying the transcripts. He wrote down the names of all the witnesses, and researched them. His plan was to verify their location and make house calls. He visited Calvin once in jail. He told him he would interview the names he had, try to identify people that had never been interviewed, and canvas the location. He went to the neighborhood where the crime occurred several times over the course of a year to a year and a half. He tried to locate some of the individuals who were never talked to initially. Most of the people were gone. The family had put up flyers in the neighborhood. They had set up a website. They had t-shirts made, and they had a rally at some point.

The first name Calvin gave him was of a woman named Patricia Damm. **He didn't believe anyone had ever spoken with her.** The prior investigator, Michael Race, had drafted an affidavit from her but it hadn't been signed. He went to her home address, and when he showed her the affidavit, she said she had never seen it. He returned another day, and redrafted it, she signed it and had it notarized. She told me that there was a woman named Nikki Clark. That she knows a lot about what goes on in the neighborhood and that he should talk to her. She might know something. He had no luck finding her. It was a very common name. Then a woman called him directly. Her name was Kimberlia Clarke. She had seen his telephone number on one of the posted flyers on East 213th Street and Bronxwood Avenue. A reference to a Kimberly Clark had been made on a police report that Cal had given him. Based upon that conversation, he told her he would come to see her. She said that Cal didn't do it. Prior to that conversation, he had been researching the name Kimberly Clark, for a year. It was very difficult, because name is spelled wrong on the police report. He traveled to North Carolina to meet her. On April 9, 2015, he interviewed her, and prepared an affidavit for her to sign. In total he interviewed, and prepared affidavits for both sisters and for Caroline Brown. Caroline Brown had written to him, saying that she saw the BuzzFeed article about Calvin, she recognized him, and knew that he wasn't the shooter.

Cross

On cross examination, Joseph Barry testified that his license had never been revoked, referring to his license as a private investigator. He admitted to having had an administrative hearing pertaining to guns that he owned in 2012. That hearing resulted in his weapons license being revoked because he was charged with felony possession of a loaded firearm. He testified that he was charged with possessing his own gun illegally. He ultimately had a hearing where it was reinstated. He had a problem with a tenant, who was involved with prostitution. She was running ads in Craiglist. He told her to leave, he broke the locks, and the police were called. He is a certified polygraph examiner. He didn't ask the witnesses about each other, he thought it would be improper. He conducted a polygraph exam on the defendant, and the results were inconclusive. His procedure is to send a letter to a witness, meet spontaneously, and have the person volunteer the truth, if they don't want to meet or talk he moves on.

The defense rested.

**The People indicated that they would put on a case. They requested two days to produce Dwight Robinson, from upstate prison. In addition, they were directed to schedule his attorney's presence during his testimony. The case was adjourned to April 7, 2017. On that date, the People indicated that they** would not be calling Dwight Robinson as a witness. The People requested the





Court to take Judicial notice of the prior 440 hearing, all prior motions, all previously rendered decisions, and the trial transcript. The defense made a record of the fact that only transcripts existed. The original exhibits introduced at trial, that included all crime scene photos, were not in their possession. It was referenced repeatedly by various witnesses that the photographs introduced at this hearing, contained multiple trees, and awnings on buildings, that were not present in September 1992 when the crime occurred.

The parties submitted written memorandums in support of their positions.

Conclusions

**The defendant's motion pursuant CPL 440.10(1)(g), is granted.** A motion to vacate a judgement of conviction upon the ground of newly discovered evidence rests within the discretion of the hearing Court. See People v. Salemi, 309 N.Y. 208, 215-216,(1955), cert denied, 350 U.S. 950,(1956); and People v. Tankleff, 49 AD3d 160 (2nd Dept. 2007). The conviction is hereby vacated on the ground of newly discovered evidence, and a new trial is ordered. Although the People argue, that the rulings of the prior 440 hearing should be controlling, this court finds the new evidence introduced by the defendant is overwhelming. Contrary to the People's argument, this is not simply a question of the defendant introducing evidence of third party culpability. The People also rely heavily on the determinations made by Judge Massaro, and ask this Court to follow those rulings. However the abundance of new evidence accumulated by the defendant, and produced before this Court, was unknown by Judge Massaro, and prior defense counsel. The substance of the evidence presented before this Court has not been previously reviewed.[8] The defendant Calvin Buari, has met his burden, and established each of the six criteria by a preponderance of the evidence. 1. The evidence would probably change the result if a new trial is granted. 2. The evidence must have been discovered since the trial. 3. The evidence could not have been discovered before trial. 4. The evidence must be material to the issue. 5. The evidence must not be cumulative. 6. The evidence must not be merely impeachment testimony. Finally, the defendant is required to show due diligence under C.P.L.§440.10 (1)(g). See People v. Salemi, *supra*; People v. Reyes, 255 AD2d 261, 263,(1st Dept. 1998), *appeal denied*, 92 N.Y.2d 1053 (1999), *cert denied*, 549 U.S. 1260,(2007); People v. Tankleff, *supra*.

**Would the alleged new evidence change the result change the result if a new trial was granted? Six witnesses testified against the defendant at his trial in 1995. Each eye witness was** introduced to the detectives by primary witness Dwight Robinson. Each eye witness had been promised something in exchange for their testimony against the defendant. The District Attorney's Office made various promises to include: no prosecution for bail jumping; dismissal of charges; no jail time; minimum sentencing plea bargains; favorable letters to parole, and release from federal custody. Each of the eye witnesses knew the defendant, and were involved with the narcotics trade of 213th Street and Bronxwood Avenue, and had some benefit to gain by testifying for the People. Clearly these numerous witnesses painted a broad picture of the double homicide. After reading the

[8] During the course of this hearing the People initially conceded that this 440 hearing involved new witnesses and that the issues regarding the prior hearing were not pertinent. Hearing transcript pg 263 line 9, through pg 264 line 16.

trial transcript, it is noticeable that the trial judge consistently and repeatedly admonishes each of the People's witnesses to speak up throughout their testimony. However, this Court cannot make a credibility determination of the trial witnesses. Only of those witnesses that testified during the course of this hearing. I find Kimberlia Clarke, Nakia Clarke, Caroline Brown, and Joseph Barry, completely credible. I found their testimony direct. None of these witnesses had anything to gain by coming forward to testify. In fact, their involvement has only served to draw unwanted attention, and hostility from the Bronx District Attorney's Office. These citizens took their time to come forward and tell their story. **The hostility, and negativity that was directed at them by the prosecution was unnecessary and unprofessional.**

The testimony of Kimberlia Clarke was completely credible. The People, failed to rebut or weaken what she said from the witness stand. Contrary to the People's contention, Ms. Clarke is a United States Citizen, and has every right to have an attorney present during questioning. She made every effort to cooperate with the Bronx District Attorney's Office. Ms. Clarke became aware of the defendant's incarceration and conviction for a crime she witnessed in 2014. In September 1992, she was the mother of two children, living on a block infested with the sale of drugs. She was also watching over her pregnant teenage sister. Kimberlia Clarke heard shots, and saw Dwight Robinson, whom she knew from the neighborhood, shooting into the window of an occupied car. Ms. Clarke took the stand determined to say what she had observed in September of 1992. She also admitted that when initially questioned by detectives that night, she said she didn't see anything because she was scared. Clearly Ms. Clarke, had concern for the safety of her children, and her sister. After moving out within a year, it was only when she visited her old neighborhood in 2014, that she saw the picture on the flyer (the defendant). She then understood that the wrong man had been convicted of the crime she saw Dwight Robinson commit. She called the listed phone number, and contacted her sister who had also witnessed the homicides. At the conclusion of her testimony, she apologized to the defendant. She was not nervous, speaking clearly and pointedly during her testimony. She traveled from North Carolina to take the stand. Defense Exhibit P, is a police report that mentions the name "Kimberly Clark," it indicates that she heard shots and nothing further. Kimberlia Clarke did not have a relationship with the defendant or Dwight Robinson. These were individuals she would see in the neighborhood.

Naikia Clarke, testified that in September 1992, she was a teenager and pregnant. She occasionally stayed with her sister Kimberlia on 213th Street and Bronxwood Avenue. She was on the street at the time of the murders. **She saw Dwight Robinson, whom she knew to be a drug dealer from the neighborhood, walk up to a parked car, with two occupants and fire a gun repeatedly into the car.** She ran to her sister's apartment, where they consoled each other. The police came and Kimberlia told her not to speak with them. Nakia testified that she didn't know Calvin, and would only see him occasionally in the neighborhood. **She knew Dwight and Peter, sold drugs, in the alleyway where her sister lived.** She didn't talk to anybody about what she saw. Years later, she saw the defendant's Facebook page, and her sister told her about the flyers. Her sister encouraged them to come forward. She testified that she was scared and didn't want to, but knew it was the right thing to do. Nakia apologized to the defendant for what had happened to him. She was emotional on the witness stand. This Court finds the testimony of Nakia Clarke, to be completely credible. For reasons unclear to this Court, the District Attorney's office and their representatives were unnecessarily hostile with this witness. Nakia testified that she was on the street and in close proximity to Dwight Robinson. She was visibly pregnant during the incident and certainly





recognizable. It's not difficult to understand the trauma she experienced, and the fear she dreaded for her family and unborn child. Like her sister, Nakia has nothing to gain by testifying on the defendant's behalf. Since coming forward, representatives of the District Attorney's Office went to her job, and made inquiries resulting in dismissal. They went to a battered women's shelter, and announced that she was part of double homicide case, resulting in the shelter withdrawing support, and her eviction. This treatment is unconscionable. Nevertheless, Nakia Clarke, bravely testified at this hearing. She visibly relived what she observed in September 1992, and testified to exonerate a man she believes was wrongly convicted. Despite aggressive, antagonistic cross examination, the People were unable to weaken Nakia's powerful testimony.

The third witness was Caroline Brown. She has been a resident of Redding, Pennsylvania for almost 21 years. In September 1992 she lived at 908 East 213th Street in the Bronx, with her daughter. On September 10, 1992, she asked for a light from Calvin, who was with friends. As she was lighting her cigarette, they all heard shots, she ran into her building, and observed Calvin and the others run towards Paulding Avenue. Years later, she and a friend were surfing the internet, and came across the "Buzz Feed," article. She recognized Calvin's picture, and read the article that instructed people to call Buzz Feed if they had any information. In 1992, she used crack, weed, and alcohol. She didn't buy from the block because she didn't her daughter to see her. She knew Dwight, Peter, Kintu and Jay from the neighborhood. She knew some of them sold drugs, but didn't buy from them so she didn't really know who. Caroline Brown was completely credible. She was direct about her former drug use, and has absolutely nothing to gain by coming forward to testify. Her testimony corroborates the trial testimony of defense witnesses John Parris, and Sylvester Heggie. It also corroborates the testimony of the defendant Calvin Buari, the first witness to testify at this hearing. Ms. Brown, was a strong witness. Her testimony and recollection was clear, and direct. The People failed to rebut or lessen the impact of Ms. Brown's testimony. The argument that her testimony should be disregarded because of her prior drug use is offensive.

Each of these witnesses testified with sincerity, and remorse, at what they perceived to be a miscarriage of justice. This Court believes that these witnesses have provided sufficient new evidence that if a jury were to hear their testimony, the end result would be different and favorable to the defendant.

The evidence must have been discovered since the trial. The numerous affidavits, and the new witnesses that were proffered by the defense, only became known to the defense in the years following the first 440 hearing. The efforts by family, and friends of the defendant to publicize his case, resulted in viable identifiable witnesses to question. With the exception of a brief reference to a Kimberly Clark in a police report, none of the witnesses who provided sworn affidavits to the defense, and made themselves available, were previously known to the police. The defendant's trial counsel relied on the materials provided to him. The evidence presented before this Court was discovered after trial. Once discovered, the defense sought to investigate the materials and promptly prepared the underlying motion.

Could the evidence have been discovered before trial? The police were responsible for investigating the scene and obtaining evidence. As stated above, the witnesses provided by the defense as the basis for this motion, came forward as a direct result of the media campaign initiated by the family. The social media network in existence today, was not present in 1992 or 1995. In addition, the witnesses that came forward, no longer reside in the drug infested atmosphere that so overwhelmed the neighborhood of 213th Street and Bronxwood Avenue in the 1990's. These

witnesses were not known to the police, were not documented in any report that could have been turned over to the defense prior to trial. **The witnesses, the People and the media have documented what a violent and dangerous neighborhood this location was.** The fear and intimidation to remain silent, resulted in relocation, and voluntary exile from the area.

The evidence must be material to the issue. Due to a social media campaign, and the investigative work of witness Joseph Barry, reliable eye witnesses to a double homicide have came forward when they found out that someone had been convicted for a crime they know he didn't commit. These witnesses were unaware of the conviction for over a decade. The testimony of witnesses with direct evidence that the defendant did not commit the crimes he was convicted of, is material and not merely cumulative. **The quality of these witnesses when compared to the motivations of the witnesses that testified at trial,** would undoubtedly raise a reasonable doubt, and result in a verdict more favorable to the defendant. See People v. Bailey, 144 AD3d 1562, (4th Dept. 2016), and People v. Singh, 111AD3d 767 (2nd Dept. 2013).

The new evidence presented is not merely impeachment evidence. **Each** of the People's trial witnesses had relationships with both the District Attorney's Office, and NYPD. Promises were made in exchange for testimony against the defendant. The People's main witness Dwight Robinson, has been instrumental in weakening his own credibility. His February 2001 recantation letter, (Defense Exhibit V), addressed to the defendant, contained a confession to committing the September 1992 homicides, and explained how he manipulated the case against the defendant. Contrary to the People's argument, this letter cannot be lumped together with the affidavits ruled upon by Judge Massaro. The letter was not introduced at the first hearing. The tone and timing of the letter, does not sound like a person in fear for his life. When Dwight Robinson took the stand at the earlier hearing, he testified to being threatened by the defendant, and forced to write a letter of recantation. The questioning starts with Mr. Stull's letter to Robinson in September 2002. He is then questioned about the affidavits, he signed, and a letter to Calvin stating that he was confessing. He also testified that he had been wrongly convicted of the homicides that resulted in his incarceration at that time. Judge Massaro, found Robinson credible, and denied the defendant's motion. In January 2015 "Buzz Feed," published an article called " A Bronx Betrayal," by Albert Samaha. Robinson is interviewed and unequivocally confirms that he was visited by police that didn't want him to change his trial testimony. They offered him money, and promised to make it easier for his family to visit him. He stated, "I wanted to help him, but I'm not going to fuck myself, to help another man." He proceeds to discuss how he then lied on the stand at the hearing, and said that Calvin would have had him and his family killed if he hadn't recanted. Despite repeated assertions to the contrary, the People did not call Robinson as a witness for this hearing. In any regard, the numerous contradictory statements of Dwight Robinson are not the basis for the granting of the defendant's motion here. Although, this Court suggests that the People review the numerous inconsistencies provided by their star witness. Robinson also states in the Buzz Feed article that he became aware that he was being filmed while in jail. It would be of no surprise to this Court that videotapes of the defendant, and recorded phone calls regarding his case are either known by the District Attorney's Office or already their possession. These materials should be provided to the defendant before trial.

The defendant has established due diligence. The testimony of Joseph Barry, the second private investigator hired by the defendant, confirms how little he had to go on to track down witnesses. This Court finds the testimony of Mr. Barry credible. Mr. Barry was direct about his





business dealings, interactions with the defendant, and contact with witnesses. The People's focus on Mr. Barry's landlord tenant squabble, or the status of his gun license during cross examination, failed to impugn the substance of his testimony. He followed entries the police reports, and investigated new leads from people that called the phone number on the flyer. Once again, the social media campaign, and the flyers posted in the old neighborhood were paramount in bringing the new evidence to light.

Neither Kimberlia Clarke, nor Nakia Clarke, were aware that Calvin Buari had been convicted of the September 1992 double homicides they witnessed. Once made aware in 2014, they contacted the defense to make statements. They came forward on their own initiative. Contrary to the People's argument, these witnesses were believable, and whether or not Kimberlia Clarke discussed what she saw in September 1992 with her significant other is irrelevant. Caroline Brown, did not observe the homicides, but provides an alibi for the defendant, and corroborates the testimony he gave at this hearing. She was unaware of the defendants conviction until reading the Buzz Feed article in 2015. What is clear is the that after securing affidavits, the defense filed a comprehensive new motion.

**The defendant Calvin Buari, was the first witness to testify at this hearing. He calmly answered the questions posed. He gave direct responses, and did not appear to be evasive. This Court, however,** denies the defendant's motion for **dismissal due to actual innocence**. The defendant failed to establish his innocence by clear and convincing evidence. See People v. Hamilton, 115 AD3d 12, (2nd Dept. 2014).

The defendant's motion to vacate the conviction based upon ineffective assistance of counsel is denied. In Strickland v. Washington, 466 US 668 (1984) the United States Supreme court, set forth a two prong test to determine ineffective assistance of counsel. The first prong, requires a defendant to establish, that his counsel's representation was inferior to an objective standard of reasonableness. The second prong, requires the defendant to show prejudice. Although the defendant's motion details a conversation with trial counsel Kenneth Schreiber, Esq., no affidavit has been provided. The defendant's motion must be denied pursuant to CPL § 440.30(4)(b), in that, "the motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts as required." This Court has read the trial transcript, and can see that Mr. Schreiber, worked diligently to defend the defendant. The People had requested, and was granted permission by the trial Court, to withhold the names of witnesses until they took the stand. Investigations by the defense may have been conducted contemporaneously with the trial. This Court will not attempt to second guess Mr. Schreiber's efforts to provide a defense under these circumstances. The defendant has failed to establish either prong of Strickland, and his motion is therefore denied.

The defendant also contends that the People have violated his right's pursuant to Brady v. Maryland, 373 U.S. 83(1963), and People v. Vilardi, 76 N.Y.2d 67 (1990). The prior 440 decision by Judge Massaro, failed to find a violation by People. The Court determined that any material or information not provided to the defense was a mere oversight. The specific issue at that hearing was the incomplete criminal record of People's witness Jerry Connor. The issue here, pertains to the substance of the Defense Exhibit R, the sworn affidavit from Ellis Douglas. The affidavit attests to statements from Dwight Robinson to Douglas, were he details promises by police in return for his cooperation. The defense argues that failure to turn over promises and benefits made to Dwight Robinson, violated the defendant's right to a fair trial, in addition to violations of *Brady* and *Vilardi*.

The People failed to address this issue in their written memorandum. In order to sustain a *Brady* violation, the defendant must establish that the People failed to disclose information in their possession or control, that is favorable and material to the defense. The defendant has failed to establish such a violation. The motion is therefore denied.

The defendant contends that the discovery provided at the trial, and at the prior 440 hearing was incomplete. In was established at this hearing, that folders from the original trial are missing. The original crime scene photographs are missing. It is unclear if any original police reports still exist. Mr. Barry testified that he received copies of police reports from the defendant. The District Attorney's Office stated in Court during this hearing, that files were destroyed due to Super Storm Sandy. A category three hurricane that caused havoc to the East Coast in late October 2012. The defendant had received a letter from the Bronx District Attorney's Office, dated February 10, 2003, stating that despite all efforts, only one of four trial folders for Indictment Number 2111/1993 could be located.[9] Was the singular remaining folder destroyed by Sandy? The defense has specifically requested recordings and transcripts of telephone conversations between Dwight Robinson and John Parris. These calls were allegedly made during Robinson's incarceration, and his testimony in this case was supposedly discussed. Unfortunately, it is unclear what materials actually exist at this point. The People are therefore reminded of their statutory obligations pertaining to discovery. The People are obligated to cooperate with the defendant, and provide him with all discovery immediately. During the course of this hearing the People were evasive when asked direct questions pertaining to what materials currently existed. The People should make every effort to compile all relevant materials, and provide direct answers to the defendant. Do recorded or transcribed telephone conversations from Dwight Robinson exist? Do the People intend to call Dwight Robinson as a witness at the new trial?

Finally, this Court rejects the defendant's claim of third party culpability. The decision for a new trial, is based completely on the overwhelming credible testimony of three disinterested witnesses, who testified before this Court. However, the new evidence on this issue is highly probative, and the defendant should be allowed to argue that Dwight Robinson is actually responsible for the homicides of September 10, 1993. See People v. DiPippo, 27 N.Y.3d 127 (2016).

This constitutes the decision and order of the court.

Bronx, New York
November 9, 2017

Hon. Eugene Oliver, Jr., A.S.C.J.

[9] Letter from Office of the District Attorney, Bronx County, "Records Certification," dated February 10, 2003, signed by ADA Zaharah R. Markoe, pursuant to Freedom Of Information request for files on Ind. No. 2111/1993, attached.







## OFFICE OF THE DISTRICT ATTORNEY, Bronx County

ROBERT T. JOHNSON
*District Attorney*

198 East 161st Street
Bronx, New York 10451

(718) 590-2156
Fax 590-6523

**RECORDS CERTIFICATION**

State of New York )
) ss.:
County of Bronx )

I, an Assistant District Attorney in the Office of Robert T. Johnson, the District Attorney of Bronx County, hereby certify as follows, pursuant to Public Officers Law Article 6 (the Freedom of Information Law), section 89(3):

1. I have diligently searched, and caused to be searched, the files of this Office for documents pertaining to the prosecutions encaptioned People of the State of New York v. Calvin Buari, Indictment Number 2111/93.

2. The combined efforts of this Office include: five personal requests for searches of the trial files on the following dates: October 20, 2000, November 16, 2000, December 20, 2000, February 20, 2001, and June 14, 2002; regular requests for searches of the trial files since October, 20, 2000,by case aide Michelle Robinson; and regular searches by archive employees.

3. On August 27, 2002, I received one (1) out of four (4) folders.

4. Despite all efforts, the remaining trial folders and documents have not been located.

5. Accordingly, I hereby certify that such records cannot be found after diligent searching of this Office's archives.

Dated: February 10, 2003

/S/
Zaharah R. Markoe
Assistant District Attorney
Office of Robert T. Johnson
District Attorney of Bronx County

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/30/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CALVIN BUARI,

Plaintiff,

-against-

CITY OF NEW YORK; ANDREW DIETZ, New York City Police Department Detective; FNU TRACY, New York City Police Department Detective; VINCENT PRICE, New York City Police Department Detective; EUGENE GOTTWIN, New York City Police Department Detective; JOSEPH NEENAN, New York City Police Department Detective; CHRISTINE FORTUNE, New York City Police Department Detective; JOHN WALL, Bronx County District Attorney's Office Investigator; FNU SCHIFFMAN, Bronx County District Attorney's Office Investigator; FRANK VIGGIANO, Bronx County District Attorney's Office Investigator; ALLEN KAREN, Bronx County District Attorney's Office Assistant District Attorney; FELICITY LUNG, Bronx County District Attorney's Office Assistant District Attorney; PETER CODDINGTON, Bronx County District Attorney's Office Assistant District Attorney; GINA MIGNOLA, Bronx County District Attorney's Office Assistant District Attorney; JOHN AND/OR JANE DOES #1–10, who are currently unknown members of the New York City Police Department; and RICHARD AND/OR RACHEL ROES #1–10, who are currently unknown members of the Bronx County District Attorney's Office,

Defendants.

1:18-cv-12299-MKV

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

In October 1995, a New York State Supreme Court jury convicted Plaintiff Calvin Buari ("Buari") of two counts of murder in the second degree in connection with a 1992 double homicide in the Bronx, New York, based solely on the testimony of alleged witnesses. Buari was sentenced to consecutive indeterminate terms of imprisonment of twenty-five years to life. In May 2017, a judge vacated Buari's conviction pursuant to New York Criminal Procedure Law Section





440.10(1)(g) and ordered a new trial. The Bronx District Attorney's Office ("Bronx DA") declined to retry Buari and dismissed his indictment in March 2018. Buari has always maintained his innocence.

In December 2018, Buari commenced this action against the City of New York ("City"); New York City Police Department ("NYPD") Detectives ("Det.") Andrew Dietz, Fnu Tracy, Vincent Price, Eugene Gottwin, Joseph Neenan, and Christine Fortune, (collectively, the "NYPD Defendants"); Bronx County Assistant District Attorneys ("ADA") Allen Karen, Felicity Lung, Peter Coddington, and Gina Mignola (collectively, the "ADA Defendants"); Investigators Frank Viggiano, Stanley Schiffman, and John Wall (collectively, the "Investigator Defendants"); John and/or Jane Does #1–10, who are unidentified officers, detectives, supervisors, and other agents and employees of the NYPD ("Does #1–10"); and Richard and/or Rachel Roes #1–10, who are unidentified investigators, agents, and employees of the Bronx DA's Office ("Roes #1–10"). (Am. Compl. ¶¶ 23–36 [ECF No. 58].)[1] Buari brings claims under 42 U.S.C. § 1983 and New York State law for malicious prosecution, due process violations, failure to intercede, conspiracy, supervisory liability, municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and *respondeat superior*. (*Id.* ¶¶ 274–363.) Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss ("Mot.") [ECF No. 61].)

Buari alleges serious misconduct by members of the NYPD and the Bronx DA's Office. Until proven at trial with competent evidence, Buari's allegations of course remain unproven allegations. Some of Buari's claims may ultimately be difficult to prove. But at this early stage in the litigation, the Court is constrained to accept Buari's allegations as true and to draw all

[1] It appears Buari also seeks to assert a claim against Bronx District Attorney Darcel Clark ("DA Clark"). (Am. Compl. ¶¶ 296–302.) But DA Clark is not named in the case caption, *see* Fed. R. Civ. P. 10(a) (noting that the "title of the complaint must name all the parties"), and there is no proof of service on the docket as to DA Clark. Nevertheless, given Plaintiff's clear intent to assert a claim against DA Clark, the Court addresses it below.

reasonable inferences in Buari's favor. For the reasons discussed below, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. Factual Background[2]

#### A. The Underlying Crime and Investigation

On September 10, 1992, at approximately 9:00 p.m., Buari was walking through his neighborhood, the Wakefield section of the Bronx, to visit a friend. (Am. Compl. ¶¶ 37–40.) As he crossed the intersection of 213th Street and Bronxwood Avenue, Buari saw Dwight Robinson ("Robinson") and his brother Peter. (*Id.* ¶ 41.) Buari met his friend near the intersection. (*Id.* ¶ 43.) As they were talking, they heard gunshots. (*Id.* ¶ 45.) They ran down 213th Street (*id.* ¶ 46), but later returned to the intersection to see what had happened (*id.* ¶ 48). Buari learned that two males, the Harris brothers, had been shot and killed while sitting in a white BMW (the "Harris Murders"). (*Id.* ¶ 51.)

Police officers of the 47th Precinct secured the crime scene, but failed to locate any eyewitnesses. (*Id.* ¶¶ 54–56.) They eventually located a witness who claimed to have observed Kintu Effort ("Effort") and another individual fleeing the scene. (*Id.* ¶ 58.) On November 4, 1992,

[2] The following facts are taken from the Amended Complaint. On the pending Motion, the Court is "constrained to accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)); *accord Oakley v. Dolan*, 980 F.3d 279, 283 (2d Cir. 2020); *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017).

Buari requests that the Court strike the statement of facts from Defendants' brief because it "improperly assert[s] facts not alleged in the [Amended Complaint]" and "improperly rel[ies] on material outside the [Amended Complaint]." (Mem. Law Opp. ("Opp.") 7–8 [ECF No. 65].) The Court declines to address this matter because the Court does not rely on Defendants' account of the facts. *See Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) (second alteration in original) ("[A] district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (first quoting *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991); then citing *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988))).





Det. Dietz interviewed Effort, who stated that he did not see who committed the Harris Murders. (*Id.* ¶¶ 59–61.)

On January 29, 1993, police arrested Alrick Griffiths, a drug-dealing associate of Robinson, for possession of narcotics and a loaded handgun. (*Id.* ¶¶ 63–65.) Suspecting that Griffiths was involved with the Harris Murders, Det. Dietz tried to find evidence linking him to the crime. (*Id.* ¶ 66.) Finding no such evidence, Det. Dietz sought to coerce Griffiths into implicating someone else by spreading a false rumor that Griffiths was a "snitch" and "talked to police." (*Id.* ¶ 41.) As the rumor spread, Griffiths' girlfriend visited the 47th Precinct and advised Det. Dietz that Griffiths was at the 213th Street and Bronxwood Avenue intersection when one of the "Yankee guys that deal crack shoot [sic] two guys in the head who were sitting in a pretty white BMW." (*Id.* ¶ 69.)

On March 22, 1993, Buari was arrested for marijuana possession. (*Id.* ¶ 71.) Det. Tracy attempted to elicit from him information about recent criminal activity in the 47th Precinct. (*Id.* ¶¶ 72–73.) Buari declined to offer any information. (*Id.* ¶ 74.)

Knowing Buari lived near the 213th Street and Bronxwood Avenue intersection, Dets. Dietz and Tracy coerced Griffiths into falsely implicating Buari for the Harris Murders. (*Id.* ¶ 76.) In exchange for his false testimony, Dets. Dietz and Tracy offered Griffiths favorable treatment, leniency, and release from custody. (*Id.* ¶ 77.) As a result of Griffiths' false statements, Buari was arrested for the Harris Murders. (*Id.* ¶ 78.)

#### B. Buari's Prosecution

The Bronx DA began prosecuting Buari for the Harris Murders based solely on Griffiths' statements. (Am. Compl. ¶ 82.) On March 26, 1993, a grand jury indicted Buari on charges of second-degree murder, first-degree manslaughter, first-degree criminal use of a firearm, and second- and third-degree criminal possession of a weapon. (*Id.* ¶ 85.)

Buari retained counsel, Kenneth Schreiber, Esq., who investigated the charges and discovered several witnesses, including Robinson, Effort, Clarence Lamont Seabrook ("Seabrook"), and Jerry Connor ("Connor"). (*Id.* ¶ 88.) These witnesses advised Schreiber that Buari did not commit the Harris Murders. (*Id.* ¶ 90.) The Bronx DA offered Buari a plea bargain of three years' imprisonment on the murder charges (*id.* ¶ 92), but Buari rejected the offer, maintaining his innocence (*id.* ¶ 93). He was later released on bail. (*Id.* ¶ 94.)

In the summer of 1995, drug violence in the 47th Precinct intensified. (*Id.* ¶¶ 95–97.) Robinson's brother, Peter, was murdered that summer. (*Id.* ¶ 98.) Believing Buari was involved, Robinson attempted to kill him by shooting at him while he was sitting in a parked car. (*Id.* ¶¶ 99–100.) Buari survived the attack but sustained serious injuries. (*Id.* ¶ 101.) Police took Robinson into custody. (*Id.* ¶ 102.)

Dets. Price, Gottwin, Neenan, and Fortune met with Robinson to discuss the drug violence in the 47th Precinct. (*Id.* ¶ 103.) The detectives proposed allowing Robinson to operate his drug trade without interference, or "heat," from the police if he implicated Buari for the Harris Murders. (*Id.* ¶¶ 108–09.) Robinson accepted and agreed to testify against Buari. (*Id.* ¶ 110.) Dets. Price, Gottwin, Neenan, and Fortune advised ADA Alan Karen, the lead prosecutor on Buari's case, of this arrangement. (*Id.* ¶ 111.) Those detectives, together with ADA Karen, then coerced Robinson's drug-dealing associates Connor, Seabrook, Johnson, and Kenya Holder ("Holder"), to implicate Buari falsely. (*Id.* ¶¶ 113, 115.) The Bronx DA offered Connor, Seabrook, and Holder recommendations for leniency for open drug and weapon charges in exchange for their testimony. (*Id.* ¶ 114.) Dets. Price, Gottwin, Neenan, and Fortune and ADA Karen also coerced Effort into falsely implicating Buari by threatening to charge him as an accessory to the Harris Murders and offering him leniency on his current prison sentence. (*Id.* ¶¶ 118–20.)





At a suppression hearing, Dets. Price, Fortune, and Neenan falsely testified that Buari became a suspect after they interviewed Robinson, who claimed Buari was trying to kill him. (*Id.* ¶ 121.) The detectives did not testify to the arrangements with Robinson and the other witnesses. (*Id.* ¶ 125.) The judge denied Buari's request to suppress Robinson's identification of him. (*Id.* ¶ 126.)

In October 1995, Buari was tried before a jury and convicted of two counts of second-degree murder. (*Id.* ¶¶ 127, 138.) The only evidence linking him to the Harris Murders was the testimony of Robinson, Seabrook, Holder, Connor, Johnson, and Effort. (*Id.* ¶ 128.) At trial, ADA Karen elicited the testimony from the witnesses but did not disclose the leniency arrangements with them. (*Id.* ¶¶ 129–37.) Buari was sentenced to consecutive indeterminate terms of imprisonment from twenty-five years to life. (*Id.* ¶ 138.)

In June 1997, Robinson was arrested for the murder Leroy McClennon. (*Id.* ¶¶ 139, 143.) He was convicted and sentenced to a term of imprisonment of twenty-five years to life. (*Id.* ¶ 143.)

**C. Post-Conviction Proceedings**

Attorneys from the Office of the Appellate Defender took up Buari's appeal. (Am. Compl. ¶ 144.) They spoke with Effort, who recanted his trial testimony and provided an affidavit explaining that he testified falsely because the Bronx DA threatened to charge him as an accessory. (*Id.* ¶¶ 145–47.) Buari moved pursuant to New York Criminal Procedure Law Section 440.10 to vacate his conviction ("First 440.10 Motion"). (*Id.* ¶ 149.) Thereafter, Buari's attorneys met with Robinson, who confessed to testifying falsely at Buari's trial and encouraging his associates to do the same. (*Id.* ¶¶ 150, 152–53.) Buari supplemented the First 440.10 Motion with Effort's affidavit and Robinson's confession that he, and not Buari, committed the Harris Murders. (*Id.* ¶ 155.)

In response to this new evidence, ADA Karen sent out the Investigator Defendants to obtain withdrawals of the recantations "in any way possible." (*Id.* ¶ 156.) The Investigator Defendants visited Effort, Robinson, and their families and pressured them to withdraw their recantations. (*Id.* ¶¶ 157–60.) The Investigator Defendants threatened Robinson that if he did not recant, any parole application he made would be rejected. (*Id.* ¶ 160.)

At a hearing on the First 440.10 Motion, Robinson recanted his confession and insisted that he did not commit the Harris Murders, while Effort testified that his recantation was accurate and that Buari did not commit the Harris Murders. (*Id.* ¶¶ 162–63.) The judge found Robinson to be credible and Effort to be not credible and denied the First 440.10 Motion. (*Id.* ¶ 164.) The Appellate Division, First Department, affirmed. (*Id.* ¶ 165.)

Buari's family launched a social media campaign to raise awareness of his wrongful conviction and discover new evidence. (*Id.* ¶ 166.) Private investigators discovered several new witnesses. (*Id.* ¶¶ 167–86.) Buari then filed a second 440.10 motion ("Second 440.10 Motion"). (*Id.* ¶ 187.)

Shortly thereafter, ADA Coddington contacted Buari's attorneys and stated that the Bronx DA's Conviction Integrity Unity ("CIU") wanted to investigate Buari's innocence claims. (*Id.* ¶¶ 188–90.) Buari and his attorneys agreed to hold the Second 440.10 Motion in abeyance while the CIU investigated. (*Id.* ¶ 193.) ADAs Mignola, Coddington, and Lung of the CIU directed investigators to intimidate Buari's new witnesses not to testify. (*Id.* ¶¶ 201, 203–07.)

Buari revived the Second 440.10 Motion, and the court held an eleven-day hearing at which Buari and his newfound witnesses testified. (*Id.* ¶ 216–20.) The prosecutors repeatedly claimed that they would produce Robinson to testify but never did. (*Id.* ¶¶ 222–23.)





On May 5, 2017, the court vacated Buari's conviction, ordered a new trial, and ordered that Buari be released on his own recognizance. (*Id.* ¶ 225.) The Bronx DA appealed (*id.* ¶ 227), and ADA Lung advised Buari's attorneys that a new witness had implicated Buari. (*Id.* ¶ 228.) At subsequent hearings, ADAs Lung and Coddington stated that the Bronx DA intended to retry Buari. (*Id.* ¶¶ 233, 238.) Buari's attorneys repeatedly requested that the prosecutors drop the case. (*Id.* ¶¶ 230–32, 236, 240.) At a status conference in spring 2018, the Bronx DA moved to dismiss the indictment, and the court granted the motion. (*Id.* ¶¶ 241–42.)

**II. Procedural Background**

Buari commenced this action on December 28, 2018. (Compl. [ECF Nos. 1, 3].) On October 11, 2019, at a pre-motion conference, the Court (Ramos, *J.*) granted leave to file the Amended Complaint and set a briefing schedule for Defendants' Motion to Dismiss. Buari filed the Amended Complaint on November 11, 2019.

The Amended Complaint alleges eleven causes of action: (1) malicious prosecution under Section 1983 against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (Am. Compl. ¶¶ 274–78); (2) due process violations under Section 1983 for fabrication of evidence and failure to investigate against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 279–83); (3) failure to intercede under Section 1983 against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 284–88); (4) conspiracy under Section 1983 against the NYPD Defendants, ADA Karen, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 289–95); (5) supervisory liability under Section 1983 against DA Clark and ADA Mignola (*id.* ¶¶ 296–302); (6) municipal liability under Section 1983 and *Monell* against the City with respect to the NYPD (*id.* ¶¶ 303–19); (7) municipal liability under Section 1983 and

*Monell* against the City with respect to the Bronx DA (*id.* ¶¶ 320–45); (8) malicious prosecution under New York State law against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 346–49); (9) intentional or negligent infliction of emotional distress under New York State law against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 350–54);[3] (10) *respondeat superior* under New York State law against the City (*id.* ¶¶ 355–58); and (11) due process violations under the New York State Constitution against the NYPD Defendants, the ADA Defendants, the Investigator Defendants, Does #1–10, and Roes #1–10 (*id.* ¶¶ 359–363).

Defendants filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on December 11, 2019. The case was reassigned to me in February 2020. Buari filed an Opposition (Opp.), and Defendants filed a Reply (Reply. Mem. Law ("Reply") [ECF No. 69]).

## LEGAL STANDARDS

### I. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*,

[3] Buari withdrew his emotional distress claim in his Opposition. (Opp. 27 n.4.)





550 U.S. at 555 (alterations, internal quotation marks, and citations omitted). In ruling on a motion to dismiss, the Court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)). The Court's role at this stage is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 713 (S.D.N.Y. 2012) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

### II. Materials Considered

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); and *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A document is incorporated by reference where the complaint "make[s] a clear, definite and substantial reference" to it. *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275–76 (S.D.N.Y. 2002) (collecting cases). "[E]ven if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on [a motion to dismiss]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (second alteration in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); and citing *Glob. Network Commc'ns*, 458 F.3d at 156). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers*, 282 F.3d at 153).

In addition, the Court may take judicial notice of certain publicly available documents, including, for example, a plaintiff's arrest reports, indictments, and criminal disposition data. *Corley v. Vance*, 365 F. Supp. 3d 407, 432 (S.D.N.Y. 2019) (collecting cases); *see Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (noting that courts may "look to public records, including complaints filed in state court, in deciding a motion to dismiss" (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002); and *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998))). When taking judicial notice of such documents, the Court does so "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1991)).

**III. Section 1983**

To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

**ANALYSIS**

**I. Absolute Prosecutorial Immunity**

As a preliminary matter, Defendants argue that all Bronx DA Defendants are entitled to absolute prosecutorial immunity. (Mot. 9–13.) Buari responds that ADA Karen is not entitled to absolute immunity because Buari has alleged conduct not intimately tied to the judicial process.





(Opp. 9.) Buari also argues that ADAs Lung, Coddington, and Mignola and the Investigator Defendants are not entitled to qualified immunity because their misconduct in connection with the Second 440.10 Motion occurred during a non-adversarial investigative review. (Opp. 10, 12.)

**A. Applicable Law**

The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam) (collecting cases); *see Deronette v. City of New York*, No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); and *United States v. Colbert*, No. 87 Civ. 4789, 1991 WL 183376, at *4 (S.D.N.Y. Sept. 11, 1991)). Indeed, it is appropriate to address the issue of absolute immunity before assessing whether the plaintiff has sufficiently alleged constitutional violations. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 n.4 (2d Cir. 1995).

Immunity may be asserted as a defense in an 12(b)(6) motion where "the facts supporting the defense appear[] on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (citing *Pani*, 152 F.3d at 74–75); *see also Deronette*, 2007 WL 951925, at *4 ("Courts may consider absolute immunity on a 12(b)(6) motion to dismiss when facts establishing the defense appear directly in the complaint." (citing *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995))). In asserting an immunity defense at the pleading stage, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 436.

The doctrine of "absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); *see also Root v. Liston*, 444 F.3d 127, 131 (2d Cir. 2006) (describing

absolute immunity as an "extreme protection"). The doctrine "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney." *Pinaud*, 52 F.3d at 1147. A prosecutor asserting immunity bears the burden of showing that it applies. *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (citing *Burns v. Reed*, 500 U.S. 478, 486–87 (1991)).

In determining whether a prosecutor is entitled to absolute immunity, courts apply a "functional" test, "looking to the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). Under the functional test, prosecutors "are absolutely immune from claims arising from conduct 'intimately associated with the judicial phase of the criminal process.'" *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). The functional test is objective. *Hill*, 45 F.3d at 662. Courts must "view the relevant circumstances as would a reasonable official in the claimant's position," *Giraldo*, 694 F.3d at 165–66 (collecting cases), and consider "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor," *id.* at 166.

Absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley*, 509 U.S. at 273. This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316(PGG), 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321–22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate





withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns*, 500 U.S. at 490 (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

However, absolute immunity does not thwart every claim against prosecutors. *See Pinaud*, 52 F.3d at 1147. Under the functional test, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33); *see Buckley*, 509 U.S. at 273 (citing *Burns*, 500 U.S. at 494–96)). Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley*, 509 U.S. at 273; *see Kanciper v. Lato*, 989 F. Supp. 2d 216, 228–29 (E.D.N.Y. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" (quoting *Day v. Morgenthau*, 909 F.2d 75, 77–78 (2d Cir. 1990))). Where absolute immunity does not apply, a prosecutor is eligible only for qualified immunity. *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (citing *Buckley*, 509 U.S. at 273).

There is no bright line for absolute immunity based on the stage of a criminal proceeding. *Moye*, 2012 WL 2569085, at *6; *see Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987). Absolute immunity generally applies "where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Moye*, 2012 WL 2569085, at *6 (quoting *Tabor v. New York City*, No. 11 CV 0195 FB, 2012 WL 603561, at *4 (E.D.N.Y. Feb. 23, 2012)); *see Warney v. Monroe County*, 587 F.3d 113, 123 (2d Cir. 2009) (noting that "a prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor

acts as an advocate"). Conversely, absolute immunity generally does not apply "where formal proceedings have not begun and the prosecutor is acting in an investigative capacity." *Moye*, 2012 WL 2569085, at *6 (citing *Tabor*, 2012 WL 603561, at *4). It is therefore critical to distinguish between "those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence." *Smith*, 147 F.3d at 94.

**B. Application**

In considering whether the Bronx DA Defendants are entitled to absolute prosecutorial immunity, the Court "must examine the role played by each . . . defendant to determine whether he or she performed a function for which absolute immunity is required." *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (citing *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) (per curiam)). Where a plaintiff fails to "plausibly state any claims against any Defendant, the Court need not address with granularity to which claims each Defendant is immune." *Dava v. City of New York*, No. 15-cv-08575 (ALC), 2016 WL 4532203, at *4 (S.D.N.Y. Aug. 29, 2016).

**1. ADA Karen**

Buari alleges that the Bronx DA knowingly presented Griffiths' false statements to the grand jury. (Am. Compl. ¶¶ 82–85.)[4] Buari further alleges that ADA Karen induced witnesses to implicate Buari falsely, specifically, offering Connor, Seabrook, Holder, and Effort recommendations for leniency and threatening to charge Effort as an accessory to the Harris Murders. (*Id.* ¶¶ 112–20, 125, 129–37.) Buari also alleges that ADA Karen directed the Investigator Defendants to obtain withdrawals of Effort's and Robinson's recantation testimony. (*Id.* ¶ 156–61.)

[4] While ADA Karen is neither explicitly mentioned in connection with the grand jury proceedings in the Amended Complaint (*see* Am. Compl. ¶¶ 82–87) nor listed as the ADA in the indictment (*see* Mot. Ex. 4 [ECF No. 61-4]), the Court, drawing reasonable inferences in Buari's favor, as it must, presumes ADA Karen was involved with the grand jury proceedings given Buari's allegation that he was the "[ADA] prosecuting Mr. Buari's case" (Am. Compl. ¶ 111).





ADA Karen is entitled to absolute immunity for all acts alleged in the Amended Complaint. First, ADA Karen's alleged presentation of false evidence to the grand jury "lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process" and is therefore protected by absolute immunity. *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (collecting cases); *see Imbler*, 424 U.S. at 430–31 (holding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983"); *Hill*, 45 F.3d at 661 (noting that "prosecutors are immune from § 1983 liability for their conduct before a grand jury" (collecting cases)); *Urrego v. United States*, No. 00 CV 1203(CBA), 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (noting that "when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false" (collecting cases)); *see also Bernard*, 356 F.3d at 503, 505 (holding that ADAs who "knowingly presenting false evidence to, while at the same time withholding exculpatory evidence from, the various grand juries that returned the[] flawed indictments" were entitled to absolute immunity); *Pinaud*, 52 F.3d at 1149 (finding that ADAs who made misrepresentations to a grand jury were entitled to absolute immunity).

Second, ADA Karen's alleged actions in inducing witnesses to implicate Buari falsely is also protected because "the falsification of evidence and the coercion of witnesses . . . [are] prosecutorial activities for which absolute immunity applies." *Taylor*, 640 F.2d at 452 (citing *Lee*, 617 F.2d at 321–22); *see Morris v. Martin*, No. 16-CV-601, 2016 WL 4059209, at *6 (N.D.N.Y. June 21, 2016) ("Absolute immunity has been found to extend to such acts as falsification of evidence, coercion of witnesses, solicitation and subornation of perjured testimony, [and] withholding of evidence . . . ." (citing *Taylor*, 640 F.2d at 452)), *report & recommendation*

*adopted*, 2016 WL 4098611 (N.D.N.Y. July 28, 2016); *see also Cox v. City of New Rochelle*, No. 17-CV-8193 (KMK), 2019 WL 3778735, at *11 (S.D.N.Y. Aug. 12, 2019) (holding that convincing witnesses to testify falsely is an advocacy-related action covered by absolute immunity (collecting cases)); *Collins v. City of New York*, 923 F. Supp. 2d 462, 470, 472 (E.D.N.Y. 2013) (holding that ADAs were absolutely immune from claims that they "coerc[ed] [witnesses] into giving false testimony, present[ed] that testimony at trial, and fail[ed] to disclose the circumstances of their testimony"); *Bertuglia*, 839 F. Supp. 2d at 735–36 (holding that ADAs were absolutely immune from claims that they "coerced and harassed various witnesses into giving false testimony").

Finally, ADA Karen's alleged directing the Investigator Defendants to pressure Effort and Robinson to recant their recantations is also protected even though it occurred after Buari's conviction. In *Warney*, the Second Circuit held that "absolute immunity shields work performed during a post-conviction collateral attack, at least insofar as the challenged actions are part of the prosecutor's role as an advocate for the state." 587 F.3d at 123. There, the court found that the failure by prosecutors to disclose exculpatory DNA results during post-conviction habeas proceedings was covered by absolute immunity because the actions were "integral to the overarching advocacy function of dealing with post-trial initiatives challenging an underlying criminal conviction." *Id.* at 124. Similarly, ADA Karen's alleged actions were integral to defending Buari's conviction against a post-conviction attack and are therefore protected by absolute immunity. *Id.*; *see Giraldo*, 694 F.3d at 166; *see also Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (holding that absolute immunity shielded prosecutor from claim that he withheld exculpatory evidence discovered after plaintiff's conviction because his "functions in representing the State in [plaintiff's] post-conviction motions and direct appeal very much implicated the judicial process"); *Newsome v. City of Newark*, No. 13–cv–06234 (CCC), 2014 WL 4798783, at





*1, *4 (D.N.J. Sept. 25, 2014) (holding that prosecutor was absolutely immune from claim that he "urged the victim to recant the recantation" because "determining whether or not Plaintiff's request that the charges be dropped, based on the victim's recantation, had a valid basis" was a prosecutorial function). Accordingly, because all alleged actions by ADA Karen are protected by absolute immunity, the Court dismisses all claims against ADA Karen.

**2. ADAs Lung, Coddington, and Mignola**

Buari alleges that ADAs Lung, Coddington, and Mignola directed the Investigator Defendants to seek out Buari's witnesses and intimidate them not to testify. (Am. Compl. ¶ 201.) Buari also alleges that ADA Lung fervently opposed the Second 440.10 Motion (*id.* ¶¶ 219–25), then stalled for months before moving to dismiss the indictment (*id.* ¶¶ 228–42).

The actions of ADAs Lung, Coddington, and Mignola in connection with the Second 440.10 Motion are protected by absolute immunity because they were "performed in defending a conviction from collateral attack." *Warney*, 587 F.3d at 122; *see Giraldo*, 694 F.3d at 166; *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003) (citing *Houstin v. Partee*, 978 F.2d 362, 365–66 (7th Cir. 1992)). Buari's attempt to distinguish *Warney* and characterize the actions of ADAs Lung, Coddington, and Mignola as part of "a purportedly non-adversarial investigative review of Plaintiff's case" is unavailing. (Opp. 10.) The actions of ADAs Lung, Coddington, and Mignola were in response to, and in anticipation of contesting, Buari's Second 440.10 Motion. (*See* Am. Compl. ¶¶ 187–89.) Buari's holding the Second 440.10 Motion in abeyance while they investigated his claim does not disassociate their actions from the judicial phase of the criminal process. *See Giraldo*, 694 F.3d at 166; *Ortiz v. Case*, 782 F. App'x 65, 67 (2d Cir. 2019) (summary order) (alteration in original) (holding that investigative acts by ADAs before plaintiff's motion to vacate was filed were protected by absolute immunity because they "would have been in

anticipation of the inevitable motion to vacate the conviction and to evaluate if and how to 'defend[] a conviction from collateral attack'" (quoting *Warney*, 587 F.3d at 122)). Indeed, as Buari alleges, ADAs Lung, Coddington, and Mignola "sought to sabotage Mr. Buari's 440.10 motion *and maintain his conviction*." (Am. Compl. ¶ 192 (emphasis added).) Such conduct is associated with their roles as advocates and is therefore protected by absolute immunity. *See Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) (noting the prosecutor's "duty to defend a conviction"); *see also Peterson v. Bernardi*, 719 F. Supp. 2d 419, 436 n.20 (D.N.J. 2010) (noting that "when confronted with a request to scrutinize a long-settled conviction, the prosecutor's interest is in preserving its hard-fought guilty verdict").

Finally, the absolute immunity to which ADA Mignola is entitled also reaches Buari's separate claim against her for supervisory liability. In *Van de Kamp*, the Supreme Court held that "supervisory prosecutors are immune in a suit directly attacking their actions related to an individual trial." 555 U.S. at 346. It is immaterial that ADA Mignola's acts occurred in connection with post-trial proceedings. Her supervision was directly connected with the advocacy functions of the prosecutors. *Id.*; *see Warney*, 587 F.3d at 122–25; *Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 205 (S.D.N.Y. 2004) ("To the extent the supervision or policies concern the prosecutorial decisions for which the ADAs have absolute immunity, then those derivative allegations against supervisors must also be dismissed on the ground that the supervising district attorneys have absolute immunity for the prosecution-related decisions of their subordinates . . . ." (quoting *Sheff v. City of New York*, No. 03 Civ.708 DLC, 2004 WL 594894, at *6 (S.D.N.Y. Mar. 24, 2004))); *see also Ortiz v. Case*, No. 16CV322V, 2018 WL 8620414, at *16 (W.D.N.Y. May 18, 2018) (finding that absolute immunity "also reaches plaintiff's claims for supervisory liability" (citing *Van de*





*Kamp*, 555 U.S. 335)), *aff'd*, 782 F. App'x 65 (2d Cir. 2019) (summary order).[5] Accordingly, the Court dismisses all claims against ADAs Lung, Coddington, and Mignola.

**3. Investigator Defendants (Viggiano, Schiffman, and Wall)**

Buari alleges that the Investigator Defendants coerced Robinson to recant his confession to committing the Harris Murders and attempted to coerce Effort to withdraw his recantation of his trial testimony implicating Buari. (Am. Compl. ¶¶ 157–61.) Critically, Buari alleges that they were "sent out" to do this by members of the Bronx DA's Office, including ADA Karen. (*Id.* ¶ 156.)

The Investigator Defendants are each entitled to absolute immunity. The Second Circuit has held that absolute prosecutorial immunity extends to persons assisting and working under the direction of prosecutors, when they perform functions closely tied to the judicial process. *Hill*, 45 F.3d at 660 (citing *Davis v. Grusemeyer*, 996 F.2d 617, 630 n.28 (3d Cir. 1993), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998)); *accord Bernard*, 356 F.3d at 502. In seeking withdrawals of Effort's and Robinson's recantations, the Investigator Defendants were performing prosecutorial functions—protecting Buari's guilty verdict from a post-conviction collateral attack—under the direction of ADA Karen. Thus, the absolute prosecutorial immunity that protects ADA Karen extends to the Investigator Defendants. *See Hamilton v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2019 WL 1452013, at *13 (E.D.N.Y. Mar. 19, 2019) (extending absolute immunity to an investigator of the district attorney's office who sought to procure false testimony from a witness); *Jackson v. Seewald*, No. 11 Civ. 5826(LAK)(JCF), 2013 WL 149341, at *7 (S.D.N.Y. Jan. 14, 2013) (extending absolute immunity to investigators of the district attorney's office); *see also O'Neal v. Morales*, 679 F. App'x 16, 18–

[5] For the same reason, the Court finds that if DA Clark were properly named as a party, *see supra* note 1, she would be entitled to absolute immunity and would therefore be dismissed from the action.

19 (2d Cir. 2017) (summary order) (affirming grant of absolute immunity to detective who conducted investigative acts that furthered the advocacy function of preparing for trial "at the behest of the [ADA]" and "*only* because the ADA requested that he do so"). Accordingly, the Court dismisses all claims against the Investigator Defendants.

## II. Malicious Prosecution (Counts I and VIII)

Buari brings causes of action against the NYPD Defendants for malicious prosecution under Section 1983 and New York State law. (Am. Compl. ¶¶ 274–78, 346–49.) Buari alleges that the NYPD Defendants fabricated evidence and withheld exculpatory evidence that vitiated probable cause. (*Id.* ¶ 275.a.) Defendants argue that Buari's malicious prosecution claims fail because (1) Buari has not demonstrated a favorable termination of proceedings, (2) Buari cannot overcome the presumption of probable cause created by the grand jury indictment, and (3) the NYPD Defendants did not initiate or continue the prosecution. (Mot. 13–17.)

### A. Applicable Law

To state a claim for malicious prosecution under Section 1983 and New York State law, a plaintiff must show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). A Section 1983 malicious prosecution claim also requires "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (citing *Murphy*, 118 F.3d at 944–46; and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116–17 (2d Cir. 1995)).





A defendant initiates a proceeding when he "play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* (alteration in original) (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283 (2d Dep't 1992); and citing *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189, 687 N.Y.S.2d 330 (1st Dep't 1999)). A claim for malicious prosecution against a police officer "requires some showing that the defendant distorted the process by which [the] plaintiff was brought to trial." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (quoting *Breeden v. City of New York*, No. 09–CV–4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014)). "Showing that the police 'failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution." *Id.* (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160 (2d Cir. 2010)); *see also Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (noting that a police officer "initiate[s] a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor" (collecting cases)).

With respect to the second element, favorable termination, different standards govern a Section 1983 claim and a claim under New York law. "New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004). Rather, a plaintiff need only demonstrate that "the circumstances surrounding the termination are not inconsistent with the innocence of the accused." *Cantalino v. Danner*, 96 N.Y.2d 391, 395, 729 N.YS.2d 405, 754 N.E.2d 164 (2001); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198, 712 N.Y.S.2d 43, 734 N.E.2d 750 (2000). There is no "per se rule that a dismissal in the interest of

justice can never constitute a favorable termination." *Cantalino*, 96 N.Y.2d at 396. The favorable termination element is satisfied "when charges are dismissed 'because they were groundless.'" *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 357, 368 (S.D.N.Y. 2010) (quoting *Cantalino*, 96 N.Y.2d at 397).

The Section 1983 requirement is more stringent: the plaintiff must "show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning v. City of Glen Falls*, 908 F.3d 19, 22 (2d Cir. 2018). "No single type of disposition is necessary or sufficient, but the termination must be 'measured in objective terms by examining the totality of the circumstances.'" *Rosario v. City of New York*, 18 Civ. 4023 (LGS), 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) (quoting *Lanning*, 908 F.3d at 28). "Allegations that merely assert that charges were dismissed are not sufficient." *Demaitre v. City of New York*, 18 Civ. 12403 (PGG), 2020 WL 6048192, at *4 (S.D.N.Y. Oct. 11, 2020) (citing *Johnson v. City of New York*, No. 20-CV-3083 (LLS), 2020 WL 2192830, at *5 (S.D.N.Y. May 5, 2020); and *Ndemenoh v. City Univ. of N.Y.*, No. 20-CV-4492 (LLS), 2020 WL 4547302, at *2, *5 (S.D.N.Y. Aug. 4, 2020)). A plaintiff who satisfies the Section 1983 standard necessarily satisfies the less-stringent New York standard. *See, e.g.*, *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 71–73 (S.D.N.Y. 2020).

No claim for malicious prosecution can survive if there was probable cause for the prosecution. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). Probable cause is "described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76 (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (noting that "the relevant probable cause determination is whether there was





probable cause to believe the criminal proceeding could succeed and, hence, should be commenced" (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999))). A grand jury indictment creates a presumption of probable cause that "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello*, 612 F.3d at 162 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The plaintiff "bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino*, 331 F.3d at 73 (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994)).

Finally, malice requires a showing "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)). "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (noting that malice may reasonably be inferred where probable cause is "totally lacking" (quoting *Wilson v. McMullen*, No. 07–CV–948, 2010 WL 1268055, *6 (E.D.N.Y. Mar. 30, 2010))). "Falsifying evidence is sufficient to show malice." *Bailey*, 79 F. Supp. 3d at 451 (collecting cases).

**B. Application**

Buari has sufficiently pleaded each element of malicious prosecution. First, Buari has alleged that Dets. Dietz and Tracy initiated his prosecution by knowingly inducing Griffiths to state falsely that Buari committed the Harris Murders, which resulted in Buari's arrest and indictment. (Am. Compl. ¶¶ 76–78, 80, 82–85.) On a 12(b)(6) motion, those allegations must be

credited. *Iqbal*, 556 U.S. at 678. Precedent is clear that police officers who induce a witness to give false testimony that results in an arrest and grand jury indictment have "initiated" a criminal proceeding. *See Manganiello*, 612 F.3d at 163; *Ricciuti*, 124 F.3d at 130 (finding that a police officer can "play[] a role in initiating the prosecution by preparing [an] alleged false confession and forwarding it to prosecutors"); *see also Chimurenga v. City of New York*, 45 F. Supp. 3d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution." (collecting sources)).

Furthermore, Buari has plausibly alleged that Dets. Price, Gottwin, Neenan, and Fortune caused a continuation of his prosecution by inducing witnesses to testify falsely. (Am. Compl. ¶¶ 104, 108–20.) Buari alleges that the detectives apprised ADA Karen of the arrangement, that Dets. Price, Fortune, and Neenan testified falsely against Buari at the suppression hearing, and that Robinson, Effort, and the other witnesses testified falsely against Buari at trial. (*Id.* ¶¶ 121–38.) These allegations, accepted as true, support a reasonable inference that the prosecution would not have continued had the detectives not testified falsely and induced the witnesses to testify falsely. *See Davis v. City of New York*, 296 F.R.D. 127, 130 (E.D.N.Y. 2013) (finding that allegations that officers testified falsely against plaintiff could satisfy the continuation element (citing *Manganiello*, 612 F.3d at 163)).

Defendants argue that the state court's exercise of independent judgment in indicting, convicting, and denying post-trial motions breaks the chain of causation. (Mot. 17.) But where, as here, police officers allegedly deceive and mislead subsequent decision-makers with false information, the chain of causation remains intact because the officers are charged with reasonably foreseeing that their actions will influence the subsequent decisions resulting in a deprivation of





the plaintiff's liberty. *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 397 (S.D.N.Y. 2016) (collecting cases); *see Hamilton v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Bermudez v. City of New York*, 790 F.3d 368, 374 (2d Cir. 2015)); *see also Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."). Put simply, the NYPD Defendants "cannot avoid liability by pointing a finger at the [state court] that [they] allegedly deceived and misled." *Shabazz*, 201 F. Supp. 3d at 397.[6]

Second, the totality of the circumstances surrounding the dismissal of Buari's indictment supports a plausible inference of actual innocence sufficient to satisfy the second prong of Buari's malicious prosecution claim under Section 1983. In vacating Buari's conviction and ordering a new trial, the state court found that Buari had established by a preponderance of evidence that the newly discovered evidence probably would have resulted in a more favorable verdict. (Decision of *People v. Buari*, No. 2111-1993, slip op. at 19 (Sup. Ct. Bronx Cnty. Nov. 9, 2017) (Oliver, Jr., J.), Ex. A to Decl. Alan H. Scheiner Supp. Mot. Dismiss ("Scheiner Decl.") [ECF No. 61-3].) In addition, Buari's Certificate of Disposition, which "constitutes presumptive evidence of a favorable termination," *Hincapie*, 434 F. Supp. 3d at 72 (citing *United States v. Green*, 480 F.3d

[6] Defendants rely on *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999); but that case in inapposite. In *Townes*, the plaintiff was arrested for possession of handguns and narcotics after the taxicab in which he was a passenger was stopped and searched unreasonably. *Id.* at 141–42. The Second Circuit found that the state court's denial of the plaintiff's motion to suppress the handguns and narcotics broke the chain of causation because "the defendants' allegedly tortious conduct had long since ended" and "[t]he state trial court, which alone had the power to suppress the improperly obtained evidence, had control over the ultimate outcome of [the plaintiff's] case." *Id.* at 147. Here, conversely, it is alleged that the misconduct by the NYPD Defendants continued through Buari's trial and tainted the state court's exercise of independent judgment. At this stage of the litigation, those allegations are sufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283; *Glob. Network Commc'ns*, 458 F.3d at 154.

627, 632 (2d Cir. 2007)), provides that he "shall be restored, in contemplation of law, to the status occupied before the arrest and prosecution" (Cert. of Disposition, *People v. Buari*, No. 2111-1993 (Sup. Ct. Bronx Cnty.), Ex. 2 to Decl. Marc C. Cannan Opp. Defs.' Mot. Dismiss ("Cannan Decl.") [ECF No. 66-2]), and that status is innocent, *see Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (noting that when a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge"); *accord Hincapie*, 434 F. Supp. 3d at 72. Moreover, the Bronx DA declined to retry Buari and dismissed the indictment. Weighing multiple factors, it believed that it could not prove guilt beyond a reasonable doubt and requested that the indictment be dismissed (Cannan Decl. Ex. 1 ¶ 15 [ECF No. 66-1]), which further supports a plausible allegation of favorable termination. *See Virgil v. City of New York*, No. 17-cv-5100, 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019) (finding that "a dismissal based on the state's express inability to prove its case beyond a reasonable doubt is sufficient to show a favorable termination [under] § 1983").

Defendants argue that the state court "denied th[e] part of the Second § 440 Motion seeking dismissal on the grounds of actual innocence." (Mot. 16.) Indeed, the state court found that Buari "failed to establish his innocence by clear and convincing evidence." (*Buari*, slip op. at 23, Ex. A to Scheiner Decl.) But the standard for favorable termination does not require a showing of innocence by clear and convincing evidence. *See Hincapie*, 434 F. Supp. 3d at 71, 73 (rejecting identical argument and noting that "neither an acquittal nor a finding of actual innocence by clear and convincing evidence is necessary"). At the 12(b)(6) stage, a plaintiff need only plausibly allege that "the criminal proceedings against him were terminated in a manner *indicating* his innocence." *Lanning*, 908 F.3d at 29 (emphasis added). Buari has done that here. *See Hincapie*, 434 F. Supp. 3d at 73 (finding that allegations of "significant weaknesses in the case including the





testimony of newly discovered witnesses which tended to exonerate [plaintiff and] the lack of physical evidence . . . are sufficient to plead favorable termination"); *Rosario*, 2019 WL 4450685, at *4 (finding plaintiff plausibly pleaded favorable termination where his "conviction was vacated and his indictment was dismissed, after he was imprisoned for nearly twenty years . . . [and] [t]he DA's Office decided not to retry Plaintiff because it did not believe it could prove the case"). Because he has satisfied the more-stringent Section 1983 standard for favorable termination, Buari necessarily also satisfies the New York standard. *See Hincapie*, 434 F. Supp. 3d at 71–73.

Third, for purposes of a motion to dismiss at the pleading stage, Buari's allegations that Dets. Dietz and Tracy induced Griffiths to testify falsely before the grand jury (Am. Compl. ¶¶ 76, 84–85) must be accepted as true, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, and, as such, overcome at this stage the presumption of probable cause associated with the grand jury indictment, *see Bouche v. City of Mount Vernon*, No. 11–CV–5246, 2013 WL 322613, at *6 (S.D.N.Y. Jan. 28, 2013) ("[I]f a defendant knows that witness statements are false or coerced, this will defeat probable cause."); *Richards v. City of New York*, No. 97–CV–7990, 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) (noting that an indictment "obtained through improper means" is stripped of its presumptive force (citing *United States v. Williams*, 504 U.S. 36, 51–52 (1992))); *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (deeming presumption of probable cause rebutted where plaintiff alleged that police officers "failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, . . . and fabricated oral statements of witnesses"); *Bailey*, 79 F. Supp. 3d at 457 (finding that police officers' alleged coercion of individuals whose testimony was used to secure an arrest warrant rebutted presumption of probable cause).

Defendants argue that Buari has failed to allege that the detectives knew that Griffiths' testimony was false. (Mot. 14–15.) However, Buari makes further allegations that permit the reasonable inference that the detectives knew of the falsity, and on a 12(b)(6) motion, those allegations must be accepted as true. *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283. Specifically, Buari alleges that: (a) there was no physical evidence corroborating Griffiths' testimony; (b) Det. Dietz suspected that Griffiths was connected to the Harris Murders; (c) Griffiths' girlfriend informed Det. Dietz that one of the "Yankee guys that deal crack" committed the Harris Murders; and (d) Det. Dietz knew that Robinson was a "Yankee guy" who dealt crack. (Am. Compl. ¶¶ 66, 69–70, 76; *see* Mot. 14 n.12). These allegations support a reasonable inference that the indictment was "the product of fraud and bad faith conduct." *Hincapie*, 434 F. Supp. 3d at 74 (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016)); *cf. B. v. City of New York*, No. 14-cv-1021 (KAM)(PK), 2016 WL 4530455, at *15 (E.D.N.Y. Aug. 29, 2016) (granting motion to dismiss where "[n]one of the allegations even suggest the nature of the purported misconduct"). At the 12(b)(6) stage, Buari "is not required to prove that the defendants lied before the grand jury or in their discussions with . . . prosecutors; instead, he need only provide sufficiently specific factual allegations regarding the nature and content of their lies." *Demosthene v. City of New York*, No. 18-cv-1358 (ARR) (PK), 2019 WL 181305, at *5 (E.D.N.Y. Jan. 10, 2019) (citing *Lewis v. City of New York*, No. 12-CV-2836 (RRM)(RML), 2013 WL 6816615, at *9 (E.D.N.Y. Dec. 24, 2013), *aff'd*, 591 F. App'x 21 (2d Cir. 2015) (summary order); and *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 476 (S.D.N.Y. 2009)). While Defendants argue that Buari does not allege that *Defendants* lied to the grand jury (Reply 6), there is no meaningful difference between Defendants lying and Defendants inducing a witness to lie. *See Bouche v. City of Mount Vernon*, No. 11 Civ. 5246(SAS), 2012 WL 987592, at *1, *7 (S.D.N.Y. Mar. 23, 2012) (denying motion to dismiss





malicious prosecution claim where plaintiff alleged that officers induced witnesses to provide false statements in exchange for leniency in pending criminal matters); *Ambrose*, 623 F. Supp. 2d at 474–77 (denying motion for judgment on the pleadings where plaintiff alleged that officers "coerced a lineup witness into implicating Plaintiff"). Finally, Defendants' reliance on *Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) (Mot. 14–15), is misguided because that case was decided at the summary judgment stage. *See Hincapie*, 434 F. Supp. 3d at 74 ("Defendants improperly rely on *Savino v. City of New York*, . . . a case decided on summary judgment to argue that Plaintiff has not met his burden at the motion to dismiss stage to rebut the presumption of probable case. The relevant burden is not the same."). Accordingly, at the present stage of the litigation, accepting his allegations as true, Buari has overcome the presumption of probable cause sufficiently to withstand a motion to dismiss.

Finally, because Buari's allegations plausibly rebut the presumption of probable cause created by the grand jury indictment, the Court may reasonably infer malice. *See Lowth*, 82 F.3d at 573 (noting that "malice may be inferred from the lack of probable cause" (quoting *Conkey v. State*, 74 A.D.2d 998, 999, 427 N.Y.S.2d 330 (4th Dep't 1980))); *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994) (noting that "the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings"). Buari's allegations that the NYPD Defendants falsified evidence also satisfy the malice element. *See Grant v. City of New York*, No. 15-CV-3635 (ILG) (ST), 2019 WL 1099945, at *9 (E.D.N.Y. Mar. 8, 2019) (finding that malice is shown through "submission of falsified evidence or withholding of material evidence" (citing *Torres v. Jones*, 26 N.Y.3d 742, 762, 27 N.Y.S.3d 468, 47 N.E.3d 747 (2016))); *see also Manganiello*, 612 F.3d at 164 (finding that malice "could easily be inferred . . . [from the detective's] willingness to coerce an inculpatory statement from one unwilling person in exchange

for not reporting that person's known criminal activities"). Because Buari has pleaded all four elements of malicious prosecution, the Court denies Defendants' Motion to dismiss the malicious prosecution claims in Counts I and VIII.

### III. Section 1983 Due Process, or Denial of Fair Trial (Count II)

Buari asserts a Section 1983 due process claim against the NYPD Defendants under two distinct theories: fabrication of evidence and failure to investigate. (Am. Compl. ¶¶ 279–83.) First, Buari alleges that the NYPD Defendants fabricated incriminating evidence by coercing witnesses to implicate Buari falsely and failing to disclose the circumstances of the witness interviews. (*Id.* ¶ 280.a.) Second, he alleges that the NYPD Defendants deliberately failed to investigate evidence pointing to Robinson. (*Id.* ¶ 280.a.) Defendants argue that Buari has not alleged facts supporting a plausible inference that the NYPD Defendants knew that the testimony against Buari was false. (Mot. 17.) Defendants also argue that Buari has no due process right to a police investigation. (Mot. 18 n.14.)

#### A. Applicable Law

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (quoting *Zahrey*, 221 F.3d at 355). To state a due process claim based on fabrication of evidence, the plaintiff must show that: "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Bailey*, 79 F. Supp. 3d at 446 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)); *see Ricciuti*, 124 F.3d at 130 (collecting cases). While a fair trial claim is distinct from a malicious prosecution claim, *Bailey*, 79 F. Supp. 3d at 446; *see Morse v. Spitzer*, No. 07–CV–4793





(CBA)(RML), 2012 WL 3202963, at *5–6 (E.D.N.Y. Aug. 3, 2012), a plaintiff may bring "claims for both malicious prosecution and denial of his fair right to trial based on the same alleged fabrication of evidence," *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 130–31; and *Jovanovic v. City of New York*, No. 04 Civ. 8437(PAC), 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006)).

As Defendants correctly argue, "there is no constitutional right to an adequate investigation." *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) (citing *Campbell v. Giuliani*, No. 99 Civ. 2603, 2000 WL 194815, at *3 n. 6 (E.D.N.Y. Feb. 16, 2000)); *see Harrington v. County of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010). Thus, "[a] police officer's failure to pursue a particular investigative path is not a constitutional violation." *Schweitzer v. Brunstein*, No. 16-CV-1172 (RRM) (LB), 2016 WL 4203482, at *2 (E.D.N.Y. Aug. 9, 2016) (collecting cases). Accordingly, "a 'failure to investigate' is not independently cognizable as a stand-alone claim" under Section 1983. *McCaffrey v. City of New York*, No. 11-CV-1636 (RJS), 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) (collecting cases); *see also* Stokes v. City of New York, No. 05-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate . . . ." (collecting cases)).

#### B. Application

Buari has sufficiently pleaded a claim for denial of a fair trial based on an alleged fabrication of evidence. As discussed above, Buari alleges that Dets. Dietz and Tracy coerced Griffiths into stating falsely that Buari committed the Harris Murders and forwarded this information to the Bronx DA to secure the indictment. (Am. Compl. ¶¶ 76–80, 82–85.) He also alleges that Dets. Price, Gottwin, Neenan, and Fortune, despite having reason to believe that

Robinson committed the Harris Murders, coerced several witnesses into testifying falsely against Buari at trial, which resulted in Buari's conviction. (*Id.* ¶¶ 104, 108–20.) These assertions, taken as true, plausibly allege the elements of a Section 1983 fair trial claim. *See Benitez v. City of New York*, 17 CV 3827 (SJ) (SJB), 2018 WL 2973387, at *3 (E.D.N.Y. June 13, 2018) (denying motion to dismiss where defendants allegedly "manufactured false identification evidence . . . [and] gave this fabricated evidence to prosecutors, who then used this fabricated evidence to prosecute Plaintiff"); *Thorpe v. County of St. Lawrence*, No. 7:15-cv-736(GLS/TWD), 2016 WL 7053545, at *4 (N.D.N.Y. Dec. 5, 2016) (denying motion to dismiss where defendants allegedly "fabricated evidence by coercing false testimony from [a witness]," which "was then submitted at trial and misled the jury"); *Jovanovic*, 2006 WL 2411541, at *13 (denying motion to dismiss where plaintiff alleged, *inter alia*, that the defendant "prepared police reports containing false and misleading information about [plaintiff's] arrest and the evidence collected at [plaintiff's] apartment, which he then forwarded to prosecutors"); *cf. Thompson v. City of New York*, No. 18 Civ. 04105 (PAC), 2020 WL 2097622, at *4 (S.D.N.Y. May 1, 2020) (dismissing fair trial claim where plaintiff "d[id] not identify what evidence was fabricated; . . . what, if any, fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury"). Just as Buari's allegations state a claim for malicious prosecution, so too do they state a claim for denial of a fair trial. *See Morse*, 2012 WL 3202963, at *6 (noting that in cases alleging that "a police officer fabricated evidence and forwarded it to prosecutors *in order to provide probable cause* for an arrest or prosecution . . . a plaintiff's malicious prosecution and fair trial claims would rise or fall together").

Defendant's three arguments to the contrary are without merit. (*See* Mot. 18–20.) First, at the pleading stage, Buari need not provide actual proof of coercion or falsity; he need only make





specific factual allegations that, "if true, are plausibly sufficient to state a legal claim." *Doe*, 831 F.3d at 48 (noting that at the motion to dismiss stage a court "is not engaged in an effort to determine the true facts"). Second, as previously discussed, Buari has plausibly alleged favorable termination. *See supra* Analysis, Section II.B.2; *see also Hincapie*, 434 F. Supp. 3d at 75. Third, Buari alleges personal involvement of each NYPD Defendant and does not, as Defendants suggest, rely on group pleading. (Mot. 19–20.) Each material allegation in the Amended Complaint specifies which Defendants were personally involved in the alleged constitutional violations. (*See, e.g.*, Am. Compl. ¶ 76 (alleging that Dets. Dietz and Tracy coerced Griffiths into falsely implicating Buari); *id.* ¶¶ 112, 115 (alleging that Dets. Price, Gottwin, Neenan, and Fortune coerced Connor, Seabrook, Johnson, and Holder to testify falsely against Buari).) *See Goldring v. Davidson*, No. 1:18-CV-06201 (ALC), 2020 WL 1547464, at *5 (S.D.N.Y. Apr. 1, 2020) (rejecting argument of group pleading where plaintiff alleged the individual defendants' "positions at [the correctional facility] and their role in the alleged violations"). Defendants, in essence, argue that Buari fails to specify which NYPD Defendants participated directly in the coercion of witnesses and which NYPD Defendants were present and failed to intercede. (*See* Mot. 19–20.) *See infra* note 7. But such specificity as to each NYPD Defendant's individual actions is not required where, as here, the complaint "give[s] each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Southerland v. N.Y.C. Hous. Auth.*, No. 10–CV–5243 (SLT), 2010 WL 4916935, at *2 (E.D.N.Y. Nov. 23, 2010) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)); *see Breton v. City of New York*, 404 F. Supp. 3d 799, 815 (S.D.N.Y. 2019) (rejecting group pleading argument where the complaint alleged that specific officers "each participated in the fabrication of evidence and the creation of police reports that omitted exculpatory evidence . . . [and] that these defendants forwarded the misleading evidence

to the prosecutors"); *Serrata v. Givens*, No. 1:18-CV-2016, 2019 WL 1597297, *5 (E.D.N.Y. Apr. 15, 2019) (rejecting group pleading argument where "the complaint refers to all the defendants collectively because all the defendants were, it alleges, on the scene and actively involved in the complained-of conduct"); *Adamou v. County of Spotsylvania*, No. 1:12-cv-07789 (ALC) (SN), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (denying motion to dismiss despite "several instances of impermissible 'group pleading'" because "those allegations [we]re buttressed by specific allegations against [particular defendants]").

Because there is no constitutional right to an adequate investigation, and therefore a claim for failure to investigate is not independently cognizable under Section 1983, the Court dismisses Buari's claim for failure to conduct an adequate investigation. *See Antonetti v. City of New York*, 422 F. Supp. 3d 668, 671 (E.D.N.Y. 2017) (dismissing Section 1983 fair trial claim based on alleged failure to investigate); *Head v. Ebert*, No. 14-CV-6546W, 2017 WL 3017395, at *2 (W.D.N.Y. July 11, 2017) (same); *Ying Li*, 246 F. Supp. 3d at 633 (same); *Newton*, 566 F. Supp. 2d at 278 (same); *Blake v. Race*, 487 F. Supp. 2d 187, 212 n.18 (E.D.N.Y. 2007) (same); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of claim that "officers violated [plaintiff's] fair trial right to have the police conduct an adequate investigation [because plaintiff] cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation"); *Harrington*, 607 F.3d at 35 (holding that there is no constitutional right to a police investigation); *Grega v. Pettengill*, 123 F. Supp. 3d 517, 537 (D. Vt. 2015) ("Because in this circuit failure to investigate is not a recognized basis for relief under the Due Process Clause, [plaintiff's] version of the proposed claim—while forceful—fails."). Accordingly, Buari's due process claim survives only insofar as it is based on the alleged fabrication of evidence.





## IV. Failure to Intercede (Count III)

Buari brings a separate cause of action under Section 1983 against the NYPD Defendants for failure to intercede. Buari alleges that the NYPD Defendants failed to intercede to prevent the alleged malicious prosecution and due process violations. (Am. Compl. ¶¶ 285–86.) Defendants argue that this claim fails because (1) Buari cannot establish an underlying constitutional violation and (2) Buari does not distinguish between NYPD Defendants who participated directly in the alleged constitutional violations and those who failed to intercede. (Mot. 20 & n.17.)[7]

### A. Applicable Law

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). A police officer can be liable for failure to intercede when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); and *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 395 (S.D.N.Y. 2005)). "[A] failure to intervene claim is contingent only on the underlying claim." *Arbuckle v. City of New York*, 14-CV-10248 (ER), 2016 WL 5793741, at *14 (S.D.N.Y. Sept 30, 2016) (citing *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012)). Accordingly, "there can be no failure to intervene claim without a primary constitutional

[7] Defendants' group pleading and failure-to-allege-personal-involvement arguments against Buari's fair trial claim overlap with their arguments against Buari's failure to intercede claim because Defendants attempted to tackle both claims together in their Motion. For clarity and precision, the Court analyzes Buari's failure to intercede claim separately.

violation." *Sanabria v. Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)).

A police officer may be liable for failure to intercede only where he "observes or has reason to know that [other] officers violated someone's constitutional rights." *Fredricks v. City of New York*, No. 12 Civ. 3734(AT), 2014 WL 3875181, at *12 (S.D.N.Y. July 23, 2014) (citing *Anderson*, 17 F.3d at 557)). A police officer cannot be liable on a failure to intercede theory, however, if he participates directly in the alleged constitutional violation. *Ulerio v. City of New York*, No. 18 Civ. 2155 (GBD), 2018 WL 7082155, at *7 (S.D.N.Y. Dec. 20, 2018) (quoting *Sanabria*, 2016 WL 4371750, at *5). Put simply, "defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation." *Marom v. City of New York*, No. 15-cv-2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016).

**B. Application**

Buari has plausibly alleged a Section 1983 claim predicated on a failure to intercede. As a threshold matter, the Court has found that Buari has plausibly alleged constitutional violations. *See supra* Analysis, Sections II.B., III.B. And, Buari has pleaded personal involvement by the NYPD Defendants. Contrary to Defendants' argument, at this stage, Buari need not allege with particularity which NYPD Defendants coerced the identifying witnesses into testifying falsely and which NYPD Defendants failed to intercede. *See, e.g., Paul v. City of New York*, No. 16-CV-1952 (VSB), 2017 WL 4271648, at *4–5 (S.D.N.Y. Sept. 25, 2017) (denying motion to dismiss where the complaint "d[id] not consistently specify exactly which officer did what, and instead, at various points, refers to the Individual Defendants as a group" because the "allegations impl[ied] that all of the Individual Defendants . . . were at least present" and failed to intercede). Where, as here, "a plaintiff has properly alleged a constitutional violation, he is 'entitled to discovery to determine





which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.'" *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)); *see Sullivan v. City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *13 (S.D.N.Y. July 10, 2018) (holding that "Plaintiff is entitled to discovery to determine which officers arrested and conducted the subsequent search, and which officers were present and failed to intervene"); *Matthews v. City of New York*, No. 15-CV-2311 (ALC), 2016 WL 5793414, at *8 (S.D.N.Y. Sept. 30, 2016) (noting that where a plaintiff has pleaded a constitutional violation and the presence of several officers, "courts have denied a motion to dismiss in order to allow greater clarification of the facts after discovery" (citing *Sanabria*, 2016 WL 4371750, at *6; and *Terebesi*, 764 F.3d at 244)); *Weaver v. City of New York*, No. 13–cv–20 (CBA)(SMG), 2014 WL 950041, at *7 (E.D.N.Y. Mar. 11, 2014) ("Although Weaver's complaint does not make clear which officers failed to intervene, she has properly alleged at least one constitutional violation and is entitled to discovery to determine which officers participated directly in the alleged constitutional violation and which officers were present and failed to intervene."). While the NYPD Defendants cannot be liable for both the underlying constitutional violations and failure to intercede, these claims may be pleaded in the alternative. *Amid v. Lamb*, No. 14-CV-3151, 2016 WL 1070814, at *5 (E.D.N.Y. Mar. 15, 2016); *see Lanorith v. Truscelli*, No. 15-CV-617 (NGG) (LB), 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017) ("Plaintiff is entitled to plead a failure to intervene claim as an alternative to direct liability." (citing *Guerrero v. City of New York*, No. 16-CV-516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017); and *Buchy v. City of White Plains*, No. 14 Civ. 1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015))).

At this stage of the litigation, the allegations are sufficient to withstand a motion to dismiss, and Buari is entitled to discovery to determine the precise involvement (if any) of each Defendant, specifically, who committed the violation and who failed to intercede. The Court notes, however, that "at the time of trial, after having had the benefit of discovery, [Buari] will have to specifically identify which, if any, of the [NYPD] Defendants []he seeks to hold liable under a failure to intervene theory." *Amid*, 2016 WL 1070814, at *5; *see also Folk v. City of New York*, 243 F. Supp. 3d 363, 376 (E.D.N.Y. 2017) (permitting failure to intercede claim despite allegations of direct participation by all defendants but noting that plaintiff "will ultimately need to refine her allegations with regard to the roles played by each of the[m]" (citing *Cuellar v. Love*, No. 11–CV–3632, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014))). Accordingly, the Court denies Defendants' Motion to Dismiss on Buari's failure to intercede claim.

## V. Conspiracy (Count IV)

Buari brings a conspiracy claim against the NYPD Defendants under Section 1983. (Am. Compl. ¶¶ 289–95.) Buari alleges that the NYPD Defendants "agreed among themselves and with" ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor to deprive Buari of his constitutional rights by fabricating evidence and committing perjury. (*Id.* ¶¶ 290–91.) Defendants argue that Buari has failed to allege a meeting of the minds, or agreement, to frame Buari. (Mot. 21; Reply 8.)

### A. Applicable Law

To state a claim for conspiracy under Section 1983, a plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (citing *Pangburn v.*





*Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). To survive a motion to dismiss, a plaintiff must allege more than "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights." *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (collecting cases). Specifically, a plaintiff "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end," as well as "some details of time and place and the alleged effects of the conspiracy." *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (quoting *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999); and citing *Hickey–McAllister v. British Airways*, 978 F. Supp. 133 (E.D.N.Y. 1997)). While a plaintiff "need not produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Gordon v. Emmanuel*, No. 15-CV-2439 (CBA) (SJB), 2018 WL 4688935, at *9 (E.D.N.Y. Sept. 28, 2018) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996); and citing *Ricciuti*, 124 F.3d at 131). The allegations must "reasonably lead to the inference that [the defendants] positively or tacitly came to mutual understanding to try to accomplish a common and unlawful plan." *Id.* (quoting *Hinkle*, 81 F.3d at 421).

### B. Application

The allegations in the Amended Complaint do not support one large conspiracy among the NYPD Defendants, ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor, as Buari alleges.[8] Buari does not allege any contact or communication between (1) Dets. Dietz and Tracy and Dets. Price, Gottwin, Neenan, and Fortune, ADA Karen, or the witnesses who testified at trial; (2) Griffiths and Dets. Price, Gottwin, Neenan, and Fortune, ADA Karen, or the

[8] Having concluded that ADA Karen and the Investigator Defendants are entitled to absolute immunity, the Court does not address Buari's other conspiracy theory. (*See* Am. Compl. ¶¶ 292–93.)

witnesses who testified at trial; and (3) Effort and the other testifying witnesses. The Court cannot infer that these individuals, without having spoken to one another, all acted in concert with the goal of depriving Buari of his constitutional rights. To state a claim for conspiracy, "allegation[s] of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. Read most generally, that is what Buari alleges here, and accordingly, Buari's conspiracy theory fails.

To the extent Buari alleges a "wheel," or "hub-and-spoke," conspiracy involving the NYPD Defendants, ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor, that theory also fails. In a wheel conspiracy, "a single person or group (the 'hub') deal[s] individually with two or more other persons or groups (the 'spokes')." *United States v. Evans*, 970 F.2d 663, 668 n.8 (10th Cir. 1992) (alteration in original). But "'without the rim of the wheel to enclose the spokes,' a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants." *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) (quoting *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)); *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002) (describing a rimless wheel conspiracy). In addition, a wheel conspiracy cannot exist if the individual spokes are unaware of the existence of other spokes. *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) (quoting *United States v. Perez*, 489 F.2d 51, 60 n.11 (5th Cir. 1973)).

Here, the Amended Complaint plausibly could be read to suggest that the NYPD Defendants served as the hub and ADA Karen, Griffiths, Robinson, Effort, Johnson, Seabrook, Holder, and Connor each served as spokes. (*See* Am. Compl. ¶ 290.) But it is not clear how the NYPD Defendants can collectively serve as the hub despite no alleged communication between Dets. Dietz and Tracy and Dets. Price, Gottwin, Neenan, and Fortune. The Amended Complaint





also plausibly suggests that ADA Karen may have been part of the hub because Buari alleges that he worked with Dets. Price, Gottwin, Neenan, and Fortune to induce the witnesses to testify falsely. (*Id.* ¶¶ 112–13, 116–17, 120.) Importantly, however, there is no indication that each spoke was aware of the existence of the other spokes. For example, Griffiths' involvement with Buari's prosecution ended after the indictment. (*Id.* ¶ 87.) *See Chandler*, 388 F.3d at 807; *see also United States v. Manarite*, 448 F.2d 583, 589–90 (2d Cir. 1971) (noting that "whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy" (collecting cases)). There is also no indication that each spoke "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy." *Evans*, 970 F.2d at 670. While the Amended Complaint suggests that Robinson and his drug-dealing associates would benefit financially from Robinson controlling the neighborhood drug trade (*see* Am. Compl. ¶ 113), there is no indication that Griffiths and Effort shared in such benefit. Accordingly, Buari's conspiracy theory—however it is construed—fails, and the Court therefore grants Defendants' Motion to Dismiss on Buari's conspiracy claim.

## VI. Qualified Immunity

Defendants argue that the NYPD Defendants are entitled to qualified immunity because there was probable cause to arrest and prosecute Buari, they acted on information from a complaining witness, and the Bronx DA decided to indict and prosecute Buari. (Mot. 26–27.) Buari responds that qualified immunity is not appropriate by reason of his allegations that the NYPD Defendants manufactured probable cause by fabricating evidence. (Opp. 27.)

**A. Applicable Law**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A claim of qualified immunity presents three issues: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, __ U.S. ___, 138 S. Ct. 577, 589 (2018). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (quoting *Reich v. Howards*, 566 U.S. 658, 664 (2012)). Qualified immunity "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

**B. Application**

The NYPD Defendants are not entitled to qualified immunity with respect to Buari's claims at this time. Buari's surviving claims—malicious prosecution, denial of a fair trial based on fabrication of evidence, and failure to intercede—arise from the same factual allegations: the NYPD Defendants coerced witnesses to testify falsely and forwarded that evidence to prosecutors, causing a deprivation of Buari's liberty.





"The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1990). Indeed, it is well-established that "[t]he right to a fair trial free of fabricated evidence is basic to our Constitution." *Jovanovic*, 2006 WL 2411541, at *13. In *Ricciuti*, the Second Circuit held that police officers who, in 1989, fabricated and forwarded to prosecutors a false confession were not entitled to qualified immunity because their "action[s] violate[d] [the] accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise." 124 F.3d at 130 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

*Ricciuti* is dispositive of Defendants' qualified immunity defense. In 1993, when the alleged misconduct began, Buari's right not to be prosecuted based on fabricated evidence was clearly established such that every reasonable officer would understand that any actions to falsify evidence violated that right. *See Ricciuti*, 124 F.3d at 130; *see also Zahrey*, 221 F.3d at 355 ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." (collecting cases)); *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994) ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause." (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993); and *Golino*, 950 F.2d at 870)). Indeed, Defendants make no attempt to argue that their alleged conduct was objectively reasonable despite Buari's clearly established right not to be prosecuted based on evidence fabricated by police officers.

Defendants' arguments in support of their qualified immunity defense are unavailing on a motion to dismiss. First, Buari has pleaded sufficiently a lack of probable case. *Supra* Analysis, Section II.B. Second, the NYPD Defendants did not act on the basis of information from witnesses; rather, it is alleged that they coerced individuals to serve as witnesses and testify falsely

against Buari. Finally, while the NYPD Defendants had no authority over the prosecution, their misconduct initiated and caused a continuation of Buari's prosecution. *Id.*; *see Shabazz*, 201 F. Supp. 3d at 397 (collecting cases). Accepting these allegations as true, as the Court must on a 12(b)(6) motion, the NYPD Defendants are not entitled to qualified immunity from claim at this time.

**VII. Municipal Liability Under Section 1983 and *Monell* (Counts VI and VII)**

Buari brings two Section 1983 claims against the City under *Monell*, one involving the NYPD and another involving the Bronx DA, and asserts three distinct theories of liability under each: (1) a *de facto* policy or custom through a widespread practice; (2) failure to train; and (3) failure to supervise and discipline.

Count VI of the Amended Complaint alleges, first, that the NYPD maintained an unofficial practice of initiating arrests and prosecutions without probable cause, coercing false testimony and statements for use in criminal proceedings, failing to correct inaccurate or misleading evidence and testimony, and failing to fulfill *Brady* obligations. (Am. Compl. ¶ 305.a.) Second, Count VI alleges that the NYPD demonstrated deliberate indifference in failing to train, supervise, and discipline employees with respect to these matters. (*Id.* ¶¶ 303–19.) To plead these theories, Buari relies on (1) the 1994 Report of the Mollen Commission, which documented corruption in the NYPD, *see* City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, Commission Report (1994) ("Mollen Commission Report"); (2) a 1987 report of the Mayor's Advisory Committee on Police Management and Personnel Policy ("Mayor's Committee Report"); and (3) cases before the NYPD Civil Complaint Review Board ("CCRB"). (*Id.* ¶¶ 307–19.)





Similarly, Count VII alleges, first, that the Bronx DA maintained an unofficial practice of prosecuting cases without probable cause, using false or unreliable testimony in criminal proceedings, failing to correct such testimony, and failing to fulfill *Brady* obligations. (*Id.* ¶ 326.a.) Count VII alleges, second, that the Bronx DA failed to train, supervise, and discipline its employees with respect to these matters. (*Id.* ¶ 326.b.) For these theories, Buari relies on, *inter alia*, (1) a list of twenty-three judicial decisions finding prosecutorial misconduct in the Bronx DA's Office and (2) a law review article that summarizes discovery in three lawsuits concerning prosecutorial misconduct by the Bronx DA. (*Id.* ¶¶ 328–45; *id.* Ex. A [ECF No. 58-1]; *id.* Ex. B [ECF No. 58-2].)

Defendants argue that Buari has failed to allege municipal policies or customs. (Mot. 22–26.) Specifically, Defendants argue that the Mollen Commission Report cannot support Buari's claims with respect to the NYPD and that the alleged number of similar incidents of misconduct by the Bronx DA is too statistically insignificant to demonstrate a pattern of misconduct. (Mot. 24–25.) Finally, Defendants argue that Buari has failed to allege a specific defect in the training programs of the NYPD and Bronx DA. (Mot. 26.)

**A. Applicable Law**

Municipalities cannot be held vicariously liable for the acts of their employees under Section 1983. *Monell*, 436 U.S. at 694; *see Reynolds v. Giuliani*, 506 F.3d 183, 190–91 (2d Cir. 2007) (noting that "*Monell* reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees" (collecting cases)). Rather, municipalities may be liable only where "execution of a government's policy or custom" causes constitutional violations. *Monell*, 436 U.S. at 694; *see Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002)

(noting that to determine municipal liability, courts must "conduct a separate inquiry into whether there exists a 'policy' or 'custom'"), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order).

A plaintiff can plead a "policy" or "custom" by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon*, 705 F. Supp. 2d at 276–77); *see Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order); *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012). In addition, to prevail on a *Monell* claim, a plaintiff must also show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

A "policy" or "custom" can be demonstrated in a variety of ways. One of the ways courts have found allegations sufficient to establish a policy or custom is when "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker . . . [but] is so widespread as to have the force of law." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (citing *Monell*, 436 U.S. at 690–91); *see Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that "persistent and widespread" practices of city officials may constitute a municipal custom (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d





864, 870–71 (2d Cir. 1992))). A practice is "widespread" when it is "common or prevalent throughout the [entity]." *Gleeson v. County of Nassau*, No. 15-CV-6487 (AMD) (RL), 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019) (alteration in original) (quoting *Fowler v. City of New York*, No. 13-CV-2372, 2019 WL 1368994, at *14 (E.D.N.Y. Mar. 26, 2019)). Under this category, "a policy maker indirectly cause[s] the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. County of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006) (citing *Monell*, 436 U.S. at 694; and *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000)).

To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citing *Sorlucco*, 971 F.2d at 870–71). A plaintiff "may adequately plead the existence of *de facto* customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (collecting cases), if such reports are "sufficiently connected to the specific facts of the case," *Gomez v. City of New York*, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017). A plaintiff may also plead the existence of *de facto* customs or policies "by citing to complaints in other cases that contain similar allegations." *Gaston v. Ruiz*, No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018) (citing *Osterhoudt v. City of New York*, No. 10 CV 3173(RJD)(RML), 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012)). Such complaints must involve factually similar misconduct, be contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability. *See, e.g.*, *Isaac*, 2018 WL 5020173, at *17 (finding that other court cases could not establish a *de facto*

policy or custom because they involved dissimilar misconduct, were resolved by settlement, or the city prevailed); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("None of the [16] lawsuits cited resulted in an adjudication or admission of liability and the number of suits does not suggest a pervasive illegal practice.").

Municipal liability can also be based on a showing of "deliberate indifference" to a recurring situation likely to result in a constitutional violation. In such circumstances, the policy or custom requirement is satisfied "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds*, 506 F.3d at 192 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); and *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)). Such a pattern may constitute a policy or custom "if sufficiently persistent or widespread as to acquire the force of law." *Id.* (collecting cases). The need to act must be "so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Id.* (citing *Canton*, 489 U.S. at 390). Three requirements must be met before a municipality's failure to act amounts to deliberate indifference: "defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights." *Id.* (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

Liability for deliberate indifference can be based upon a failure to train or a failure to supervise or discipline. *Amnesty America*, 361 F.3d at 127. Courts must analyze these theories





separately because they emphasize different facts and require different showings to establish deliberate indifference. *Id.*

Under the failure to train theory, a municipality may be liable "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . [but] the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Brown*, 520 U.S. at 407). Recurring civil rights complaints can put a municipality on notice of deficiencies in its training program. *Breton*, 404 F. Supp. 3d at 818 (citing *Felix*, 344 F. Supp. 3d at 661–62)). There is no bright-line rule for how many civil rights complaints there must be, or how recent the complaints must be, to put a municipality on notice. *Tieman v. City of Newburgh*, No. 13 Civ. 4178(KMK), 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 26, 2015).

Furthermore, the plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 579 (E.D.N.Y. 2018) (quoting *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007)). The Second Circuit has suggested that a plaintiff "need only plead that the city's failure to train caused the constitutional violation" because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty America*, 361 F.3d at 130 n.10. But after *Twombly* and *Iqbal*, courts generally require that a plaintiff "provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train.'" *Tieman*, 2015 WL 1379652, at *22 (collecting cases); *see Collins*, 923 F. Supp. 2d at 478 (noting that under *Iqbal*, a plaintiff "must allege, not only a viable [failure to train] theory, but facts that render the theory plausible"). Accordingly, a plaintiff must "allege

facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman*, 2015 WL 1379652, at *22 (collecting cases).

Under the failure to supervise or discipline theory, a plaintiff must show that "the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) . . . [and] that such a failure of supervision or discipline was tantamount to deliberate indifference." *Alwan*, 311 F. Supp. 3d at 578 (collecting cases). Deliberate indifference is shown when "the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Canton*, 489 U.S. at 390). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (citing *Ricciuti*, 941 F.2d at 123; and *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986)). "[T]here is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise." *Felix*, 344 F. Supp. 3d at 662 (citing *Manigault v. City of New York*, No. 11-CV-4307 (AJN), 2012 WL 13049173, at *8–9 (S.D.N.Y. Apr. 19, 2012)); *see Fiacco*, 783 F.2d at 328 ("The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.").





**B. Application**

**1. NYPD**

With respect to the NYPD, the allegations in the Amended Complaint, accepted as true, plausibly suggest a *de facto* policy based on a widespread practice of unconstitutional investigative techniques and a causal link between that practice and Buari's alleged constitutional injuries. Quoting findings in the Mollen Commission Report, Buari alleges that at the time of his 1993 arrest and 1995 prosecution "there [wa]s a strong institutional incentive to allow corruption efforts to fray and lose priority"; "police perjury and falsification of official records [wa]s probably the most common form of police corruption"; the practice of police falsifications "[wa]s widely tolerated by corrupt and honest officers alike, as well as their supervisors"; and officers reported that "supervisors knew or should have known about falsified versions of searches and arrests and never questioned them." (Am. Compl. ¶ 308.) These allegations, which the Court is required to accept as true for purposes of Defendants' Motion to Dismiss, and the findings in the Mollen Commission Report, plausibly allege a practice so widespread that it may be inferred at this stage of the litigation that when the NYPD allegedly violated Buari's rights, policymakers were aware of "subordinate[s'] unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America*, 361 F.3d at 126 (citing *Sorlucco*, 971 F.2d at 870–71).[9]

Defendants' objection to Buari's reliance on the Mollen Commission Report is misplaced. (Mot. 24; *see* Reply 9–10.) Courts that have rejected reliance on government reports like the Mollen Commission Report have done so because such reports bore no connection to the specific

[9] Buari does not attach the Mollen Commission Report to the Amended Complaint as an exhibit or expressly incorporate it by reference, but it is readily apparent that Buari relied on it in alleging the NYPD *Monell* claim. Therefore, the Court may consider its contents. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (citing *Cortec Indus.*, 949 F.2d at 47–48); *see also, e.g.*, *Harrison v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 424, 431 (S.D.N.Y. 2006) (considering document outside the complaint to which plaintiff cited and from which plaintiff quoted).

factual allegations of the plaintiff's case. *See, e.g.*, *Gleeson*, 2019 WL 4754326, at *16 ("The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed from the plaintiffs' case to be probative of a then-existing policy or practice." (collecting cases)); *Breton*, 404 F. Supp. 3d at 817 (recognizing that the Mollen Commission Report can support *Monell* claims, but rejecting plaintiff's reliance on it because "the plaintiff was arrested twenty-two years after the issuance of [the report]"); *Isaac v. City of New York*, No. 16-CV-4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (rejecting reliance on Mollen Commission Report because the "pleading in this case fails to make [a] connection"); *Yanez v. City of New York*, 29 F. Supp. 2d 100, 112 (E.D.N.Y. 1998) (finding that "the connection between the Mollen Commission's findings, and the events in the instant case are too remote for me to allow these *Monell* claims to proceed"). But where a report evidences a policy or custom directly related to the constitutional deprivation alleged by the plaintiff, reliance on the report is proper. *See, e.g.*, *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (affirming district court's reliance on investigative report as evidence of municipal policy); *Flores v. Nieva*, No. 14-cv-7960 (KPF), 2017 WL 899942, at *6 (S.D.N.Y. Mar. 6, 2017) (finding that report by United States Attorney's Office detailing pervasive use of excessive force at Riker's Island was sufficient to demonstrate a policy or custom); *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) (denying motion to dismiss where Justice Department report demonstrated a widespread practice at county jail).

Here, accepting his allegations as true, as the Court must, Buari has plausibly alleged a connection between the alleged misconduct by the NYPD Defendants in his case and the findings in the Mollen Commission Report. Buari's allegations of misconduct by the NYPD—*inter alia*, testifying falsely, coercing witnesses to do the same, and permitting Robinson to sell narcotics





without "heat" from the police if he and his associates provided evidence implicating Buari (Am. Compl. ¶¶ 6–7, 10–11, 13, 76–80, 84–85, 107–110)—are factually similar to findings in the relatively contemporaneous Mollen Commission Report. The Mollen Commission Report describes perjury and falsification of evidence, as well as police officers protecting and assisting narcotics traffickers. *See generally* Mollen Commission Report 31–34, 36–43. In addition, Buari alleges misconduct by the NYPD during the precise time of the Mollen Commission's investigation (1992–1994). Therefore, considering Buari's allegations together with the findings in the Mollen Commission Report, the allegations are sufficient at the pleading stage to support a reasonable inference of the existence of a *de facto* policy or custom and a link between the policy or custom and Buari's alleged constitutional deprivation.

Buari has also plausibly alleged a failure by the NYPD to train, supervise, and discipline. As a threshold matter, Buari plausibly has alleged deliberate indifference. (*See* Am. Compl. ¶¶ 306–07.) First, NYPD officials clearly knew that police officers would initiate arrests and prosecutions, speak with witnesses, and possess *Brady* material because these are basic aspects of a police officer's job. *See Bertuglia*, 839 F. Supp. 2d at 738 (citing *Walker*, 974 F.2d at 300). Second, Buari alleges that there is a history of NYPD officers mishandling arrests, witness interviews, and production of *Brady* materials (Am. Compl. ¶¶ 306–12), and similar misconduct is documented in the Mollen Commission Report. *See, e.g.*, Mollen Commission Report 36–43; *see also Walker*, 974 F.2d at 300 (allowing plaintiff to pursue discovery "to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth"). Third, it is reasonable to infer that the alleged failure to train, supervise, and discipline subordinate officers with respect to these matters could cause

frequent constitutional deprivations. *See White-Ruiz v. City of New York*, No. 93CIV.7233(DLC)(MHD), 1996 WL 603983, at *10–11 (S.D.N.Y. Oct. 22, 1996) (finding deliberate indifference based on Mollen Commission Report).

With respect to his failure to train theory, Buari, relying on the Mollen Commission Report and the Mayor's Committee Report, alleges that "police perjury and falsification of official records [wa]s probably the most common form of police corruption" and that "the NYPD ha[d] been on notice [of] inadequate . . . police officers joining the force." (Am. Compl. ¶¶ 308.b–309.) These allegations, together with the findings in the Mollen Commission Report, accepted as true, plausibly allege a "pattern of similar constitutional violations" and that training was "deficient in a similar respect." *Connick*, 563 U.S. at 62; *see, e.g., Colon v. City of Rochester*, 419 F. Supp. 3d 586, 606 (W.D.N.Y. 2019) (collecting cases); *White v. City of New York*, No. 13 Civ. 7421(KPF), 2015 WL 4601121, at *8 (S.D.N.Y. July 31, 2015).

*Collins*, a strikingly similar case, is instructive. 923 F. Supp. 2d 462. There, the plaintiff was released after sixteen years in prison when it was discovered that, in 1994, police officers coerced a witness to falsely implicate him and later threatened the witness not to recant the false statement. *Id.* at 466–67. The court held that the plaintiff, relying on the Mollen Commission Report, plausibly stated a claim for failure to train officers on *Brady* obligations and the impropriety of coercing witnesses to testify falsely. *Id.* at 477–79. The court noted that "[a]n entire section of the [Mollen Commission] Report is devoted to 'Perjury and Falsifying Documents,' which is described as 'a serious problem facing the Department,'" and that the Mollen Commission Report describes testimonial and documentary perjury as "probably the most common form of police corruption facing the criminal justice system today." *Id.* at 479.





Here, like in *Collins*, the findings in the Mollen Commission Report "make it plausible that the type of misconduct that led to [Buari's] arrest and prosecution was endemic within the NYPD" during the relevant time period. *Id.* Therefore, Buari has plausibly alleged that NYPD officials "were aware of a serious risk of constitutional violations, and that the failure to take any action in response to the problem—whether through training or otherwise—was the result of deliberate indifference." *Id.*

Moreover, Buari has alleged specific deficiencies in the NYPD's training program: the failure to train officers not to initiate arrests and prosecutions without probable cause, not to coerce witnesses to testify falsely, to correct false testimony, and to disclose *Brady* material. (Am. Compl. ¶ 305.) When accepted as true, these alleged deficiencies, albeit general, plausibly state a claim. *See Felix*, 344 F. Supp. 3d at 661 (denying motion to dismiss and where plaintiff alleged that NYPD failed to incorporate crisis intervention in its training). As the Second Circuit has emphasized, at the pleading stage, Buari "cannot be expected to know the details of [the NYPD's] training programs prior to discovery." *Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order) (quoting *Amnesty America*, 361 F.3d at 130 n.10). By alleging facts that could support an inference of a pattern of similar constitutional violations, Buari has satisfied *Iqbal*'s plausibility requirement. *Id.*; *Collins*, 923 F. Supp. 2d at 478. The Court notes, however, that after discovery, Buari "is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation." *Amnesty America*, 361 F.3d at 130 n.10.

With respect to Buari's failure to supervise and discipline theory, the alleged deficiencies in the NYPD's misconduct review procedures reasonably support an inference that the alleged failure to investigate complaints and discipline misconduct rise to the level of deliberate

indifference. Buari alleges, *inter alia*, that between 1990 and 1992, the CCRB completely investigated 36 percent of complaints received, closed 40 percent of cases without completing full investigations, substantiated 3.3 percent of complaints received, and recommended disciplinary action in 7.5 percent of disposed cases. (Am. Compl. ¶ 309.d.) He also alleges that since 1988, victims of police misconduct were awarded damages in 300 to 400 cases annually despite the CCRB substantiating only approximately 100 complaints annually between 1988 and 1992. (*Id.* ¶ 309.h.) These allegations, among others, taken as true at this stage, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, plausibly suggest a consistent failure to investigate complaints of unconstitutional activity and discipline those involved. *See Tieman*, 2015 WL 1379652, at *21; *see also Marlin v. City of New York*, No. 15 Civ. 2235 (CM), 2016 WL 4939371 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"); *cf. Alwan*, 311 F. Supp. 3d at 584 (dismissing failure to supervise or discipline claim where plaintiff "ha[d] not identified any complaints to which the City simply failed to respond"); *Aguirre v. City of New York*, 15-CV-6043 (PKC), 2017 WL 4236552, at *7 (E.D.N.Y. Sept. 22, 2017) (dismissing failure to supervise or discipline claim where, *inter alia*, the complaint "d[id] not allege any [specific] facts regarding the number of filed complaints that the CCRB or NYPC [sic] Commissioner ignored"); *Walker v. City of New York*, No. 14-CV-808(ER), 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (finding that CCRB complaints did not demonstrate failure to supervise or discipline because "Plaintiff d[id] not allege any specific facts as to the contents of the complaints, how many were filed, and when they were filed").

While the misconduct underlying the uninvestigated complaints and undisciplined cases is unknown, it is at least plausible that it is similar to Buari's allegations and that the alleged failure





to supervise and discipline is causally related to Buari's alleged injuries. This inference is not unreasonable in light of the factual similarity and temporal proximity between Buari's alleged injuries and the alleged inadequate misconduct control measures of the NYPD outlined in the Mollen Commission Report's thirty-nine-page chapter titled "The Collapse of the Department's Corruption Controls." Mollen Commission Report 70–109. *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.' The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito matter was reflective of that policy." (collecting cases)); *Gentile v. County of Suffolk*, 129 F.R.D.435, 446 (E.D.N.Y. 1990) (finding that investigative report "supports plaintiffs' allegation that the police . . . were likely . . . to consistently ignore evidence of misconduct on the part of the defendant officers and to sanction and cover up any wrongdoing"), *aff'd*, 926 F.2d 142 (2d Cir. 1991); *see also Felix*, 344 F. Supp. 3d at 662 ("Even if the precise factual circumstances of these cases vary . . . Plaintiffs' allegation that the cases illustrate NYPD officers' repeated failures to respond to emotionally disturbed persons is at least a plausible one."). Accordingly, the Court denies Defendants' Motion with respect to Buari's NYPD-related *Monell* claim.

**2. Bronx DA**

With respect to the Bronx DA, Buari has not plausibly alleged a policy or custom based on a widespread practice of similar prosecutorial misconduct. Buari alleges that the Bronx DA unofficially permitted prosecutors to initiate prosecutions without probable cause, use false or

unreliable testimony in court, fail to correct misconduct, and fail to fulfill *Brady* obligations. (Am. Compl. ¶ 326.a.) In his effort to plead a *de facto* policy or custom, Buari cites twenty-three cases where convictions were vacated due to misconduct by Bronx DA prosecutors. (*Id.* Ex. A.)

Having carefully reviewed each case cited by Buari (*id.*),[10] the Court finds that Buari has not adequately pleaded a *de facto* policy or custom. Buari correctly notes that the cases involve

[10] *See Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) (granting writ of habeas corpus in connection with 1992 convictions where prosecution failed to disclose that a third party had confessed to hiring a hit man to kill the victim); *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2002) (granting writ of habeas corpus in connection with 1990 conviction where prosecution failed to turn over statements in police officer's memobook); *Morales v. Portuondo*, 165 F. Supp. 2d 601 (S.D.N.Y. 2001) (granting writ of habeas corpus in connection with 1988 convictions where prosecution failed to investigate exculpatory evidence and the record reflected that prosecution was more intent on protecting a conviction than in seeing that justice was done); *People v. Garcia*, 46 A.D.3d 461, 848 N.Y.S.2d 137 (1st Dep't 2007) (vacating 2002 convictions where prosecution failed to disclose evidence that contradicted complainant's claim); *People v. Olivero*, 272 A.D.2d 174, 710 N.Y.S.2d 29 (1st Dep't 2000) (vacating 1997 conviction where prosecution misrepresented import of evidence); *People v. Mikel*, 274 A.D.2d 325, 710 N.Y.S.2d 70 (1st Dep't 2000) (vacating 1998 conviction where prosecution failed to disclose lead witness's criminal history, cooperation agreement with prosecution, and witness's failure to abide by prosecution agreement, which resulted in a new cooperation agreement); *People v. King*, 241 A.D.2d 329, 659 N.Y.S.2d 469 (1st Dep't 1997) (vacating 1994 conviction where prosecution failed to turn over affidavit of victim before victim testified); *People v. Ortega*, 241 A.D.2d 369, 659 N.Y.S.2d 883 (1st Dep't 1997) (vacating 1994 conviction where prosecution failed to turn over victim's grand jury testimony at independent source hearing); *People v. Lantigua*, 228 A.D.2d 213, 643 N.Y.S.2d 963 (1st Dep't 1996) (vacating 1992 conviction where prosecution failed to disclose evidence that impeached the credibility of the prosecution's witness); *People v. Ramos*, 201 A.D.2d 78, 614 N.Y.S.2d 977 (1st Dep't 1994) (vacating 1985 conviction where prosecution failed to turn over documents related to credibility of complaining witness); *People v. Rutter*, 202 A.D.2d 123, 616 N.Y.S.2d 598 (1st Dep't 1994) (vacating 1982 conviction where prosecution delayed in turning over polygraph transcript containing prior inconsistent statements of prosecution's principal witness); *People v. White*, 200 A.D.2d 351, 606 N.Y.S.2d 172 (1st Dep't 1994) (vacating 1986 conviction where prosecution failed to disclose police report that summarized interview with prosecution's principal witness); *People v. Banfield*, 194 A.D.2d 330, 599 N.Y.S.2d 227 (1st Dep't 1993) (vacating 1990 conviction where prosecution failed to disclose promises made to witness in exchange for witness's testimony); *People v. Byfield*, 194 A.D.2d 331, 599 N.Y.S.2d 227 (1st Dep't 1993) (vacating 1990 conviction where prosecution failed to disclose promises made to witness in exchange for witness's testimony); *People v. Lewis*, 174 A.D.2d 294, 580 N.Y.S.2d 6 (1st Dep't 1992) (vacating 1991 conviction where prosecution failed to correct witness's misstatement and to disclose promises made to witness in exchange for witness's testimony); *People v. Negron*, 161 A.D.2d 537, 556 N.Y.S.2d 41 (1st Dep't 1990) (vacating 1988 conviction where prosecution accused defendant of fabricating his defense during summation); *People v. Olmo*, 153 A.D.2d 544, 545 N.Y.S.2d 285 (1st Dep't 1989) (vacating 1985 conviction where prosecution failed to correct false testimony at 1985 suppression hearing); *People v. Velez*, 118 A.D.2d 116, 504 N.Y.S.2d 404 (1st Dep't 1986) (vacating 1984 conviction where prosecution failed to disclose evidence that may have impeached the complaining witness); *People v. Gonzalez*, 120 A.D.2d 464, 502 N.Y.S.2d 468 (1st Dep't 1986) (vacating 1983 conviction where prosecution failed to disclose exculpatory grand jury testimony); *People v. Johnson*, No. 8428/98, 2001 WL 1263380 (N.Y. Sup. Ct., Bronx Cnty. 2001) (vacating 2000 conviction where prosecution failed to turn over recordings of statements of eyewitnesses); *People v. Collins*, 228 A.D.2d 213, 643 N.Y.S.2d 963 (N.Y. Sup. Ct., Bronx Cnty. 1996) (vacating 1995 conviction where prosecution failed to disclose the existence of a witness to the crime and correct false testimony); *People v. Nikollaj*, 155 Misc.2d 642, 589 N.Y.S.2d 1013 (N.Y. Sup. Ct., Bronx Cnty. 1992) (vacating 1991 conviction where prosecution failed to turn over pretrial statements of prosecution's witnesses); *People v. Bruno*, Ind. No. 0027/97, N.Y. L.J., Apr. 23, 2003, at 19 (vacating conviction where prosecutor withheld information casting doubt on voluntariness of confession). (*See* Am. Compl. Ex. A ¶ 22.)





findings of similar prosecutorial misconduct, but the convictions—and therefore the prosecutorial misconduct—in these cases span from 1982 to 2002, a twenty-year period. Citing twenty-three cases, Buari alleges only slightly more than one case of similar prosecutorial misconduct each year. Even drawing reasonable inferences in Buari's favor, such a relatively small number of cases over the course of two decades in such a large municipality does not plausibly suggest that the alleged practice is "so widespread as to have the force of law," *Brown*, 520 U.S. at 404 (citing *Monell*, 436 U.S. at 690–91), or "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco*, 971 F.2d at 871 (citing *Praprotnik*, 485 U.S. at 130; and *Krulik v. Bd. of Educ.*, 781 F.2d 15, 23 (2d Cir. 1986)); *see Jones*, 691 F.3d at 85 (finding that evidence of "two instances, or at most three instances, over a period of several years . . . fell far short of showing a policy, custom, or usage"); *Felix*, 344 F. Supp. 3d at 659 (finding that ten civil rights complaints over the course of thirty years was insufficient to plead a widespread practice); *Calderon*, 138 F. Supp. 3d at 613 (finding that sixteen lawsuits over twelve years in such a large municipality (New York) were inadequate to plead a municipal custom); *Tieman*, 2015 WL 1379652, at *17 (finding that "allegations of thirteen instances of excessive force during arrests over four years . . . during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate" a widespread practice); *Walker v. City of New York*, No. 12 Civ. 5902(PAC), 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014) (finding that ten complaints of similar conduct, "spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim"). *But see Osterhoudt*, 2012 WL 4481927, at *1. The decisions on which Buari relies (Opp. 25) are not relevant to this inquiry because they involved *Monell* claims pleaded under deliberate indifference

theories. *See Walker*, 2014 WL 1259618, at *3 (noting that failure to train cases are inapposite to claims alleging a widespread practice).

Buari, however, has sufficiently pleaded a failure by the Bronx DA to train, discipline, and supervise, relying on a plausibly alleged deliberate indifference theory. First, Bronx DA officials plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire *Brady* material "because these are basic facets of an ADA's job." *Bertuglia*, 839 F. Supp. 2d at 738 (citing *Walker*, 974 F.2d at 300). Second, as discussed below, Buari plausibly alleges a history of ADAs mishandling these matters. Third, it is reasonable to infer that the failure to train, supervise, and discipline prosecutors in connection with these matters likely would cause recurrent constitutional violations. *See Walker*, 974 F.2d at 300 ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights."); *Bertuglia*, 839 F. Supp. 2d at 739 ("[W]here an assistant district attorney commits misconduct before a grand jury that results in an indictment based on insufficient evidence, or violates their obligations under *Brady*, those actions will frequently result in the violation of citizens' constitutional rights.").

With respect to his failure to train theory, drawing reasonable inferences in Buari's favor, as the Court must, *Iqbal*, 556 U.S. at 678; *Oakley*, 980 F.3d at 283, Buari's list of judicial decisions finding similar prosecutorial misconduct plausibly permits a reasonable inference that Bronx DA policymakers should have been aware or were on notice of training deficiencies with respect evidence presentation and *Brady* obligations. (Am. Compl. Ex. A.) The list of decisions Buari cites include five vacated convictions in 1993 and 1994, the two years before Buari's prosecution, and several others before then. *Supra* note 10; *see Fiacco*, 783 F.2d at 329–32 ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice . . . .");





*Vasconcellos v. City of New York*, No. 12 Civ. 8445(CM), 2014 WL 4961441, at *13 (S.D.N.Y. Oct. 2, 2014); *see also Felix*, 344 F. Supp. 3d at 662 (denying motion to dismiss where plaintiff pointed to "lawsuits *and* corroborating reports"); *Tieman*, 2015 WL 1379652, at *22 (finding that thirteen claims alleged in nine lawsuits in five years plausibly suggested City was on notice); *Edwards v. City of New York*, 14-CV-10058, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (denying motion to dismiss deliberate indifference claim where complaint cited eighteen lawsuits over twelve-year period); *McCants v. City of Newburgh*, No. 14–CV–556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (finding that "seventeen excessive force claims made against the City in the seven-year time period prior to" the challenged misconduct "evidence[d] the City was on notice to the possible use of excessive force by its police" (citing *Fiacco*, 783 F.2d at 328)), *clarified on denial of reconsideration*, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014); *Farrow v. City of Syracuse*, No. 12–CV–1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (noting that fifteen cases in five years would survive motion to dismiss).

In addition, Buari identifies specific areas where training in the Bronx DA's Office allegedly was deficient: initiating prosecutions without probable cause, using false or unreliable testimony or statements in criminal proceedings, failing to correct such testimony or statements, and failing to fulfill *Brady* obligations. (*Id.* ¶ 326.a.) Buari further alleges that the Bronx DA "trained prosecutors in blatantly unlawful practices to prevent disclosure of evidence favorable to criminal defendants under *Brady*." (Am. Compl. ¶ 334.) Since Buari cannot be expected to know particulars of Bronx DA training policies prior to discovery, *see Amnesty America*, 361 F.3d at 130 n.10, the Court finds that these allegations, accepted as true at the 12(b)(6) stage, plausibly state a claim, *see supra* Analysis, Section VII.B.1. Finally, it is plausible that the alleged training deficiencies led to Buari's injury given the factual similarities in the judicial decisions Buari cites

and the temporal proximity of Buari's prosecution to the alleged training deficiencies. Accordingly, the Court denies Defendants' Motion with respect to Buari's Bronx DA *Monell* claim based on a failure to train theory.

Buari has also sufficiently pleaded a *Monell* claim based on a failure to supervise and discipline theory. As discussed above, Buari has plausibly alleged that the Bronx DA was on notice of prosecutorial misconduct similar to what Buari has alleged. He has also alleged a failure to investigate and discipline the misconduct. Specifically, Buari alleges that the Bronx DA's Office failed to "conduct internal disciplinary investigations; discipline the prosecutors who were known to engage in such misconduct . . . ; or refer such individuals for possible discipline." (Am. Compl. ¶ 329.) More specifically, he alleges that "in approximately 72 cases where courts had found prosecutorial misconduct occurred (including the use of and failure to correct false or misleading testimony and *Brady* violations), officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect." (*Id.* ¶ 334.) Furthermore, Buari alleges that "personnel files for [Bronx DA] cases where prosecutor misconduct had been found from between 1989 through 2006 . . . [revealed no] documentary evidence of disciplinary action ever being taken against the prosecutors." (*Id.* ¶ 335.) In short, Buari plausibly alleges a conscious disregard for prosecutorial misconduct and an absence of disciplinary action. Accepting these allegations as true, Buari has plausibly stated a claim for failure to supervise and discipline "tantamount to deliberate indifference." *Alwan*, 311 F. Supp. 3d at 578 (collecting cases); *see Bertuglia*, 839 F. Supp. 2d at 738 (finding deliberate indifference where plaintiff "pleaded that the City has a longstanding, *de facto* policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct"); *cf. Walker*, 974 F.2d at 298 (noting that the absence of a policy can





provide a basis for deliberate indifference).[11] The Court does not consider or rely on the law review article cited by Buari because his allegations plausibly plead a *Monell* claim based on failure to supervise and discipline without the aid of the article. (*See* Mot. 25.) Finally, the Court may reasonably infer that the constitutional deprivations of which Buari complains were directly linked to the alleged failure by the Bronx DA to supervise and disciple prosecutors committing violations.

In sum, Buari's *Monell* claim relating to the Bronx DA fails under a widespread practice theory but survives under a theory of failure to train, supervise, and discipline.

### VIII. Remaining State Law Claims (Counts X and XI)

Buari brings a due process claim under the New York State Constitution against the NYPD Defendants (Count XI). (Am. Compl. ¶¶ 359–63). Separately, he seeks to hold the City liable for his state law malicious prosecution and state constitutional due process claims under a theory of *respondeat superior* (Count X). (*Id.* ¶¶ 357, 363.) Buari alleges that the NYPD Defendants acted as agents of the City, within the scope of their employment, and in furtherance of the City's law enforcement functions. (*Id.* ¶ 356.) Defendants argue that Buari's state claims are duplicative of his federal claims and should therefore be dismissed. (Mot. 28 & n.20.) Buari responds that these claims should proceed because Section 1983 does not provide an adequate alternative remedy. (Opp. 27–28.)

[11] Although Buari does not allege a failure to *investigate* complaints—indeed, he only alleges substantiated instances of misconduct and the failure to discipline that misconduct—his failure to supervise theory is plausible. The Second Circuit has explained that while the failure to respond to repeated civil rights complaints would constitute deliberate indifference claim for a failure to supervise, that showing is not required. *Amnesty America*, 361 F.3d at 128 (citing *Vann*, 72 F.3d at 1049). At the motion to dismiss stage, Buari need only plausibly allege that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct . . . and the policymaker's failure to investigate *or rectify* the situation evidences deliberate indifference." *Id.* (emphasis added) (noting that the "means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing"). Buari has plausibly alleged a failure to rectify prosecutorial misconduct.

**A. Applicable Law**

Courts in this Circuit have "uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Alwan*, 311 F. Supp. 3d at 586 (collecting cases); *see also Gounden v. City of New York*, No. 14 Civ. 7411(BMC), 2015 WL 5793625, at *5 n.3 (E.D.N.Y. Oct. 2, 2015) (noting the "common view" in this Circuit "that there is no right of action under the New York State Constitution for claims that can be brought under § 1983" (citing *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439 (S.D.N.Y. 1999))). These courts "rely on the premise that § 1983 provides an 'adequate' alternative remedy for violations of the New York State Constitution." *Alwan*, 311 F. Supp. 3d at 586. Thus, "where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 171–72 (S.D.N.Y. 2019) (collecting cases).

"[U]nlike cases brought under § 1983, municipalities may be liable for the common law torts, like . . . malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." *Mesa v. City of New York*, No. 09 Civ. 10464(JPO), 2013 WL 31002, at *34 (S.D.N.Y. Jan. 3, 2013) (quoting *L.B. v. Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002)). In addition, courts in this Circuit have concluded that "§ 1983 is not an adequate alternative remedy for state-constitutional claims that rely on a theory of *respondeat superior*." *Alwan*, 311 F. Supp. 3d at 587 (emphasis added) (collecting cases). Indeed, the New York Court of Appeals has recognized that "[a] plaintiff seeking to recover on the basis of *respondeat superior* simply does not come within the terms of section 1983." *Brown v. State*, 89 N.Y.2d 172, 194, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996) (emphasis added); *accord Alwan*, 311 F. Supp. 3d at 587.





**B. Application**

Buari cannot maintain his state constitutional due process claim (Count XI) against the NYPD Defendants because Section 1983 provides an adequate remedy. *See Talarico*, 367 F. Supp. 3d at 172; *see also Lee v. Cornell*, No. 1:13-cv-8359, 2016 WL 1322444, at *5 (S.D.N.Y. Apr. 1, 2016) (finding no private right of action for due process claim under New York State Constitution because Section 1983 provides adequate remedy); *Krug v. County of Rensselaer*, 559 F. Supp. 2d 223, 248 (N.D.N.Y. 2008) (dismissing state constitutional law claims that mirrored Section 1983 claims).

Buari's state constitutional due process claim survives, however, insofar as he seeks to hold the City liable under the doctrine of *respondeat superior*. *See Logan v. City of Schenectady*, 1:18-cv-01179 (BKS/CFH), 2019 WL 3803631, at *9 (N.D.N.Y. Aug. 13, 2019) (dismissing state constitutional claims against individual defendants because Section 1983 provided remedy but declining to dismiss those claims against the municipality); *Brown v. City of New York*, No. 13-CV-6912, 2017 WL 1390678, at *15 (S.D.N.Y. Apr. 17, 2017) (dismissing state constitutional claims against individual defendants but not municipality because claims were asserted under *respondeat superior*); *Espinoza v. City of New York*, 194 F. Supp. 3d 203, 208 (E.D.N.Y. 2016) (same). Moreover, Buari's state-law malicious prosecution claim asserted against the City under the doctrine of *respondeat superior* also survives. *See Mesa*, 2013 WL 31002, at *34 (holding that "where Plaintiffs' state law claims survive, so too do their *respondeat superior* claims against the City"); *Reyes v. City of New York*, 992 F. Supp. 2d 290, 299 (S.D.N.Y. 2014) (allowing state law claims to proceed against municipality due to potential for vicarious liability for actions of police officers (citing *L.B.*, 232 F. Supp. 2d at 239)). Accordingly, Buari's state constitutional due process claim against the NYPD Defendants is dismissed and his state law malicious prosecution and state

constitutional due process claims against the City survive to the extent they are based on a *respondeat superior* theory.

## IX. Leave to Amend

In his opposition to the Motion to Dismiss, Buari requests leave to amend further to correct any deficiencies identified by the Court in ruling on the Motion. (Opp. 28.)

### A. Applicable Law

The Second Circuit has stated, "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). Nevertheless, "a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint that a valid claim might be stated." *Perri v. Bloomberg*, No. 11–CV–2646, 2012 WL 3307013, at *4 (E.D.N.Y. Aug. 13, 2012) (citing *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). In other words, leave to amend may be denied if an amendment would be futile—that is, "a proposed claim could not withstand a motion to dismiss pursuant to 12(b)(6)." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti*, 941 F.2d at 123); *see also Hayden*, 180 F.3d at 53 ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." (citing *Pani*, 152 F.3d at 76)). A plaintiff's "failure to cure deficiencies by amendments previously allowed" weighs against granting leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### B. Application

As a preliminary matter, Buari asserts claims, many against similar groupings of Defendants, on alternate theories. In addition, the Court has given the Amended Complaint a





liberal reading and where clams are dissimilar, it has confirmed that leave to replead particular claims would be futile. For example, the Court considered Buari's supervisory liability claim against DA Clark despite Buari's failure to name DA Clark as a party to the action. *See supra* notes 1, 5. The Court also presumed ADA Karen's involvement in Buari's indictment despite Buari's failure to specify which ADA was involved. *See supra* note 4.

Buari's claims, in significant measure, survive the Motion to Dismiss. However, certain claims, assuming all factual allegations to be true, nonetheless fail as a matter of law. Further amendment therefore would be largely futile. First, further amendment will not result in liability of the ADA Defendants, the Investigator Defendants, or DA Clark in light of the fact that, as a matter of law, they have absolute immunity with respect to Buari's claims. *See Johnson v. N.Y.C. Police Dep't*, 651 F. App'x 58, 61 (2d Cir. 2016) (summary order); *Contreras v. Perimenis*, 562 F. App'x 50 (2d Cir. 2014) (summary order); *Ying Li*, 246 F. Supp. 3d at 646; *Levesque v. Does*, No. 2:15–cv–17, 2015 WL 1412204, at *1 (D. Vt. Mar. 26, 2015). Second, further amendment likely would not enable Buari to plead a *Monell* claim against the City with respect to the Bronx DA's Office under a widespread practice theory because he clearly has already attempted to amass and marshal what information he had, and his allegations, even when taken as true, do not plausibly suggest liability. *See Molina v. County of Westchester*, No. 16 CV 3421 (VB), 2017 WL 1609021, at *6 (S.D.N.Y. Apr. 28, 2017); *Pluma v. City of New York*, No. 13 Civ.2017(LAP), 2015 WL 1623828, at *13 (Mar. 31, 2015); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 258 (2d Cir. 2018) (noting that "a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim" (quoting *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990))). Third, the problem with Buari's

state constitutional claim against the NYPD Defendants "is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

It bears noting, moreover, that Buari has already amended his claims. His first amendment followed Defendants' pre-motion letter, which noted specific deficiencies in the Complaint; and the pre-motion conference. (*See* Letter Mot. Conference [ECF No. 55].) Having failed to remedy pertinent pleading deficiencies of which he received notice, Buari should not be given "yet another bite at the proverbial apple." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *see Nat'l Credit Union Admin. Bd.*, 898 F.3d at 257–58 (alteration in original) ("When a plaintiff was aware 'of the deficiencies in his complaint when he first amended,' he 'clearly has no right to a second amendment [even if] the proposed second amended complaint in fact cures the defects of the first.'" (quoting *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978); and citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890–91 (9th Cir. 2014))).

Buari's conspiracy claim, however, could benefit from further amendment. The factual allegations may suggest a conspiracy, but not one all-encompassing conspiracy, as Buari pleads. Furthermore, Defendants' pre-motion letter did not address the conspiracy claim, so Buari was not on notice of pleading deficiencies when he filed the Amended Complaint. Accordingly, the Court grants Buari leave to amend only for the purpose of repleading and clarifying his conspiracy claim. *See Rivera v. City of New York*, No. 1:16-cv-9709-GHW, 2019 WL 252019, at *9 (S.D.N.Y. Jan. 17, 2019) (granting "leave to amend only with respect to [specific] claims and only to cure the deficiencies identified"); *Gonzalez v. City of New York*, No. 1:18-cv-02197-GHW, 2018 WL 10323053, at *9 (S.D.N.Y. Dec. 18, 2018) (same); *Davis v. United States*, 430 F. Supp. 2d 67, 81 (D. Conn. Apr. 28, 2006) (granting leave to amend only for purpose of setting forth specific claim against particular defendant).





**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss. To summarize:

- Defendants' Motion is GRANTED insofar as it seeks dismissal of all claims against Defendants Karen, Lung, Coddington, Mignola, Wall, Schiffmann, and Viggiano on absolute immunity grounds;
- DENIED with respect to Count I;
- GRANTED IN PART (failure to investigate) and DENIED IN PART (fabrication of evidence) with respect to Count II;
- DENIED with respect to Count III;
- GRANTED with respect to Count IV;
- GRANTED with respect to Count V;
- DENIED with respect to Count VI;
- GRANTED IN PART (widespread practice theory) and DENIED IN PART (failure to train, supervise, and discipline theory) with respect to Count VII;
- DENIED with respect to Count VIII;
- GRANTED with respect to Count IX (claim withdrawn (Opp. 27 n.4.));
- DENIED with respect to Count X as it relates to Counts VIII and XI;
- GRANTED with respect to Count XI as against Defendants Dietz, Tracy, Price, Gottwin, Neenan, Fortune, Does #1–10, and Roes #1–10; and
- GRANTED IN PART (NYPD Defendants) and DENIED IN PART (Defendant City of New York) with respect to Count XI.

IT IS HEREBY ORDERED that Buari shall file a Second Amended Complaint and a redline version showing differences between that document and the Amended Complaint on or before April 7, 2021. The remaining Defendants shall answer or otherwise respond to the Second Amended Complaint within 14 days after service of the Second Amended Complaint.

The Clerk of Court is respectfully requested to terminate the case as against Defendants Karen, Lung, Coddington, Mignola, Wall, Schiffmann, and Viggiano and close docket entry 61.

**SO ORDERED.**

**Date: March 30, 2021**
**New York, NY**

Mary Kay Vyskocil
**MARY KAY VYSKOCIL**
**United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

CALVIN BUARI,

Plaintiff,

- against -

CITY OF NEW YORK, et al.,

Defendant.

Docket #1:18-cv-12299-MKV

New York, New York
August 31, 2021

SETTLEMENT CONFERENCE

PROCEEDINGS BEFORE
THE HONORABLE JUDGE BARBARA C. MOSES,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: CUOMO LLC
BY: OSCAR MICHELEN, ESQ.
200 Old Country Road, Suite 2
South Mineola, New York 11501

BELDOCK LEVINE & HOFFMAN LLP
BY: MARC AUGUSTINE CANNAN, ESQ.
99 Park Avenue
New York, New York 10016

For Defendants: NYC LAW DEPARTMENT
BY: ALAN HOWARD SCHEINER, ESQ.
100 Church Street
New York, New York 10007

Also Present: NYC COMPTROLLER OFFICE
BY: CHARLES GRAVES

Transcription Service: Carole Ludwig, *Transcription Services*
155 East Fourth Street #3C
New York, New York 10009
Phone: (212) 420-0771
Email: Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

# INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

THE CLERK: Calvin Buari versus City of New York et al, Docket Number 18-cv-12299.

Counsel for the parties, please state your appearance for the record.

MR. OSCAR MICHELEN: For the plaintiff, Oscar Michelen, as well as Marc Cannan.

HONORABLE BARBARA C. MOSES (THE COURT): I remember how to spell it --

MR. MICHELEN: Thank you, Judge.

THE COURT: -- but you still have to spell it.

MR. MICHELEN: M-i-c-h-e-l-e-n.

THE COURT: Thank you.

MR. MICHELEN: And C-a-n-n-a-n for Mr. Cannan. And my client, Mr. Buari.

THE COURT: Thank you very much.

MR. ALAN SCHEINER: And Alan Scheiner from the Corporation Counsel's Office for the defendants.

THE COURT: You have to spell, too.

MR. SCHEINER: Sorry, your Honor. A-l-a-n S-c-h-e-i-n-e-r.

THE COURT: And with you is --?

MR. CHARLES GRAVES: Charlie Graves from the Office of the Corporation Counsel. G-r-a-v, as in victor - e-s.

THE COURT: Thank you very much. I understand it's late in the afternoon, gentlemen, and I apologize for nagging you about spelling your names.

MR. SCHEINER: -- no, you said the Corporation Counsel.

MR. GRAVES: Sorry. I'm giving my position --

THE COURT: Where are you from, Mr. Graves?

MR. GRAVES: From the Comptroller's Office.

THE COURT: The New York City Comptroller's Office, right? Let's just be clear here.

MR. GRAVES: Yes, your Honor.

THE COURT: All right. It is --

MR. GRAVES: Twenty-five years ago, I had the other position.

THE COURT: It is late in the evening, and I want to thank parties and counsel for their patience. I think it was well worth it. The reason it is late in the evening is that we spent most of the afternoon and the early part of the evening in a settlement conference, and we are now on the record for the best possible reason, which is to memorialize the terms of the settlement that the parties have reached.

And, Mr. Michelen, are you prepared to state those terms for the record?

MR. MICHELEN: I am, your Honor.

THE COURT: Go ahead.

MR. MICHELEN: After all of the conferencing and the discussions back and forth, the parties have agreed to settle the case of Calvin Buari versus the City of New York et al, 18-cv-12299 for the total amount of $4 million. And that's inclusive of all legal fees, costs, etc. And the amount will come from the City of New York; however, all the defendants, of course, including the individual defendants, will be released as part of the paperwork.

The City will forward to the plaintiff their usual settlement papers, which includes waiver of liens, notice of liens, Medicaid forms, etc., and Stipulation of Discontinuance, as well as a general release of all parties. Upon full execution of those documents and return to Mr. Scheiner on behalf of the City, then the City will pay the terms of the settlement agreement, the $4 million, in accordance with the time set by the CPLR of the State of New York.

And we thank your Honor for your efforts in this matter. It was not easy. It took a lot of going back and forth. And I can speak that the parties would not have reached a settlement without the Court's efforts. So thank you.

THE COURT: Thank you very much.

And, Mr. Scheiner, anything to add or clarify with respect to the terms?

MR. SCHEINER: Yes, your Honor, just a couple of minor things. Mr. Michelen said something about the CPLR in the State of New York. That is not a part of the settlement because this is in federal court. So, you know, we're not including the CPLR in any part of the terms of this settlement, so I'm not sure --

THE COURT: But you are going to forward all those lien papers and --

MR. SCHEINER: Oh, yes, I will -- yes. With respect to the rest of it, yes, I agree. Mr. Michelen's familiar with the standard paperwork, including from another case, McKee, 18-cv-11230, recently executed. So that includes the things that he mentioned, as well as also W-9 forms for counsel as well as the plaintiff. So we're in agreement with respect to all of that. It was just the CPLR I wanted to clarify because we're in federal court --

MR. MICHELEN: I'll withdraw that. That was my effort.

THE COURT: I understand. And I appreciate that. And at the end of the day, this was implicit. But let's make it explicit. That Stipulation of Discontinuance,

that's going to get filed, right?

MR. MICHELEN: Yes, your Honor, yes. We will sign it and file that once all the paperwork is complete.

THE COURT: All right. Thank you very much.

Mr. Buari, you are the plaintiff, correct?

MR. CALVIN BUARI (THE PLAINTIFF): Yes.

THE COURT: Did you hear and understand the terms of the settlement that your counsel put on the record and that the City's counsel just clarified?

THE PLAINTIFF: Yes.

THE COURT: Do you agree to settle this case on those terms?

THE PLAINTIFF: Yes.

THE COURT: Do you understand that, although the paperwork is not yet completed and lots of documents still need to get reviewed and signed, you are entering into a binding agreement of settlement right now?

THE PLAINTIFF: Yes.

THE COURT: And, Mr. Graves, you are here representing the City of New York, correct?

MR. GRAVES: Yes, your Honor.

THE COURT: Did you hear and understand the terms of the settlement placed on the record by counsel?

MR. GRAVES: Yes, your Honor, I did.

THE COURT: Are you authorized to settle this case on behalf of the City?

MR. GRAVES: Yes, your Honor.

THE COURT: Are you also authorized to settle the case on behalf of the remaining individual defendants?

MR. GRAVES: Yes, your Honor.

THE COURT: And on behalf of all defendants, do you agree to settle this case on the terms we just discussed?

MR. GRAVES: Yes, your Honor.

THE COURT: And do you understand, also, that although the settlement paperwork is not yet complete, you are entering into a binding agreement of settlement on behalf of all of the defendants this evening?

MR. GRAVES: I do, your Honor.

THE COURT: Thank you very much. Is there anything further from either side?

MR. MICHELEN: No. Thank you. I want to thank you, Mr. Snell.

MR. SCHEINER: Your Honor, if I may -- this my have already been covered, and I just want it to be, though, 100% clear, that with respect to the individual defendants, they're not participating in any payment of the settlement. The settlement will provide that all claims

against them as well as against the City will be dismissed with prejudice, and they along with the City will be provided with a general release of all claims.

THE COURT: I think that was incorporated in what Mr. Michelen said, but certainly, Mr. Michelen, you can say yes again.

MR. MICHELEN: Yes again.

THE COURT: Okay.

MR. SCHEINER: Thank you.

THE COURT: Anything further, gentlemen?

MR. MICHELEN: No, thank you, your Honor.

THE COURT: Thank you very much. We'll be adjourned.

(Whereupon, the matter is adjourned.)

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Buari v. City of New York et al, Docket #18-cv-12299-MKV, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature Carole Ludwig

Carole Ludwig

Date: September 2, 2021

VIRGIN ISLANDS OF THE UNITED STATES
DEPARTMENT OF HEALTH

# CERTIFICATE OF DEATH

TYPE, OR PRINT IN PERMANENT INK
SEE HANDBOOK FOR INSTRUCTIONS

LOCAL FILE NUMBER: 013
STATE FILE NUMBER:

**DECEASED**

| Field | Entry |
|---|---|
| 1. DECEASED—NAME (FIRST, MIDDLE, LAST) | HELEN DUREN HARRIS |
| 2. SEX | Female |
| 3. DATE OF DEATH (MONTH, DAY, YEAR) | January 22, 1995 |
| 4. RACE (WHITE, NEGRO, AMERICAN INDIAN, ETC.) (SPECIFY) | Caucasian |
| 5a. AGE—LAST BIRTHDAY (YEARS) | 57 |
| 5b. UNDER 1 YEAR (MOS. / DAYS) | |
| 5c. UNDER 1 DAY (HOURS / MIN.) | |
| 6. DATE OF BIRTH (MONTH, DAY, YEAR) | May 11, 1937 |
| 7a. COUNTY OF DEATH | St. Croix, V.I. |
| 7b. CITY, TOWN, OR LOCATION OF DEATH | Christiansted |
| 7c. INSIDE CITY LIMITS (SPECIFY YES OR NO) | No |
| 7d. HOSPITAL OR OTHER INSTITUTION—NAME (IF NOT IN EITHER, GIVE STREET AND NUMBER) | (D.O.A.) Est. Work & Rest |
| 8. STATE OF BIRTH (IF NOT IN U.S.A., NAME COUNTRY) | South Carolina |
| 9. CITIZEN OF WHAT COUNTRY | U.S. |
| 10. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (SPECIFY) | Divorced |
| 11. SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) | ———— |
| 12. SOCIAL SECURITY NUMBER | 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 |
| 13a. USUAL OCCUPATION (GIVE KIND OF WORK DONE DURING MOST OF WORKING LIFE, EVEN IF RETIRED) | House Keeper |
| 13b. KIND OF BUSINESS OR INDUSTRY | Carambola Beach Resort |

USUAL RESIDENCE WHERE DECEASED LIVED. IF DEATH OCCURRED IN INSTITUTION, GIVE RESIDENCE BEFORE ADMISSION.

| Field | Entry |
|---|---|
| 14a. RESIDENCE—STATE | St. Croix |
| 14b. COUNTY | |
| 14c. CITY, TOWN, OR LOCATION | Christiansted |
| 14d. INSIDE CITY LIMITS (SPECIFY YES OR NO) | No |
| 14e. STREET AND NUMBER | Est. Work & Rest |

**PARENTS**

| Field | Entry |
|---|---|
| 15. FATHER—NAME (FIRST, MIDDLE, LAST) | James Sinclair |
| 16. MOTHER—MAIDEN NAME (FIRST, MIDDLE, LAST) | Muhsinah Shabazz |
| 17a. INFORMANT—NAME | Muhsinah Shabazz |
| 17b. MAILING ADDRESS (STREET OR R.F.D. NO., CITY OR TOWN, STATE, ZIP) | 22 Emhaden Ave. Otisuille, New York 10963 |

**CAUSE**

PART I. 18. DEATH WAS CAUSED BY: [ENTER ONLY ONE CAUSE PER LINE FOR (a), (b), AND (c)] — APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

IMMEDIATE CAUSE

(a) Cause of death undetermined, pending investigation

DUE TO, OR AS A CONSEQUENCE OF:

(b) [redacted]

DUE TO, OR AS A CONSEQUENCE OF:

(c) Decomposure of body, advanced 4-5 days

CONDITIONS, IF ANY, WHICH GAVE RISE TO IMMEDIATE CAUSE (a), STATING THE UNDERLYING CAUSE LAST

PART II. OTHER SIGNIFICANT CONDITIONS: CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (a)

Sciatica, clinical

| Field | Entry |
|---|---|
| 19a. AUTOPSY (YES OR NO) | Yes |
| 19b. IF YES WERE FINDINGS CONSIDERED IN DETERMINING CAUSE OF DEATH | Yes |
| 20a. ACCIDENT, SUICIDE, HOMICIDE, OR UNDETERMINED (SPECIFY) | Pending Investigation |
| 20b. DATE OF INJURY (MONTH, DAY, YEAR) | |
| 20c. HOUR | M. |
| 20d. HOW INJURY OCCURRED (ENTER NATURE OF INJURY IN PART I OR PART II, ITEM 18) | |
| 20e. INJURY AT WORK (SPECIFY YES OR NO) | |
| 20f. PLACE OF INJURY AT HOME, FARM, STREET, FACTORY, OFFICE BLDG., ETC. (SPECIFY) | |
| 20g. LOCATION (STREET OR R.F.D. NO., CITY OR TOWN, STATE) | |

**CERTIFIER**

| Field | Entry |
|---|---|
| 21a. CERTIFICATION—PHYSICIAN: I ATTENDED THE DECEASED FROM (MONTH, DAY, YEAR) | |
| 21b. TO (MONTH, DAY, YEAR) | |
| 21c. AND LAST SAW HIM/HER ALIVE ON (MONTH, DAY, YEAR) | |
| 21d. I DID/DID NOT VIEW THE BODY AFTER DEATH | |
| 21e. DEATH OCCURRED (HOUR) AT THE PLACE, ON THE DATE, AND, TO THE BEST OF MY KNOWLEDGE, DUE TO THE CAUSE(S) STATED. | M. |
| 22a. CERTIFICATION—MEDICAL EXAMINER OR CORONER: ON THE BASIS OF THE EXAMINATION OF THE BODY AND/OR THE INVESTIGATION, IN MY OPINION, DEATH OCCURRED ON THE DATE AND DUE TO THE CAUSE(S) STATED. HOUR OF DEATH | M. |
| 22b. THE DECEDENT WAS PRONOUNCED DEAD (MONTH, DAY, YEAR) | January 22, 1995 |
| HOUR | 1800 M. |
| 23a. CERTIFIER—NAME (TYPE OR PRINT) | James S. Glenn, M.D. |
| 23b. SIGNATURE / DEGREE OR TITLE | /s/ James S. Glenn, M.D. |
| 23c. DATE SIGNED (MONTH, DAY, YEAR) | January 26, 1995 |
| 23d. MAILING ADDRESS—CERTIFIER (STREET OR R.F.D. NO., CITY OR TOWN, STATE, ZIP) | Juan F. Luis Hospital, C'sted. St. Croix, V.I. 00820 |

**BURIAL**

| Field | Entry |
|---|---|
| 24a. BURIAL, CREMATION, REMOVAL (SPECIFY) | Burial |
| 24b. CEMETERY OR CREMATORY—NAME | Public Cemetery |
| 24c. LOCATION (CITY OR TOWN, STATE) | Kingshill St. Croix, V.I. |
| 24d. DATE (MONTH, DAY, YEAR) | January 28, 1995 |
| 25a. FUNERAL HOME—NAME AND ADDRESS (STREET OR R.F.D. NO., CITY OR TOWN, STATE, ZIP) | Thomas-Hyll Memorial Funeral Chapel, Est. Peter's Rest, C'sted. STX |
| 25b. FUNERAL DIRECTOR—SIGNATURE | William T. Griffin |
| 26a. REGISTRAR—SIGNATURE | Rita M. Gordon |
| 26b. DATE RECEIVED BY LOCAL REGISTRAR | January 26, 1995 |

CERTIFIED COPY

I HEREBY CERTIFY that the attached is a true and correct copy of the Certificate of Death of HELEN DUREN HARRIS as made from the certificate of such death filed in this office in accordance with law.

SIGNED Rita M. Gordon OFFICIAL TITLE Registrar

DATE September 1, 19 98 ADDRESS C'sted, St. Croix, V.I. 00820

HD-hp